**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY HILL, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 897 |
| | ) | |
| vs. | ) | Honorable Judge |
| | ) | Suzanne B. Conlon |
| THOMAS DART, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS' EXHIBIT F

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COPY

| | |
|---|---|
| ANTHONY HILL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )No. 1:10-cv-00897 |
| | )The Honorable |
| COOK COUNTY, THOMAS J. | )Suzanne B. Conlon |
| DART, WILLIE LEWIS, ROBERT | ) |
| BONAKOWSKI, NICHOLAS | )JURY TRIAL DEMANDED |
| BOHLSEN, MICHAEL | ) |
| CONTRERAS, BRIAN TORO, | ) |
| JAMES HOLMES, PETER CHICO, | ) |
| LEON MARMAL, DANIEL | ) |
| MORECI, CRYSTAL SPIVEY, | ) |
| HUGH WALSH, CLARENCE LACY, | ) |
| JOHN DOES 1-20, | ) |
| | ) |
| Defendants. | |

The deposition of MICHAEL CONTRERAS,
called for examination, taken pursuant to the
Federal Rules of Civil Procedure of the United
States District Courts pertaining to the taking
of depositions, taken before ATHENA MIRMINGOS, a
Notary Public within and for the County of
DuPage, State of Illinois, and a Certified
Shorthand Reporter of said state, CSR
No. 84-4272, at Suite 3000, Ten South Wacker
Drive, Chicago, Illinois, on the 30th day of
November, 2011, at 1:13 p.m.

## Page 2

1  PRESENT:
2  BANNER & WITCOFF,
   (Ten South Wacker Drive, Suite 3000,
3  Chicago, Illinois 60606,
   312-463-5000), by:
4  MR. ERIC J. HAMP,
   MR. SEAN JUNGELS and
5  MR. BINAL J. PATEL,
6  appeared on behalf of the Plaintiff;
7
8  OFFICE OF THE STATE'S ATTORNEY,
   COOK COUNTY, ILLINOIS,
9  (Richard J. Daley Center,
   50 West Washington Street, 5th Floor,
10 Chicago, Illinois 60602,
   312-603-5153), by:
11 MR. AARON BOND,
   Assistant State's Attorney,
12
   appeared on behalf of the Defendants.
13
14
15
16
17
18
19
20
21
22
23
24 REPORTED BY: ATHENA MIRMINGOS, CSR

## Page 3

1  (WHEREUPON, the witness was duly
2  sworn.)
3  MICHAEL CONTRERAS,
4  called as a witness herein, having been first
5  duly sworn, was examined and testified as
6  follows:
7  EXAMINATION
8  BY MR. HAMP:
9  Q.  Could you, please, state your name for
10 the record.
11 A.  Michael Contreras.
12 Q.  Have you ever gone by any other names?
13 A.  No.
14 Q.  Have you ever given a deposition
15 before?
16 A.  No, I've not.
17 Q.  Have you ever testified at trial
18 before?
19 A.  Testified, no. I've been involved in
20 a trial. They ended up not needing me.
21 Q.  Okay. We'll come back to that in a
22 minute.
23 Since you never testified or been
24 deposed, the court reporter is writing down

## Page 4

1  everything I say and everything you say. And
2  it's important for us to try to keep the record
3  as clean as possible so if your lawyer wants to
4  use it down the road, if we want to use it, we
5  can. To achieve that aim, I ask that you,
6  please, try to answer audibly to every question.
7  If you nod or shake your shoulders, that doesn't
8  go on the record.
9  It works best if we make an effort
10 not to interrupt each other. So I ask, please,
11 could you wait until I finish asking the
12 question and respond, and I'll make efforts
13 never to interrupt you while you're answering
14 the question.
15 If you ever don't understand a
16 question, just let me know. I can rephrase it.
17 If it wasn't clear or if you just didn't hear
18 me, I'll repeat it. If you do answer, I'll
19 assume you understood; is that fair?
20 A.  That's fair.
21 Q.  And if you ever need to take a break,
22 just say so. We can accommodate you.
23 Okay. So outside of the
24 formalities, is there any reason you can't give

## Page 5

1  truthful testimony today?
2  A.  No, there is not.
3  Q.  So you're not any type of medication
4  or anything?
5  A.  No.
6  Q.  Nothing that would impair your memory
7  of any type?
8  A.  No.
9  Q.  I'd like to start off talking about
10 your background a little bit.
11 Could you, please, generally
12 describe your educational background?
13 A.  I have some college, 60 credit hours.
14 And in our field, that's considered equivalent
15 to an associate's degree. But it's not an
16 associate's degree.
17 Q.  Where did you take those courses?
18 A.  Triton College, Moraine Valley
19 Community College, and that's it.
20 Q.  When did you take the courses?
21 A.  Anywhere from 2000 to -- I've been in
22 school the last year and a half as well.
23 Q.  All right. Could you briefly describe
24 your work experiences before the Cook County

2 (Pages 2 to 5)

## Page 6

1    Jail?
2        A.    I did security for about three years
3    undercover at a Home Depot, and my job was to
4    watch employees.  I worked as a Home Depot
5    employee, at least they thought so, and
6    monitored internal theft.  I did that for about
7    three years.  And two years prior to that, I did
8    mall security.  And that would be the five years
9    before my county --
10       Q.    Do you remember what specific years
11   you were working at Home Depot?
12       A.    Maybe 2004 was the end of it.  Maybe
13   2002 to 2004 possibly.
14       Q.    Okay.
15       A.    Not sure on that, though.
16       Q.    All right.  Thanks.
17             So did you start working for the
18   Cook County Jail in 2004.
19       A.    The end of it.  December of 2004.
20       Q.    And what were your initial
21   responsibilities when you started working there?
22       A.    Watch the inmates, take over the tier,
23   which means make sure your count is correct on
24   your tier.  Feed them when they were due feed.

## Page 7

1    Just -- you want me to get in depth like -- I
2    mean --
3        Q.    That's enough for now.
4              Do you remember what your job title
5    was at that escort?
6        A.    Correctional officer.
7        Q.    And do you have a different position
8    now?
9        A.    Yes.
10       Q.    What positions have you had at the
11   jail after you were initially a correctional
12   officer?
13       A.    Just emergency response team.  That's
14   the only other thing I've done.
15       Q.    Could you describe generally what your
16   duties are as a member of the response team?
17       A.    Yeah.  High-risk movements, which is
18   detainees that are considered, obviously, high
19   risk, whether they're escape or combative.
20   Something about them makes them allegedly worse
21   than the other inmates.  Moving inmates from one
22   county to another, which is considered -- called
23   escorts.  Searching tiers for safety and
24   security or for gang info or contraband.  Any

## Page 8

1    emergency that could pop up.  And that's pretty
2    broad.  But, like, an escape, a riot, anything
3    that can -- it can cause for anything.  A bus
4    breaking down.
5        Q.    How long have you been a member of the
6    ERT?
7        A.    Three years in June in this upcoming
8    June.
9        Q.    Then either as a member of the ERT or
10   before as a correctional officer, have you ever
11   had to use force on an inmate?
12       A.    Yes.
13       Q.    Can you estimate how many times?
14       A.    Approximately maybe between five and
15   eight.
16       Q.    Okay.  What sort of types of force
17   have you had to use these five to eight times?
18       A.    I don't understand that question.
19       Q.    What did you do?
20       A.    It wasn't lethal.
21       Q.    Can you describe what sort of force
22   you used?
23       A.    Maybe put somebody in an escort
24   position.  Hands on.  Maybe taking somebody down

## Page 9

1    if they were fighting, maybe inmates fighting.
2    Something along those lines.  I've never used
3    the OC spray.  That's pretty much it.
4        Q.    So all the times you remember using
5    force, it was either an escort hold or taking
6    someone to the ground?
7        A.    Somewhere in between that, yeah, for
8    the most part.
9        Q.    Have you ever had a grievance or a
10   complaint filed against you by an inmate for use
11   of force?
12       A.    Never.
13       Q.    Have you ever been sued for use of
14   force outside of this case?
15       A.    Never.
16       Q.    Going back to the five to eight times
17   you remember having to use force before, do you
18   remember approximately when you did these
19   things?
20       A.    No, not at all.  It's over a
21   seven-year career.
22       Q.    Would you say they're pretty evenly
23   spread out over your career?
24       A.    Yeah.  I guess you could say that,

Elite Deposition Services
312-445-0005

## Page 10

1 yeah.
2 Q. Have any of them happened lately in
3 the past year, say?
4 A. No.
5 Q. Have there been any incidents since
6 November 5th, 2009, that you can think of?
7 A. With use of force?
8 Q. Uh-huh.
9 A. I have no use of forces on ERT.
10 That's -- so three years in June. Or maybe one.
11 I might have one use of force. I can't
12 remember, but maybe one.
13 Q. Do you remember any details about
14 that?
15 A. That one I'm trying to think. Yeah.
16 Inmate -- we were doing a cell search, had a
17 random door. When the door popped, the inmate
18 charged at me with a weapon. He had a shank,
19 which is a made knife.
20 Q. What did you do in that situation?
21 A. I struck him in his arm with my elbow
22 and forced him to drop it. And then me and my
23 partner took him down and restrained him.
24 Q. Do you remember the date that

## Page 11

1 happened?
2 A. No. Actually, no. I could
3 guesstimate it, but, no, nothing solid.
4 Q. Well, you can say as best you can.
5 A. Maybe September, October of '09 maybe.
6 I got a letter of commendation for it. So it
7 should be traceable.
8 Q. So the incident with Anthony Hill,
9 that's the basis of this lawsuit, you do not
10 consider that a time you had to use force as a
11 member of the ERT?
12 A. No, not at all.
13 Q. We'll talk more about that in a little
14 bit.
15 A. Okay.
16 Q. Actually, I'd like to talk about your
17 training.
18 Have you ever had any training on
19 the use of force?
20 A. Yes.
21 Q. When did you get that training?
22 A. Initially, when we were in the
23 academy, I got it. And you get it once a year
24 minimally thereafter.

## Page 12

1 Q. Did you get any additional special
2 training when you became a member of the ERT?
3 A. Yes.
4 Q. And did that cover use of force as
5 well?
6 A. Yes.
7 Q. So when you get these training
8 sessions, what sort of materials are used, or
9 what sort of guidelines do they give you?
10 A. There's a model, which has been
11 changed recently. But there's a model of -- a
12 guideline, basically, to follow.
13 Q. Is there anything else they give you
14 besides this model?
15 A. As far as?
16 Q. Do they give you presentations or any
17 other documents or --
18 A. Yes. It's a course. They'll show
19 videos, see what people did right or wrong, what
20 they could have did different. They'll show us
21 the model. They'll give us the model. You take
22 a test on it.
23 Q. So when they show videos, do you mean
24 they show videotaped incidents that occur in the

## Page 13

1 jail?
2 A. No. It's outside departments. It's
3 more of an educational thing. They'll show you
4 obvious use of forces that were not proper and
5 use of forces that were proper so you can get a
6 guideline.
7 Q. Are these the same videos every year
8 in your in-service training, or do they update
9 them?
10 A. They change -- they change with the
11 times, but times they're the same.
12 Q. Where do you receive these training
13 sessions?
14 A. Once a year you have to go to
15 in-service, it's a 40-hour course. It's not all
16 use of force, obviously. You get it at your
17 in-service. And that's mandatory once a year.
18 They actually go over use of force, I believe,
19 at the firing range.
20 Q. Do you remember where the in-service
21 training is?
22 A. Yes. It's at Moraine Valley Community
23 College right now.
24 Q. And the sessions at Moraine Valley, is

4 (Pages 10 to 13)

## Page 14

1 that where you see the videos about use of
2 force?
3     A.    Correct.
4     Q.    I'm going to pass you what is marked
5 as Plaintiff's Exhibit 1. It is marked
6 CCSA0337 through 345.
7         MR. HAMP: Do you want it, Aaron?
8         MR. BOND: It's okay.
9 BY MR. HAMP:
10     Q.    Do you recognize this document?
11     A.    Yes, sir.
12     Q.    Could you explain what it is?
13     A.    This is our general order for the use
14 of force. It is no longer effective, but it's
15 the one that was effective at the time.
16     Q.    When exactly was the use of force
17 model updated?
18     A.    September of this year. I don't know
19 the exact date.
20     Q.    Okay. That's good enough.
21         So is this the document that's used
22 in your in-service training?
23     A.    Correct.
24     Q.    About using force?

## Page 15

1     A.    Yes.
2     Q.    I wonder if you could turn to the last
3 page. It's marked CCSA0345.
4         Is this the model that you were
5 describing earlier?
6     A.    This is it.
7     Q.    Okay. And on the left side of this
8 document, it provides a sort of continuum of the
9 possible behaviors that an inmate can have,
10 right?
11     A.    Correct.
12     Q.    Then on the right it gives you the
13 corresponding measures you can take?
14     A.    Correct.
15     Q.    So let's talk about some of the
16 categories on the left side of the document.
17 One of them is an active resister. Do you see
18 that portion?
19     A.    Uh-huh.
20     Q.    And that's defined as movement to
21 avoid physical control, right?
22     A.    Correct.
23     Q.    So whether someone is an active
24 resister is solely based on movement, right?

## Page 16

1     A.    An active, correct.
2     Q.    It doesn't matter if they're saying
3 something. It's just if they're moving, right?
4     A.    If they're saying something like
5 combative? I'm sorry.
6     Q.    No, no, no. That's okay.
7         So you're saying there are times
8 when someone could be an active resister solely
9 through verbal conduct?
10     A.    No, no. I misunderstood what you were
11 asking.
12     Q.    Well, we'll go back to that.
13         Just to clarify, so someone is an
14 active resister solely based off of their
15 physical actions, right?
16     A.    Correct.
17     Q.    So their verbal conduct doesn't make
18 them an active resister, right?
19     A.    It can make them an assailant
20 depending on what they're saying.
21     Q.    What sort of things would an inmate
22 say to become an assailant solely based off of
23 verbal?
24     A.    I'm going to kill you. And if he has

## Page 17

1 the right instrument in his hand, he could
2 actually be -- move from an active resister to
3 an assailant in the same instance.
4     Q.    What if he didn't have any sort of
5 weapon, could you still be an assailant based
6 solely off of verbal conduct?
7     A.    It's debatable. I'd have to say no,
8 though. It would be a special case.
9     Q.    Going back to active resister, the
10 model states movement to avoid physical control.
11         Could you describe what sort of
12 general movements would satisfy that standard?
13     A.    One example could be if I put my hands
14 on you and you tug away. Kicking, obviously,
15 pulling, pushing, running. If we're walking
16 towards you to maybe put handcuffs on you and
17 you're just moving away. Just any movement
18 that's going against whatever lawful order we're
19 giving you.
20     Q.    What if an inmate is being held down
21 by guards already? Can he still -- and he can't
22 actually get away, can he still move to become
23 an active resister?
24     A.    Yes. Definitely.

5 (Pages 14 to 17)

## Page 18

1  Q.  What sort of things would qualify in
2  that situation if they're being held down
3  actively by guards?
4  A.  You could have the guy by his legs, he
5  could be swinging his top.  You could have him
6  by his top, he could be kicking his legs.  You
7  can actually have arms and legs and he could
8  just be rolling and you still can't get
9  handcuffs on.  That's still actively resisting
10 instead of passive.
11 Q.  If he had handcuffs on already, he's
12 been restrained, and he's being held down, is
13 there anything they can do then to qualify as an
14 active resister?
15 A.  Yes.
16 Q.  What sort of things?
17 A.  Depending on what the order is you
18 gave them.  Rolling over, kicking, headbutting,
19 biting, scratching.
20 Q.  All right.  Let's talk about the
21 possible actions you can take for an active
22 resister, just moving to the right side of the
23 continuum.
24      One of the categories states

## Page 19

1  control instruments.  What are control
2  instruments?  It's the third line from the
3  bottom.
4  A.  Third from the bottom, control
5  instruments.  I believe maybe an escort grabbing
6  by the arm (indicating).  Obviously, you
7  can't -- grabbing of the arm.  Just trying to
8  control the body.
9  Q.  So does that just include an officer
10 grabbing them physically, or does it include
11 handcuffs or things like that?
12 A.  There's specific holds.  They call
13 them mock holds.  There's five of them.
14 Q.  And one of those holds is the escort
15 position where you grab their arm?
16 A.  That's not one of the five mock holds,
17 but that's another maneuver.
18 Q.  Are there any mock holds -- strike
19 that.
20      Could you generally describe what
21 the five mock holds are?
22 A.  They're just versions of possible arm
23 locks, arm bars.  Just moves -- moves that are
24 to control a person's body using their own --

## Page 20

1  whatever -- whatever they're doing, use their
2  force against them so that you can take control
3  of their body without actually hurting them.
4  Q.  Are all five of the holds arm locks,
5  or do any involve the legs?
6  A.  None involve the legs.  No mock holds
7  involve legs.
8  Q.  Are you ever taught any possible holds
9  to use on an inmate's legs?
10 A.  You are taught that in emergency
11 response team when you might do a cell
12 extraction or a takedown, but not as a mock
13 hold, no.
14 Q.  So when you're doing a takedown,
15 you'll take some sort of action on an inmate's
16 legs?
17 A.  Yeah.  What you could do is if he's
18 being combative, you try to -- if it's -- it
19 depends on how many guys you have available.
20 But if you have three, you're doing an arm and
21 an arm, and a third guy will try to cross his
22 legs over.  And that will take away his effect
23 to kick.  Actually, it takes pretty much control
24 of his body.  For the most part he can't kick

## Page 21

1  and pretty much can't rollover.  If you have
2  four guys, it's a leg and a leg.  But three
3  guys, one guy will do both legs.  It's just you
4  cross them over -- it looks like an X.
5  Q.  Let's say you're trying to take
6  someone to the ground and they're standing up,
7  do they ever teach you specific techniques to do
8  that?
9  A.  To take him to the ground?
10 Q.  Uh-huh.
11 A.  Some of the mock holds could be
12 transferred to the ground, but -- to take him to
13 the ground, but there's no actual specific
14 technique because you can't really gauge.  Every
15 scenario would be different.  So it just depends
16 on how it happens.
17 Q.  Now, when you're doing these types of
18 holds, are you ever taught to take an inmate's
19 injuries into account?
20 A.  When you're doing the hold -- no.
21 Actually, I never heard of that because there's
22 really no way to know the inmate's injuries
23 physically unless he physically has a cane or
24 something.  Then, yes, definitely you'll try to

## Page 22

1  take that into -- you'll try to take that in if
2  he has a cane or crutches, and we would
3  definitely adjust, but --
4      Q.   So if an inmate had an obvious
5  physical injury, you would --
6      A.   Yeah.  If he had a wooden leg or
7  something, we wouldn't do the acts.  We would
8  adjust.
9      Q.   What if an inmate was complaining
10  about an injury, he didn't have any visual
11  indications, but he was complaining about an
12  injury, would you adjust your conduct then?
13      A.   No.  We would use the force necessary
14  as long -- we'd use the force necessary to get
15  control of him.  Assuming he had an injury, I'd
16  presume he would actually stop the fight and he
17  would actually -- the force would stop at that
18  point.
19      Q.   So coming back to the allowed
20  measures, do handcuffs or the blue box appear
21  anywhere on this model order?
22      A.   As a use of force?
23      Q.   Uh-huh.
24      A.   No.  I do not see handcuffs.

## Page 23

1      Q.   Are you taught what situations you're
2  supposed to use handcuffs or the blue box in?
3      A.   Yeah.  You know, when they use
4  handcuffs, they guide you, yeah.
5      Q.   Are you taught to use either of those
6  measures when an inmate is resisting?
7      A.   Yes.  Handcuffs, yes.
8      Q.   When would it be appropriate to use
9  the blue box?
10      A.   It's always appropriate to use the
11  blue box, to be honest.  If you handcuff him,
12  you can blue box him.  There's no reason you
13  couldn't.  It's just a safety measure.
14      Q.   Okay.  So even if someone was a
15  cooperative subject, you could use handcuffs and
16  the blue box on him?
17      A.   If I'm moving him somewhere,
18  definitely.
19      Q.   Are you ever taught specific
20  techniques of how to apply the blue box?
21      A.   Yeah.  You're shown how to apply the
22  blue box properly because it could be put on
23  wrong.
24      Q.   How are you supposed to put it on?

## Page 24

1      A.   It's probably easier to show than
2  tell.
3      Q.   Yeah.  I'm sorry.  As best you can.
4      A.   Yeah.  His arms are vertical instead
5  of side by side.  You apply the blue box.  You
6  want the chain to be closer to the stomach
7  (indicating).  If you put it on the other way,
8  the chain will be to the outside.  You want the
9  chain as close as possible to the stomach.  It
10  wraps around tightly.  He shouldn't have too
11  much movement when he's secured by the chain.
12  Then you lock it.
13      Q.   So you're describing or showing a
14  position where the arms are in front of the
15  body?
16      A.   Correct.
17      Q.   Parallel to each other?
18      A.   Correct.
19      Q.   So when you apply a blue box, are
20  their arms always supposed to be in front of the
21  body?
22      A.   Supposed to, no.  If it's an emergency
23  situation and you have to get the blue box on,
24  you get it on how you can get it on.  But if

## Page 25

1  it's a compliant subject, you blue box him to
2  the front, as I said before.
3      Q.   What is --
4      A.   Even when handcuffing it's -- there's
5  a compliant way, and then there's an emergency
6  way.  So that goes with any handcuffing.
7  Handcuffing itself is not a use of force.
8      Q.   So when you said an emergency
9  situation you might put the blue box on
10  differently, what types of emergencies would
11  meet that criteria?
12      A.   Inmate fighting with officers, staff,
13  with another inmate, he could have possibly been
14  cuffed to the back.  And then in which case you
15  can actually blue box him with the cuffs in the
16  back.
17      Q.   So if an inmate is fighting, you can
18  blue box him in the front or the back?  Either
19  is okay?
20      A.   Yes.
21      Q.   What if an inmate has been already
22  subdued by the guards, would that still be an
23  emergency situation?
24      A.   Is he compliant, or is he

Elite Deposition Services
312-445-0005

Page 26

1    noncompliant?
2        Q.    Well, let's go through both.  Let's
3    say he's now being compliant?
4        A.    No.  It's not an emergency situation.
5        Q.    If he's not being compliant?
6        A.    It could be, yes.
7        Q.    When you blue box, do you ever do
8    anything with the inmate's legs?
9        A.    Shackle.
10       Q.    Anything else?
11       A.    That's it.  You just put him in
12   shackles.
13       Q.    Do you ever connect the shackles in
14   the blue box chain or anything like that?
15       A.    Not ERTs.  There are such cuffs and
16   shackles.  Ours are not like that.  They're
17   separate.
18       Q.    I'd like to go back to holds for a
19   minute.
20             So when you're taught these
21   different types of holds you can do, do any of
22   them include twisting of the joints in any way?
23       A.    No.
24       Q.    Are you ever taught specific ways to

Page 27

1    hold an inmate -- strike that.
2             You described a hold before where
3    an inmate is on the ground, two officers are
4    holding arms, and one is holding legs.  Are you
5    ever taught to put pressure on other areas of
6    the upper body or --
7        A.    Possibly.  If it's a struggle to get
8    control, yes, it's possible.
9        Q.    What other areas of the upper body can
10   you deal with in that situation?
11       A.    You go for a major muscle because
12   you're not trying to hurt him.  Maybe a shoulder
13   blade.  Shoulder blade would be ideal.
14       Q.    What about the neck?
15       A.    The neck is not ideal, no.  It would
16   be.  No, that's not --
17       Q.    So you're taught to put pressure on
18   shoulder blades rather than the neck?
19       A.    Major muscle groups.
20       Q.    So you're taught to put pressure on
21   shoulder blades rather than the neck?
22       A.    Major muscle groups.  I don't know if
23   the neck is considered a major muscle group or
24   not.

Page 28

1        Q.    So you're taught to put pressure on
2    major muscle groups rather than the neck,
3    correct?
4        A.    Major muscle groups, yeah.
5        Q.    Have you ever had any training about
6    videotaping procedures?
7        A.    No.
8        Q.    Have you ever had to videotape an
9    incident at the jail?
10       A.    Yes.
11       Q.    How often have you done that?
12       A.    Not common.
13       Q.    So you've done it once?  Less than
14   five times?
15       A.    Career?  In the past year?  You want,
16   like, a career guesstimation or just maybe the
17   past year?
18       Q.    Yeah.  Well, let's start with career.
19       A.    I've probably used it maybe 15, 20
20   times maybe.
21       Q.    And how about the past year, how many
22   times?
23       A.    Maybe about ten maybe.
24       Q.    What sort of situations have you

Page 29

1    videotaped?  Let's just focus on the past year
2    since you --
3        A.    Cell searches.  They run it from the
4    start of the search until the end.
5        Q.    Has that been every time you've used
6    the videotape in the past year is cell searches?
7        A.    I believe I've done an escort.  Some
8    detainees require the camera for the whole
9    escort.  And I've done that.  I can remember
10   doing that once.  And that's all I can remember.
11   It's possible I might have done it some other
12   times.
13       Q.    Would officers using force on an
14   inmate be something that should be taped?
15       A.    Yes.
16       Q.    Have you ever videotaped officers
17   using force?
18       A.    I can't say for sure, to be honest.
19   It's definitely possible.
20       Q.    So when you are videotaping events,
21   what determines how long you're keeping the
22   video camera on?  Is it orders by your sergeant?
23       A.    For the most part, yeah.  He'll tell
24   you when to start it.  So, normally, when you're

8 (Pages 26 to 29)

## Page 30

1  going onto the tier, he'll tell you when to cut
2  it. Normally, it's when the search is over.
3      Q.   Are there ever any reasons you can
4  think of that you would turn off the video
5  outside of that?
6      A.   If the battery is dying, you might
7  have to turn it off to transition to the second
8  camera. That's the only thing I can think of
9  where you would turn off the video that's in
10  use.
11      Q.   So if the battery is not dying and
12  you've been ordered to videotape something --
13      A.   Yeah, we keep going.
14      Q.   -- you keep the camera on?
15          So if the battery is not dying and
16  you've been ordered to tape the event, you would
17  keep the camera on the entire time?
18      A.   Yes.
19      Q.   And then when you're taping these
20  situations, what are you supposed to focus the
21  camera on?
22      A.   The detainee is being taken out of the
23  cell. You try to get as much as you can at
24  once. From there once the situation is secure,

## Page 31

1  you pretty much keep the camera on the
2  detainees.
3      Q.   So if there's an incident with use of
4  force, would the camera be on the detainee the
5  entire time?
6      A.   Yeah. That becomes the priority.
7      Q.   So you wouldn't pan away for any other
8  reason in that situation?
9      A.   If another priority happened, you can
10  possibly start panning, yeah.
11      Q.   So if there's one incident with force,
12  but no other incidents going on, the camera
13  should be focused on that one incident the
14  entire time, right?
15      A.   Correct.
16      Q.   Just to clarify, you've never had
17  formal training for videotaping procedures at
18  the jail or any other related entities?
19      A.   Formal training, correct.
20      Q.   Have you ever had any informal
21  training?
22      A.   Actually, I mean, yeah. I've just
23  been told the idea of how they want it.
24      Q.   Who would tell you that?

## Page 32

1      A.   The supervisors through the years.
2      Q.   All right. Well, let's shift focus to
3  November 5th, 2009, just when the incident
4  occurred. That's the basis of this lawsuit.
5          Is that day the first time you
6  became familiar with Anthony Hill?
7      A.   Yep.
8      Q.   So you had never had any previous
9  encounters with Mr. Hill?
10      A.   No.
11      Q.   Have you ever heard of him before this
12  date?
13      A.   No.
14      Q.   Did you ever have any incidents with
15  him after November 5th?
16      A.   No.
17      Q.   At this time, you were working the
18  2:00 to 10:00 shift, right?
19      A.   Yeah.
20      Q.   So when you started working that day,
21  what was your assignment?
22      A.   Initially, I believe I had to do
23  perimeter patrols.
24      Q.   So you weren't told to go to Cermak?

## Page 33

1      A.   No. I was in Cermak later in the day.
2  There was a group before me that might have
3  gotten that assignment.
4      Q.   But you do recall going to Cermak that
5  day?
6      A.   Yeah. I did at some point get
7  assigned to Cermak.
8      Q.   Do you remember how long you were
9  doing your initial duties before you were told
10  to go to Cermak?
11      A.   I do not.
12      Q.   Do you remember who gave you the order
13  to go to Cermak?
14      A.   I do not.
15      Q.   Do you remember why you were told to
16  go to Cermak?
17      A.   Because an inmate had became
18  combative.
19      Q.   Were you told to bring anything?
20      A.   Handcuffs, shackles, and a blue box,
21  which we call a setup, and the camera. Or -- I
22  believe we did bring another camera, yeah.
23      Q.   And where were you when you got those
24  orders to go to Cermak?

9 (Pages 30 to 33)

## Page 34

1    A.   In our command post.

2    Q.   Is that where you got the various

3 items like the shackles?

4    A.   Correct.

5    Q.   Do you remember when you got to

6 Cermak?

7    A.   No, I don't.

8    Q.   Do you remember what was going on when

9 you arrived at Cermak?

10    A.   Actually, I don't.

11    Q.   Do you remember seeing Anthony Hill

12 when you got there?

13    A.   I did see him, yeah. But this was a

14 while ago.

15    Q.   Do you remember seeing him at all, or

16 has it just been too long?

17    A.   No. I saw him. I just don't

18 physically remember the event. I'm sure -- I

19 know it's videotaped.

20    Q.   Do you remember anything that you did

21 once you got there?

22    A.   I handed the blue box maybe to Officer

23 Bohlsen.

24    Q.   So as best you can remember, when you

## Page 35

1 first arrived, the first thing you did was give

2 the blue box to Officer Bohlsen?

3    A.   Yeah, I believe so.

4    Q.   Did the officers there begin to blue

5 box Mr. Hill at that time?

6    A.   I don't remember.

7    Q.   Do you remember if he was blue boxed

8 at all?

9    A.   I don't remember. I know there's a

10 video, though.

11    Q.   Yeah. We'll play that.

12    A.   Okay.

13    Q.   But we only have parts.

14    Do you remember anything else you

15 did besides hand the blue box to Officer

16 Bohlsen?

17    A.   That's all I did. I just monitored

18 the situation, actually.

19    Q.   Do you remember anything you saw when

20 you were monitoring the situation?

21    A.   No.

22    Q.   Do you remember anything anyone said?

23    A.   No. I just remember the inmate was

24 combative a little bit and then --

## Page 36

1    Q.   Do you remember specific things he was

2 doing?

3    A.   I do not, no.

4    Q.   Do you remember if he got any medical

5 treatment while you were there?

6    A.   I don't remember that.

7    Q.   Do you remember leaving Cermak?

8    A.   Honestly, no.

9    Q.   Were you ever told why Mr. Hill was

10 there initially?

11    A.   I believe I was --

12    Q.   Do you remember what --

13    A.   -- informed.

14    Q.   Do you remember what you were told?

15    A.   Combative with officers on a prior

16 shift.

17    Q.   But you don't know why he was getting

18 medical attention?

19    A.   No, I do not. It's mandatory if you

20 have use of force that they get medical

21 attention.

22    Q.   So the only interaction you had with

23 Mr. Hill this day was at Cermak, right?

24    A.   I'm not sure.

## Page 37

1    Q.   As best you remember is the only

2 interaction you had?

3    A.   Yeah. That's correct.

4    Q.   And as best you remember, the only

5 thing you did there was hand the blue box to

6 Officer Bohlsen?

7    A.   That's correct.

8    Q.   Did you ever touch Mr. Hill in any

9 way?

10    A.   I don't believe so.

11    Q.   Do you remember getting any other

12 orders while you were at Cermak?

13    A.   No. I don't remember that.

14    Q.   Do you remember anyone ordering for

15 Hill to be taken out of Cermak?

16    A.   No.

17    Q.   Were you involved with transporting

18 him back from Cermak in any way?

19    A.   It's possible, but I'm not sure.

20    Q.   So outside of arriving with the

21 equipment and handing the blue box to Officer

22 Bohlsen, do you remember anything else that

23 happened at Cermak with Mr. Hill?

24    A.   No, I don't. He was on the floor.

10 (Pages 34 to 37)

## Page 38

1   That's all I can remember.  And he was being
2   combative, saying things verbally, but I don't
3   remember.
4       Q.    So he's on the floor.  Do you remember
5   how he's on the floor?
6       A.    That I don't remember.
7       Q.    Do you remember any particular things
8   he was saying?
9       A.    I don't.
10      Q.    Just that he was combative in general?
11      A.    He was -- yeah.
12      Q.    No other specifics you can --
13      A.    Not at the time.
14      Q.    Do you remember what any of the other
15  officers were doing to Mr. Hill when you got
16  there or while you were there?
17      A.    They were trying to restrain him on
18  the floor, and they were waiting for the setup.
19      Q.    So when you got there, they were still
20  restraining Mr. Hill on the floor?
21      A.    Yeah.  I believe so.
22      Q.    But do you remember how they were
23  holding him or --
24      A.    No.

## Page 39

1       Q.    Once you arrived, did they restrain
2   him with the shackles and blue box?
3       A.    Yeah.
4       Q.    Do you remember who did that, what
5   officers specifically?
6       A.    No, I don't.
7       Q.    But you weren't one of the ones?
8       A.    I don't believe so.
9       Q.    Do you remember what they did to him
10  after he was blue boxed?
11      A.    I do not.
12      Q.    All right.  Well, I think we're just
13  going to go to the video now.
14          Well, just to totally clarify, the
15  first time you got to Cermak that day is when
16  you arrived with the blue box, shackles, and
17  camera; is that right?
18      A.    That's correct.
19      Q.    And you never touched Mr. Hill at all
20  while you were there?
21      A.    I don't believe so.
22      Q.    Do you remember any other officers
23  using force on Mr. Hill in any way?
24      A.    I can't remember.  I can't remember

## Page 40

1   the -- I know there was, obviously, a use of
2   force, but I can't remember who did what.
3       Q.    Do you remember anybody hitting him?
4       A.    No.
5       Q.    No punching, no kicking?
6       A.    No.
7       Q.    I think we're going to put on the
8   video next.  Since we're changing gears a little
9   bit, do you want to take a break, get some
10  water?
11      A.    No, I'm good.
12          MR. BOND:  Can I take two seconds?
13          MR. HAMP:  Yeah.  Sure.
14          (WHEREUPON, a recess was had.)
15  BY MR. HAMP:
16      Q.    We are going to play a DVD marked as
17  Plaintiff's Exhibit 3.  It's labeled
18  ERT 09328.
19          We're starting the video at the
20  time of 59 minutes and 12 seconds.
21          (WHEREUPON, the video was played.)
22          MR. HAMP:  All right.  We're going to
23  stop at 59 minutes, 31 seconds.
24

## Page 41

1   BY MR. HAMP:
2       Q.    Did you hear someone state that
3   they're going to blue box the inmate from
4   behind?
5       A.    Yes.
6       Q.    And this is Mr. Hill.  Mr. Hill
7   already had his hands handcuffed behind his
8   back, right?
9       A.    Correct.
10      Q.    And he's being held down by at least
11  two officers, right, at the beginning of the
12  video?
13      A.    Correct.
14      Q.    Did it appear that Mr. Hill was moving
15  at the beginning of this video?
16      A.    Can I see it again?
17      Q.    Yeah.
18          We're back at 5912.
19          (WHEREUPON, the video was played.)
20          MR. HAMP:  We're stopping now at
21  59 minutes, 26 seconds.
22  BY MR. HAMP:
23      Q.    Did you see Mr. Hill moving at all in
24  this portion of the video?

11 (Pages 38 to 41)

## Page 42

1    A.    Slight hand movements.

2    Q.    But those slight hand movements aren't

3  touching any of the officers, right?

4    A.    Correct.

5    Q.    So would this qualify as an emergency

6  situation?

7    A.    Yes.

8    Q.    And why is that?

9    A.    Because they had already called him in

10  as being a combative inmate.

11    Q.    And is that why it's appropriate to

12  blue box from the back?

13    A.    Correct. Because he's already

14  handcuffed to the back. And if you took the

15  handcuffs off to reapply them to the front, he

16  could easily become an assailant. And if he's

17  already making verbal threats and cursing, he's

18  already kind of at that level. So, basically,

19  you want to get him secure as quick as possible.

20    Q.    Do you see Mr. Hill's legs and foot in

21  the bottom right corner of the video?

22    A.    Yep.

23    Q.    Is that the hold you're describing

24  earlier with the legs?

## Page 43

1    A.    Correct.

2    Q.    So that's the hold you're taught to

3  use in those situations?

4    A.    Correct.

5    Q.    Now, this portion of the video,

6  if Mr. Hill was only moving his hands and not

7  touching an officer with them, where would he

8  fall on the use of force paradigm that we were

9  looking at earlier?

10    A.    At the time of this, it's kind of in

11  between. It's possibly coming down from being

12  passive to maybe cooperating.

13    Q.    So he's not an active resister at this

14  portion?

15    A.    Not exactly at this moment because

16  he's in control. They're at the point of

17  putting the restraints on him. He's under

18  control.

19    MR. HAMP: All right. We're going to

20  play more from 59 minutes, 26 seconds.

21    (WHEREUPON, the video was played.)

22    MR. HAMP: We're now at 1 hour,

23  0 minutes, and 18 seconds.

24

## Page 44

1  BY MR. HAMP:

2    Q.    So in this portion of the video,

3  Mr. Hill is being blue boxed, right?

4    A.    Correct.

5    Q.    And his head is being -- he's in a

6  standing position, right? He's on his feet now?

7    A.    Correct.

8    Q.    But his head is being pushed down

9  towards the ground, right?

10    A.    (No response.)

11    Q.    We can replay if --

12    A.    Yeah. It kind of stopped.

13    MR. HAMP: We're now at 59 minutes,

14  55 seconds.

15    (WHEREUPON, the video was played.)

16    MR. HAMP: We're stopping at 1 hour,

17  0 minutes, and 26 seconds.

18  BY MR. HAMP:

19    Q.    So in this portion of the video,

20  Mr. Hill was initially brought to his feet and

21  was in the standing position, right?

22    A.    Correct.

23    Q.    Then when the officers began to blue

24  box him, his head was pushed down towards the

## Page 45

1  ground, right?

2    A.    Wrong. They were trying to get -- use

3  his shoulder to get him down to get him back

4  into compliance.

5    Q.    So his shoulders and upper body were

6  being pushed down towards the ground?

7    A.    Correct.

8    Q.    And then his arms are being brought up

9  vertically, right?

10    A.    No. They have their arms inside of

11  his cuffed arms, and they're just applying

12  pressure on his shoulders. They're not actually

13  pulling his arms up.

14    Q.    But his arms are up as a result of --

15    A.    Because -- yes.

16    Q.    -- putting pressure on the shoulders?

17    A.    Correct.

18    Q.    And just so we're clear, his arms are

19  up as a result of the pressure of the officers

20  putting on his shoulders?

21    A.    Correct.

22    Q.    I'm sorry. I interrupted.

23    Is that an appropriate method

24  you're taught to blue box a prisoner from the

12 (Pages 42 to 45)

Page 46

1    back?
2    A.    Once again, it's not about being
3    appropriate because he became an assailant once
4    he started moving off the wall while they were
5    trying to do it the correct way.  It becomes a
6    matter of getting him secure for his safety and
7    ours.
8    Q.    So Mr. Hill became an assailant when
9    he pushed off the wall?
10   A.    Yes.
11   Q.    So even though Mr. Hill was
12   handcuffed, shackled at that point and being
13   held against the wall by two officers, he became
14   an assailant when he pushed off?
15   A.    Correct.  Cuffed and shackled inmates
16   still are not allowed to hit an officer.
17   Q.    So on the top of the use of force
18   model, it defines an assailant as actions will
19   probable cause death or serious physical
20   injuries, right?
21   A.    Correct.
22   Q.    So you're saying an inmate that's
23   handcuffed, shackled, held against the wall by
24   guards could probably cause death or serious

Page 47

1    physical injury by pushing off the wall like
2    that?
3    MR. BOND:  Object to form of the
4    question.
5    If you know the answer.
6    BY THE WITNESS:
7    A.    Possible?  Yes, it is possible.  But
8    that's not all an assailant is.  A person who
9    spits on you could be an assailant, and that's
10   not likely to cause death or serious injury
11   either.  But that is an assailant.  You can't
12   just go off this one sentence for assailant.
13   BY MR. HAMP:
14   Q.    Are there any other actions that you
15   could think of that would qualify an inmate as
16   an assailant?
17   A.    That's not as drastic as this?
18   Q.    Uh-huh.
19   A.    Because I know you're stressing the
20   serious physical injury, which is, obviously,
21   like a knife or firearm.  But spitting,
22   pinching, scratching, all those things would
23   still make a person an assailant.  That's why
24   they actually have the three levels; low-, mid-

Page 48

1    and high-level assailants.  He's a low-level
2    assailant.
3    Q.    But all three levels are defined as
4    will probable cause death or serious physical
5    injury, right?
6    A.    I don't know.
7    Q.    On this model?
8    A.    Yes.  Correct.
9    Q.    And this model is the primary material
10   used in your use of force training?
11   A.    Correct.  But in our use of force
12   training, they do teach us that spitting or
13   scratching or pushing off a wall is a low-level
14   assailant as well.
15   Q.    But they never give you documents with
16   these other actions that qualified as an
17   assailant?
18   A.    Well, I think this is just a
19   generalization.  This isn't, obviously,
20   everything that can possibly happen.
21   Q.    So when they tell you other things
22   outside of this model -- is this just given to
23   you verbally, or do they give you any other
24   materials?  Are there videos?

Page 49

1    A.    Well, it's part of the course.  Like I
2    said, the videos -- it's a full course.
3    Q.    Are there any other things -- let's
4    talk about resister now.
5    Are there any things that you can
6    think of there that aren't on this document that
7    you're taught that an inmate can do to qualify,
8    or is it just the assailant that has
9    additional --
10   A.    Can you rephrase it possibly?
11   Q.    So you're saying you're taught that
12   there are things beyond the definition of the
13   model order of an assailant that an inmate can
14   do to qualify as an assailant, right?
15   A.    No.  I'm saying this is just a little
16   general statement and, you know, you couldn't
17   possibly put every act of an assailant.
18   Q.    But when you're taught what an
19   assailant is, you're taught other things beyond
20   this general statement, right?
21   A.    Correct.  You're referring to
22   actions -- yes.
23   Q.    So for a resister, are you similarly
24   taught things beyond the definition or the

13 (Pages 46 to 49)

Page 50

1  generalization given on the order?
2      A.    No.  That's it right there
3  (indicating).
4      Q.    Let's talk about the allowable actions
5  on the model or for an assailant.  One of them
6  is direct, mechanical, which is defined as
7  direct body mechanics against body structure?
8      A.    Yes.
9      Q.    What sort of things qualify?
10     A.    Maybe a strike to the thigh.
11  Basically, a strike to a major muscle group;
12  chest.
13     Q.    So the actions the officers are doing
14  now, do those qualify as direct mechanical, or
15  are they some other type of force?
16     A.    No.  They're justified.
17     Q.    I'm trying to figure out what category
18  they're in.
19     A.    I don't know the exact name if you're
20  looking for an exact name.  But the arms over
21  the shoulders and trying to push the head back
22  to gain control is justified for the level he
23  was at.
24     MR. HAMP:  Let's keep playing.  We're

Page 51

1  at 1 hour, 0 minutes, 26 seconds.
2      (WHEREUPON, the video was played.)
3  BY MR. HAMP:
4      Q.    We're at 1 hour, 0 minutes,
5  53 seconds.
6      So you heard an officer tell
7  Mr. Hill to stop fighting, right?
8      A.    Correct.
9      Q.    And now that you've seen the video,
10  did you see anything Mr. Hill was doing once he
11  was in this position that was fighting or
12  resisting?
13     A.    I presume he's -- he's shaking.
14  That's what they're referring to.  They want him
15  to relax so they can finish the restraints.
16     (WHEREUPON, the video was played.)
17     MR. HAMP:  We're now at 1 hour,
18  1 minute, and 55 seconds.
19  BY MR. HAMP:
20     Q.    So this portion of the video
21  Mr. Hill was -- stood back up, right?
22     A.    Correct.
23     Q.    He wasn't fighting at all while he was
24  standing up, right?

Page 52

1      A.    Correct.
2      Q.    And the officers blue boxed his hands
3  behind his back, right?
4      A.    Correct.
5      Q.    Now, why would it have been necessary
6  to push Mr. Hill's upper body down like that
7  when he was already against the wall with his
8  back and his hands facing the officers?
9      MR. BOND:  Object to the foundation.
10  At what point are we talking about?  During this
11  clip or during previous clips?
12  BY MR. HAMP:
13     Q.    During the previous clip, we discussed
14  how Mr. Hill was standing upright against the
15  wall and then how an officer pushed against his
16  shoulder to push that part of his body down,
17  right?
18     A.    Correct.
19     Q.    So why would that have been necessary
20  when you're blue boxing -- when an officer is
21  blue boxing Mr. Hill's hands behind his back and
22  his hands and back are already facing the
23  officers on the wall?
24     A.    It was necessary because at the time,

Page 53

1  he was compliant, and they were going to attempt
2  to put the blue box on him.  And then he pushed
3  off the wall and became an assailant.  And
4  that's when they reengaged to gain control of
5  the body.  And that's why they both went into
6  the shoulder lock.
7      MR. HAMP:  We're going to start at
8  1 hour, 2 minutes, and 28 seconds.
9      (WHEREUPON, the video was played.)
10     MR. HAMP:  And the video ends at
11  approximately 1 hour, 2 minutes, 55 seconds.
12  BY MR. HAMP:
13     Q.    So in this portion of the video, Mr.
14  Hill is brought over to a bench in the hallway,
15  right?
16     A.    It's actually inside of what they
17  call Cermak.  It's still in the hospital.
18     Q.    And Mr. Hill is carried to that bench
19  by two officers, right?
20     A.    Correct.
21     Q.    Where this bench is, it's not
22  physically inside a doctor's office, right?
23     A.    Correct.
24     Q.    But it's in the Cermak area, but it's

14 (Pages 50 to 53)

Page 54

1  not a place where you'd actually get seen by a
2  doctor, right?
3      A.  Correct.
4      Q.  So Mr. Hill wasn't going to
5  immediately get medical treatment at that
6  location, right?
7      A.  It's actually at -- Cermak is --
8      Q.  I'll rephrase.
9          So he wouldn't be about to receive
10 medical treatment at that spot in the hallway,
11 right?
12     A.  No.  The office was right across.
13     Q.  He would have gone to another office
14 or another room or something like that?
15     A.  Correct.
16     Q.  Did you hear a person near the end of
17 the video state the words, "Is it off?"?
18     A.  Yes.
19     Q.  Did you recognize that voice?
20     A.  No.
21     Q.  Do you recall who said that?
22     A.  No.
23     Q.  And, obviously, that's the end of the
24 video.

Page 55

1          Do you recall anything that
2  happened after the camera turned off?
3      A.  I do not.
4      Q.  Do you remember any officer having to
5  use force on Mr. Hill after that?
6      A.  No.  If there was force used again,
7  the camera would have to go on immediately.
8      Q.  So you don't remember any other
9  officer or yourself touching or striking
10 Mr. Hill after that?
11     A.  No, not at all.
12     Q.  Was Mr. Hill being a cooperative
13 subject at the end of the video in that last
14 clip?
15     A.  Yes.
16     Q.  So he wasn't being verbally combative
17 in that last clip after he was being blue boxed?
18     A.  He was saying verbal -- yes, he was
19 spewing verbals that, you know -- but -- he was
20 sitting.  He wasn't moving.  He was sitting, and
21 he was restrained.  So that would be considered
22 compliant.
23     Q.  So he wasn't moving at all after he
24 was blue boxed?

Page 56

1      A.  No.
2          MR. HAMP:  No further questions.
3          MR. BOND:  Can you just real quick, can
4  you rewind it to that 5931 portion?  Actually,
5  if you want to start at 5925 and stop it at 31.
6  Thank you.
7          MR. JUNGELS:  Yeah.  59 minutes, about
8  25 seconds.
9          (WHEREUPON, the video was played.)
10         MR. BOND:  Just go back to 5912 when
11 you guys started.  I'm sorry.  Thanks.
12         (WHEREUPON, the video was played.)
13         EXAMINATION
14 BY MR. BOND:
15     Q.  Officer Contreras, do you see any
16 visible injuries to Mr. Hill's legs at that
17 point in time, like a cast or anything that
18 would indicate a leg hold being improper at this
19 point in time?
20     A.  No, I do not.
21     Q.  Did you know if Mr. Hill had a cane or
22 anything, if you recall?
23     A.  No.  They did not give us one for him.
24     Q.  Did he have one, though, when you got

Page 57

1  there, do you remember?
2      A.  No.
3          MR. BOND:  I have no questions.
4          MR. HAMP:  No follow up.  Thanks a lot.
5          MR. BOND:  Do you want to waive
6  signature or review the transcript if you want
7  to review?
8          THE WITNESS:  Oh, no.  I can waive it.
9          MR. BOND:  We'll waive.
10         FURTHER DEPONENT SAITH NOT.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

15 (Pages 54 to 57)

Page 58

```
 1    STATE OF ILLINOIS  )
 2                       )  SS:
 3    COUNTY OF DUPAGE   )
 4          I, ATHENA MIRMINGOS, a Notary Public
 5    within and for the County of DuPage, State of
 6    Illinois, and a Certified Shorthand Reporter of
 7    said state, CSR No. 84-4272, do hereby certify:
 8          That previous to the commencement of
 9    the examination of the witness, the witness was
10    duly sworn to testify the whole truth concerning
11    the matters herein;
12          That the foregoing deposition was
13    reported stenographically by me, was thereafter
14    reduced to typewriting under my personal
15    direction and constitutes a true record of the
16    testimony given and the proceedings had;
17          That the said deposition was taken
18    before me at the time and place specified;
19          That the said deposition was adjourned
20    as stated herein;
21          That I am not a relative or employee or
22    attorney or counsel, nor a relative or employee
23    of such attorney or counsel for any of the
24    parties hereto, nor interested directly or
```

Page 59

```
 1    indirectly in the outcome of this action.
 2          IN WITNESS WHEREOF, I do hereunto set
 3    my hand and affix my seal this 12th day of
 4    December, 2011.
 5
 6
 7          Notary Public, DuPage County, Illinois.
 8          My commission expires 04/20/14.
 9
10    CSR Certificate No. 84-4272.
11
12                Athena Mirmingos
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 60

```
 1                I N D E X
 2    WITNESS                      EXAMINATION
 3    MICHAEL CONTRERAS
 4      By Mr. Hamp                      3
 5      By Mr. Bond                     56
 6
 7
 8              E X H I B I T S
 9    NUMBER                    REFERRED TO
10    Plaintiff's Deposition Exhibit
11      No. 1                        14
12      No. 3                        40
13
14
15
16
17
18
19
20
21
22
23
24
```

Elite Deposition Services
312-445-0005

**A**

aaron 2:11 14:7
academy 11:23
accommodate 4:22
account 21:19
achieve 4:5
act 49:17
action 20:15 59:1
actions 16:15 18:21 46:18 47:14 48:16 49:22 50:4,13
active 15:17,23 16:1,8,14,18 17:2,9,23 18:14 18:21 43:13
actively 18:3,9
acts 22:7
actual 21:13
additional 12:1 49:9
adjourned 58:19
adjust 22:3,8,12
affix 59:3
ago 34:14
aim 4:5
allegedly 7:20
allowable 50:4
allowed 22:19 46:16
answer 4:6,18 47:5
answering 4:13
anthony 1:3 11:8 32:6 34:11
anybody 40:3
appear 22:20 41:14
appeared 2:6,12
apply 23:20,21 24:5,19
applying 45:11
appropriate 23:8 23:10 42:11 45:23 46:3
approximately 8:14 9:18 53:11
area 53:24
areas 27:5,9
arent 42:2 49:6
arm 10:21 19:6,7 19:15,22,23 20:4,20,21
arms 18:7 24:4,14 24:20 27:4 45:8 45:10,11,13,14 45:18 50:20
arrived 34:9 35:1 39:1,16
arriving 37:20
asking 4:11 16:11
assailant 16:19 16:22 17:3,5 42:16 46:3,8,14 46:18 47:8,9,11 47:12,16,23

48:2,14,17 49:8 49:13,14,17,19 50:5 53:3
assailants 48:1
assigned 33:7
assignment 32:21 33:3
assistant 2:11
associates 5:15 5:16
assume 4:19
assuming 22:15
athena 1:17 2:24 58:4
attempt 53:1
attention 36:18 36:21
attorney 2:8,11 58:22,23
audibly 4:6
available 20:19
avoid 15:21 17:10

**B**

b 1:6 60:8
back 3:21 9:16 16:12 17:9 22:19 25:14,16 25:18 26:18 37:18 41:8,18 42:12,14 45:3 46:1 50:21 51:21 52:3,8,21 52:22 56:10
background 5:10 5:12
banner 2:2
bars 19:23
based 15:24 16:14,22 17:5 basically 12:12 42:18 50:11
basis 11:9 32:4
battery 30:6,11 30:15
began 44:23
beginning 41:11 41:15
behalf 2:6,12
behaviors 15:9
believe 13:18 19:5 29:7 32:22 33:22 35:3 36:11 37:10 38:21 39:8,21
bench 53:14,18 53:21
best 4:9 11:4 24:3 34:24 37:1,4
beyond 49:12,19 49:24
binal 2:5
bit 5:10 11:14 35:24 40:9
biting 18:19
blade 27:13,13
blades 27:18,21

blue 22:20 23:2,9 23:11,12,16,20 23:22 24:5,19 24:23 25:1,9,15 25:18 26:7,14 33:20 34:22 35:2,4,7,15 37:5 37:21 39:2,10 39:16 41:3 42:12 44:3,23 45:24 52:2,20 52:21 53:2 55:17,24
body 19:8,24 20:3 20:24 24:15,21 27:6,9 45:5 50:7,7 52:6,16 53:5
bohlsen 1:7 34:23 35:2,16 37:6,22
bonakowski 1:7
bond 2:11 14:8 40:12 47:3 52:9 56:3,10,14 57:3 57:5,9 60:5
bottom 19:3,4 42:21
box 22:20 23:2,9 23:11,12,16,20 23:22 24:5,19 24:23 25:1,9,15 25:18 26:7,14 33:20 34:22 35:2,5,15 37:5 37:21 39:2,16 41:3 42:12 44:24 45:24 53:2
boxed 35:7 39:10 44:3 52:2 55:17 55:24
boxing 52:20,21
break 4:21 40:9
breaking 8:4
brian 1:8
briefly 5:23
bring 33:19,22
broad 8:2
brought 44:20 45:8 53:14
bus 8:3

**C**

call 19:12 33:21 53:17
called 1:14 3:4 7:22 42:9
camera 29:8,22 30:8,14,17,21 31:1,4,12 33:21 33:22 39:17 55:2,7
cane 21:23 22:2 56:21
cant 4:24 10:11 17:21 18:8 19:7 20:24 21:1,14

29:18 39:24,24 40:2 47:11
career 9:21,23 28:15,16,18
carried 53:18
case 9:14 17:8 25:14
cast 56:17
categories 15:16 18:24
category 50:17
cause 8:3 46:19 46:24 47:10 48:4
ccsa0337 14:6
ccsa0345 15:3
cell 10:16 20:11 29:3,6 30:23
center 2:9
cermak 32:24 33:1,4,7,10,13 33:16,24 34:6,9 36:7,23 37:12 37:15,18,23 39:15 53:17,24 54:7
certificate 59:10
certified 1:19 58:6
certify 58:7
chain 24:6,8,9,11 26:14
change 13:10,10
changed 12:11
changing 40:8
charged 10:18
chest 50:12
chicago 1:22 2:3 2:10
chico 1:8
civil 1:15
clarence 1:10
clarify 16:13 31:16 39:14
clean 4:3
clear 4:17 45:18
clip 52:11,13 55:14,17
clips 52:11
close 24:9
closer 24:6
college 5:13,18 5:19 13:23
combative 7:19 16:5 20:18 33:18 35:24 36:15 38:2,10 42:10 55:16
come 3:21
coming 22:19 43:11
command 34:1
commencement 58:8
commendation 11:6
commission 59:8

common 28:12
community 5:19 13:22
complaining 22:9 22:11
complaint 9:10
compliance 45:4
compliant 25:1,5 25:24 26:3,5 53:1 55:22
concerning 58:10
conduct 16:9,17 17:6 22:12
conlon 1:6
connect 26:13
consider 11:10
considered 5:14 7:18,22 27:23 55:21
constitutes 58:15
continuum 15:8 18:23
contraband 7:24
contreras 1:8,13 3:3,11 56:15 60:3
control 15:21 17:10 19:1,1,4,8 19:24 20:2,23 22:15 27:8 43:16,18 50:22 53:4
cook 1:6 2:8 5:24 6:18
cooperating 43:12
cooperative 23:15 55:12
corner 42:21
correct 6:23 14:3 14:23 15:11,14 15:22 16:1,16 24:16,18 28:3 31:15,19 34:4 37:3,7 39:18 41:9,13 42:4,13 43:1,4 44:4,7,22 45:7,17,21,24 46:5 46:15,21 48:8 48:11 49:21 51:8,22 52:1,4 52:18 53:20,23 54:3,15
correctional 7:6 7:11 8:10
corresponding 15:13
couldnt 23:13 49:16
counsel 58:22,23
count 6:23
county 1:6,18 2:8 5:24 6:9,18 7:22 58:3,5 59:7
course 12:18 13:15 49:1,2

courses 5:17,20
court 1:1 3:24
courts 1:16
cover 12:4
credit 5:13
criteria 25:11
cross 20:21 21:4
crutches 22:2
crystal 1:9
csr 1:20 2:24 58:7 59:10
cuffed 25:14 45:11 46:15
cuffs 25:15 26:15
cursing 42:17
cut 30:1

**D**

d 60:1
daley 2:9
daniel 1:9
dart 1:6
date 10:24 14:19 32:12
day 1:22 32:5,20 33:1,5 36:23 39:15 59:3
deal 27:10
death 46:19,24 47:10 48:4
debatable 17:7
december 6:19 59:4
defendants 1:11 2:12
defined 15:20 48:3 50:6
defines 46:18
definitely 17:24 21:24 22:3 23:18 29:19
definition 49:12 49:24
degree 5:15,16
demanded 1:7
departments 13:2
depending 16:20 18:17
depends 20:19 21:15
deponent 57:10
deposed 3:24
deposition 1:13 3:14 58:12,17 58:19 60:10
depositions 1:17
depot 6:3,4,11
depth 7:1
describe 5:12,23 7:15 8:21 17:11 19:20
described 27:2
describing 15:5 24:13 42:23
details 10:13
detainee 30:22

31:4
detainees 7:18
  29:8 31:2
determines 29:21
didnt 4:17 17:4
  22:10
different 7:7
  12:20 21:15
  26:21
differently 25:10
direct 50:6,7,14
direction 58:15
directly 58:24
discussed 52:13
district 1:1,1,16
division 1:2
doctor 54:2
doctors 53:22
document 14:10
  14:21 15:8,16
  49:6
documents 12:17
  48:15
doesnt 4:7 16:2
  16:17
doing 10:16 20:1
  20:14,20 21:17
  21:20 29:10
  33:9 36:2 38:15
  50:13 51:10
dont 4:15 8:18
  14:18 27:22
  34:7,10,17 35:6
  35:9 36:6,17
  37:10,13,24
  38:2,6,9 39:6,8
  39:21 48:6
  50:19 55:8
door 10:17,17
drastic 47:17
drive 1:22 2:2
drop 10:22
due 6:24
duly 3:1,5 58:10
dupage 1:19 58:3
  58:5 59:7
duties 7:16 33:9
dvd 40:16
dying 30:6,11,15

__E__
e 60:1,8
earlier 15:5 42:24
  43:9
easier 24:1
easily 42:16
eastern 1:2
educational 5:12
  13:3
effect 20:22
effective 14:14
  14:15
effort 4:9
efforts 4:12
eight 8:15,17
  9:16
either 8:9 9:5

23:5 25:18
  47:11
elbow 10:21
emergencies
  25:10
emergency 7:13
  8:1 20:10 24:22
  25:5,8,23 26:4
  42:5
employee 6:5
  58:21,22
employees 6:4
encounters 29:21
ended 3:20
ends 53:10
entire 30:17 31:5
  31:14
entities 31:18
equipment 37:21
equivalent 5:14
eric 2:4
ert 8:6,9 10:9
  11:11 12:2
  40:18
erts 26:15
escape 7:19 8:2
escort 8:23 9:5
  19:5,14 29:7,9
escorts 7:23
estimate 8:13
evenly 9:22
event 30:16 34:18
events 29:20
exact 14:19 50:19
  50:20
exactly 14:16
  43:15
examination
  1:14 3:7 56:13
  58:9 60:2
examined 3:5
example 17:13
exhibit 14:5
  40:17 60:10
experiences 5:24
expires 59:8
explain 14:12
extraction 20:12

__F__
facing 52:8,22
fair 4:19,20
fall 43:8
familiar 32:6
far 12:15
federal 1:15
feed 6:24,24
feet 44:6,20
field 5:14
fight 22:16
fighting 9:1,1
  25:12,17 51:7
  51:11,23
figure 50:17
filed 9:10
finish 4:11 51:15
firearm 47:21

firing 13:19
first 3:4 32:5 35:1
  35:1 39:15
five 6:8 8:14,17
  9:16 19:13,16
  19:21 20:4
  28:14
floor 2:9 37:24
  38:4,5,18,20
focus 29:1 30:20
  32:2
focused 31:13
follow 12:12 57:4
follows 3:6
foot 42:20
force 8:11,16,21
  9:5,11,14,17
  10:7,11 11:10
  11:19 12:4
  13:16,18 14:2
  14:14,16,24
  20:2 22:13,14
  22:17,22 25:7
  29:13,17 31:4
  31:11 36:20
  39:23 40:2 43:8
  46:17 48:10,11
  50:15 55:5,6
forced 10:22
forces 10:19 13:4,5
foregoing 58:12
form 47:3
formal 31:17,19
formalities 4:24
foundation 52:9
four 21:2
front 24:14,20
  25:2,18 42:15
full 49:2
further 56:2
  57:10

__G__
gain 50:22 53:4
gang 7:24
gauge 21:14
gears 40:8
general 14:13
  17:12 38:10
  49:16,20
generalization
  48:19 50:1
generally 5:11
  7:15 19:20
getting 36:17
  37:11 46:6
give 4:24 12:9,13
  12:16,21 35:1
  48:15,23 56:23
given 3:14 48:22
  50:1 58:16
gives 15:12
giving 17:19
go 4:8 13:14,18
  16:12 26:2,18
  27:11 32:24
  33:10,13,16,24

39:13 47:12
  55:7 56:10
goes 25:6
going 9:16 14:4
  16:24 17:9,18
  30:1,13 31:12
  33:4 34:8 39:13
  40:7,16,22 41:3
  43:19 53:1,7
  54:4
good 14:20 40:11
gotten 33:3
grab 19:15
grabbing 19:5,7
  19:10
grievance 9:9
ground 9:6 21:6,9
  21:12,13 27:3
  44:9 45:1,6
group 27:23 33:2
  50:11
groups 27:19,22
  28:2,4
guards 17:21
  18:3 25:22
  46:24
guess 9:24
guesstimate 11:3
guesstimation
  28:16
guide 23:4
guideline 12:12
  13:6
guidelines 12:9
guy 18:4 20:21
  21:3
guys 20:19 21:2,3
  56:11

__H__
h 60:8
half 5:22
hallway 53:14
  54:10
hamp 2:4 3:8
  14:7,9 40:13,15
  40:22 41:1,20
  41:22 43:19,22
  44:1,13,16,18
  47:13 50:24
  51:3,17,19
  52:12 53:7,10
  53:12 56:2 57:4
  60:4
hand 17:1 35:15
  37:5 42:1,2
  59:3
handcuff 23:11
handcuffed 41:7
  42:14 46:12,23
handcuffing 25:4
  25:6,7
handcuffs 17:16
  18:9,11 19:11
  22:20,24 23:2,4
  23:7,15 33:20
  42:15

handed 34:22
handing 37:21
hands 8:24 17:13
  41:7 43:6 52:2
  52:8,21,22
happen 48:20
happened 10:2
  11:1 31:9 37:23
  55:2
happens 21:16
head 44:5,8,24
  50:21
headbutting
  18:18
hear 4:17 41:2
  54:16
heard 21:21
  32:11 51:6
held 17:20 18:2
  18:12 41:10
  46:13,23
hell 29:23 30:1
hereto 58:24
hereunto 59:2
hes 18:11,12
  20:17 24:11
  26:3,5 38:4,5
  41:10 42:13,16
  42:17 43:13,16
  43:17 44:5,6
  48:1 51:13,13
high 7:18
highlevel 48:1
highrisk 7:17
hill 1:3 11:8 32:6
  32:9 34:11 35:5
  36:9,23 37:8,15
  37:23 38:15,20
  39:19,23 41:6,6
  41:14,23 43:6
  44:3,20 46:8,11
  51:7,10,21
  52:14 53:14,18
  54:4 55:5,10,12
  56:21
hills 42:20 52:6
  52:21 56:16
hit 46:16
hitting 40:3
hold 9:5 20:13
  21:20 27:1,2
  42:23 43:2
  56:18
holding 27:4,4
  38:23
holds 19:12,13,14
  19:16,18,21
  20:4,6,8 21:11
  21:18 26:18,21
holmes 1:8
home 6:3,4,11
honest 23:11
  29:18
honestly 36:8
honorable 1:5
hospital 53:17
hour 43:22 44:16

51:1,4,17 53:8
  53:11
hours 5:13
hugh 1:10
hurt 27:12
hurting 20:3

__I__
id 5:9 11:16 17:7
  22:15 26:18
idea 31:23
ideal 27:13,15
ill 4:12,18,18 54:8
illinois 1:1,19,22
  2:3,8,10 58:1,6
  59:7
im 10:15 14:4
  16:5,24 23:17
  24:3 34:18
  36:24 37:19
  40:11 45:22
  49:15 50:17
  56:11
immediately 54:5
impair 5:6
important 4:2
improper 56:18
incident 11:8
  28:9 31:3,11,13
  32:3
incidents 10:5
  12:24 31:12
  32:14
include 19:9,10
  26:22
indicate 56:18
indicating 19:6
  24:7 50:3
indications 22:11
indirectly 59:1
info 7:24
informal 31:20
informed 36:13
initial 6:20 33:9
initially 7:11
  11:22 32:22
  36:10 44:20
injuries 21:19,22
  46:20 56:16
injury 22:5,10,12
  22:15 47:1,10
  47:20 48:5
inmate 8:11 9:10
  10:16,17 15:9
  16:21 17:20
  22:4,9 23:6
  25:12,13,17,21
  27:1,3 29:14
  33:17 35:23
  41:3 42:10
  46:22 47:15
  49:7,13
inmates 6:22
  7:21,21 9:1
  20:9,15 21:18
  21:22 26:8

46:15
inservice 13:8,15
13:17,20 14:22
inside 45:10
53:16,22
instance 17:3
instrument 17:1
instruments 19:1
19:2,5
interaction 36:22
37:2
interested 58:24
internal 6:6
interrupt 4:10,13
interrupted
45:22
involve 20:5,6,7
involved 3:19
37:17
isnt 48:19
items 34:3
ive 3:16,19 5:21
7:14 9:2 28:19
29:7,9 31:22

**J**

j 1:6 2:4,5,9
jail 6:1,18 7:11
13:1 28:9 31:18
james 1:8
job 6:3 7:4
john 1:10
joints 26:22
june 8:7,8 10:10
jungels 2:4 56:7
jury 1:7
justified 50:16,22

**K**

keep 4:2 30:13,14
30:17 31:1
50:24
keeping 29:21
kick 20:23,24
kicking 17:14
18:6,18 40:5
kill 16:24
kind 42:18 43:10
44:12
knife 10:19 47:21
21:22 23:3
27:22 34:19
35:9 36:17 40:1
47:5,19 48:6
49:16 50:19
55:19 56:21

**L**

labeled 40:17
lacy 1:10
lately 10:2
lawful 17:18
lawsuit 11:9 32:4
lawyer 4:3
leaving 36:7
left 15:7,16

leg 21:2,2 22:6
56:18
legs 18:4,6,7 20:5
20:6,7,9,16,22
21:3 26:8 27:4
42:20,24 56:16
leon 1:9
lethal 8:20
letter 11:6
level 42:18 50:22
levels 47:24 48:3
lewis 1:6
line 19:2
lines 9:2
little 5:10 11:13
35:24 40:8
49:15
location 54:6
lock 24:12 53:6
locks 19:23 20:4
long 8:5 22:14
29:21 33:8
34:16
longer 14:14
looking 43:9
50:20
looks 21:4
lot 57:4
low 47:24
lowlevel 48:1,13

**M**

m 1:23
major 27:11,19
27:22,23 28:2,4
50:11
making 42:17
mall 6:8
mandatory 13:17
36:19
maneuver 19:17
marked 14:4,5
15:3 40:16
marmal 1:9
material 48:9
materials 12:8
48:24
matter 16:2 46:6
matters 58:11
mean 7:2 12:23
31:22
means 6:23
measure 23:13
measures 15:13
22:20 23:6
mechanical 50:6
50:14
mechanics 50:7
medical 36:4,18
36:20 54:5,10
medication 5:3
meet 25:11
member 7:16 8:5
8:9 11:11 12:2
memory 5:6
method 45:23
michael 1:7,13

3:3,11 60:3
mid 47:24
minimally 11:24
minute 3:22
26:19 51:18
minutes 40:20,23
41:21 43:20,23
44:13,17 51:1,4
53:8,11 56:7
mirmingos 1:17
2:24 58:4
misunderstood
16:10
mock 19:13,16,18
19:21 20:6,12
21:11
model 12:10,11
12:14,21,21
14:17 15:4
17:10 22:21
46:18 48:7,9,22
49:13 50:5
moment 43:15
monitored 6:6
35:17
monitoring 35:20
moraine 5:18
13:22,24
moreci 1:9
move 17:2,22
movement 15:20
15:24 17:10,17
24:11
movements 7:17
17:12 42:1,2
moves 19:23,23
moving 7:21 16:3
17:17 18:22
23:17 41:14,23
43:6 46:4 55:20
55:23
muscle 27:11,19
27:22,23 28:2,4
50:11

**N**

n 60:1
name 3:9 50:19
50:20
names 3:12
near 54:16
necessary 22:13
22:14 52:5,19
52:24
neck 27:14,15,18
27:21,23 28:2
need 4:21
needing 3:20
never 3:23 4:13
9:2,12,15 21:21
31:16 32:8
39:19 48:15
nicholas 1:7
nod 4:7
noncompliant
26:1
normally 29:24

30:2
northern 1:1
notary 1:18 58:4
59:7
november 1:23
10:6 32:15
number 60:9

**O**

object 47:3 52:9
obvious 13:4 22:4
obviously 7:18
13:16 17:14
19:6 40:1 47:20
48:19 54:23
oc 9:3
occur 12:24
occurred 32:4
october 11:5
office 2:8 53:22
54:12,13
officer 7:6,12
8:10 19:9 34:22
35:2,15 37:6,21
43:7 46:16 51:6
52:15,20 55:4,9
56:15
officers 25:12
27:3 29:13,16
35:4 36:15
38:15 39:5,22
41:11 42:3
44:23 45:19
46:13 50:13
52:2,8,23 53:19
oh 57:8
okay 3:21 4:23
6:14 8:16 11:15
14:8,20 15:7
16:6 23:14
25:19 35:12
once 11:23 13:14
13:17 28:13
29:10 30:24,24
34:21 39:1 46:2
46:3 51:10
ones 39:7
order 14:13 17:18
18:17 22:21
33:12 49:13
50:1
ordered 30:12,16
ordering 37:14
orders 29:22
33:24 37:12
outcome 59:1
outside 4:23 9:14
13:2 24:8 30:5
37:20 48:22

**P**

p 1:23
page 15:3
pan 31:7
panning 31:10
paradigm 43:8
parallel 24:17

part 9:8 20:24
29:23 49:1
52:16
particular 38:7
parties 58:24
partner 10:23
parts 35:13
pass 14:4
passive 18:10
43:12
patel 2:5
patrols 32:23
people 12:19
perimeter 32:23
person 47:8,23
54:16
personal 58:14
persons 19:24
pertaining 1:16
peter 1:8
physical 15:21
16:15 17:10
22:5 46:19 47:1
47:20 48:4
physically 19:10
21:23,23 34:18
53:22
pinching 47:22
place 54:1 58:18
plaintiff 1:4 2:6
plaintiffs 14:5
40:17 60:10
play 35:11 40:16
43:20
played 40:21
41:19 43:21
44:15 51:2,16
53:9 56:9,12
playing 50:24
please 3:9 4:6,10
5:11
point 7:5 22:18
33:6 43:16
46:12 52:10
56:17,19
pop 8:1
popped 10:17
portion 15:18
41:24 43:5,14
44:2,19 51:20
53:13 56:4
position 7:7 8:24
19:15 24:14
44:6,21 51:11
positions 7:10
possible 4:3 15:9
18:21 19:22
20:8 24:9 27:8
29:11,19 37:19
42:19 47:7,7
possibly 6:13
25:13 27:7
31:10 43:11
48:20 49:10,17
post 34:1
present 2:1
presentations

12:16
pressure 27:5,17
27:20 28:1
45:12,16,19
presume 22:16
51:13
pretty 8:1 9:3,22
20:23 21:1 31:1
previous 32:8
52:11,13 58:8
primary 48:9
prior 6:7 36:15
priority 31:6,9
prisoner 45:24
probable 46:19
48:4
probably 24:1
28:19 46:24
procedure 1:15
procedures 28:6
31:17
proceedings
58:16
proper 13:4,5
properly 23:22
provides 15:8
public 1:18 58:4
59:7
pulling 17:15
45:13
punching 40:5
pursuant 1:14
push 50:21 52:6
52:16
pushed 44:8,24
45:6 46:9,14
52:15 53:2
pushing 17:15
47:1 48:13
put 8:23 17:13,16
23:22,24 24:7
25:9 26:11 27:5
27:17,20 28:1
40:7 49:17 53:2
putting 43:17
45:16,20

**Q**

qualified 48:16
qualify 18:1,13
42:5 47:15 49:7
49:14 50:9,14
question 4:6,12
4:14,16 8:18
47:4
questions 56:2
57:3
quick 42:19 56:3

**R**

random 10:17
range 13:19
real 56:3
really 21:14,22
reapply 42:15
reason 4:24 23:12
31:8

reasons 30:3
recall 33:4 54:21
  55:1 56:22
receive 13:12
  54:9
recess 40:14
recognize 14:10
  54:19
record 3:10 4:2,8
  58:15
reduced 58:14
reengaged 53:4
referred 60:9
referring 49:21
  51:14
related 31:18
relative 58:21,22
relax 51:15
remember 6:10
  7:4 9:4,17,18
  10:12,13,24
  13:20 29:9,10
  33:8,12,15 34:5
  34:8,11,15,18
  34:20,24 35:6,7
  35:9,14,19,22
  35:23 36:1,4,6,7
  36:12,14 37:1,4
  37:11,13,14,22
  38:1,3,4,6,7,14
  38:22 39:4,9,22
  39:24,24 40:2,3
  55:4,8 57:1
repeat 4:18
rephrase 4:16
  49:10 54:18
replay 44:11
reported 2:24
  58:13
reporter 1:20
  3:24 58:6
require 29:8
resister 15:17,24
  16:8,14,18 17:2
  17:9,23 18:14
  18:22 43:13
  49:4,23
resisting 18:9
  23:6 51:12
respond 4:12
response 7:13,16
  20:11 44:10
responsibilities
  6:21
restrain 38:17
  39:1
restrained 10:23
  18:12 55:21
restraining 38:20
restraints 43:17
  51:15
result 45:14,19
review 57:6,7
rewind 56:4
richard 2:9
right 5:23 6:16
  12:19 13:23

15:10,12,21,24
16:3,15,18 17:1
18:20,22 31:14
32:2,18 36:23
39:12,17 40:22
41:8,11 42:3,21
43:19 44:3,6,9
44:21 45:1,9
46:20 48:5
49:14,20 50:2
51:7,21,24 52:3
52:17 53:15,19
53:22 54:2,6,11
54:12
riot 8:2
risk 7:19
road 4:4
robert 1:6
rolling 18:8,18
rollover 21:1
room 54:14
rules 1:15
run 29:3
running 17:15

——— S ———

s 60:8
safety 7:23 23:13
  46:6
saith 57:10
satisfy 17:12
saw 34:17 35:19
saying 16:2,4,7
  16:20 38:2,8
  46:22 49:11,15
  55:18
scenario 21:15
school 5:22
scratching 18:19
  47:22 48:13
seal 59:3
sean 2:4
search 10:16 29:4
  30:2
searches 29:3,6
searching 7:23
second 30:7
seconds 40:12,20
  40:23 41:21
  43:20,23 44:14
  44:17 51:1,5,18
  53:8,11 56:8
secure 30:24
  42:19 46:6
secured 24:11
security 6:2,8
  7:24
see 12:19 14:1
  15:17 22:24
  34:13 41:16,23
  42:20 51:10
  56:15
seeing 34:11,15
seen 51:9 54:1
sentence 47:12
separate 26:17
september 11:5

14:18
sergeant 29:22
serious 46:19,24
  47:10,20 48:4
sessions 12:8
  13:13,24
set 59:2
setup 33:21 38:18
sevenyear 9:21
shackle 26:9
shackled 46:12
  46:15,23
shackles 26:12,13
  26:16 33:20
  34:3 39:2,16
shake 4:7
shaking 51:13
shank 10:18
shift 32:2,18
  36:16
shorthand 1:20
  58:6
shoulder 27:12
  27:13,18,21
  45:3 52:16 53:6
shoulders 4:7
  45:5,12,16,20
  50:21
shouldnt 24:10
show 12:18,20,23
  12:24 13:3 24:1
showing 24:13
shown 23:21
side 15:7,16
  18:22 24:5,5
signature 57:6
similarly 49:23
sir 14:11
sitting 55:20,20
situation 10:20
  18:2 24:23 25:9
  25:23 26:4
  27:10 30:24
  31:8 35:18,20
  42:6
situations 23:1
  28:24 30:20
  43:3
slight 42:1,2
solely 15:24 16:8
  16:14,22 17:6
solid 11:3
somebody 8:23
  8:24
sorry 16:5 24:3
  45:22 56:11
sort 8:16,21 12:8
  12:9 15:8 16:21
  17:4,11 18:1,16
  20:15 28:24
  50:9
south 1:21 2:2
special 12:1 17:8
specific 6:10
  19:12 21:7,13
  23:19 26:24
  36:1

specifically 39:5
specifics 38:12
specified 58:18
spewing 55:19
spits 47:9
spitting 47:21
  48:12
spivey 1:9
spot 54:10
spray 9:3
spread 9:23
ss 58:2
staff 25:12
standard 17:12
standing 21:6
  44:6,21 51:24
  52:14
start 5:9 6:17
  28:18 29:4,24
  31:10 53:7 56:5
started 6:21
  32:20 46:4
  56:11
starting 40:19
state 1:19,20 3:9
  41:2 54:17 58:1
  58:5,7
stated 58:20
statement 49:16
  49:20
states 1:1,16 2:8
  2:11 17:10
  18:24
stenographically
  58:13
stomach 24:6,9
stood 51:21
stop 22:16,17
  40:23 51:7 56:5
stopped 44:12
stopping 41:20
  44:16
street 2:9
stressing 47:19
strike 19:18 27:1
  50:10,11
striking 55:9
struck 10:21
structure 50:7
struggle 27:7
subdued 25:22
subject 23:15
  25:1 55:13
sued 9:13
suite 1:21 2:2
supervisors 32:1
supposed 23:2,24
  24:20,22 30:20
sure 6:15,23
  29:18 34:18
  36:24 37:19
  40:13
suzanne 1:6
swinging 18:5
sworn 3:2,5 58:10

——— T ———

t 60:8
take 4:21 5:17,20
  6:22 12:21
  15:13 18:21
  20:2,15,22 21:5
  21:9,12,18 22:1
  22:1 40:9,12
takedown 20:12
  20:14
taken 1:14,17
  30:22 37:15
  58:17
takes 20:23
talk 11:13,16
  15:15 18:20
  49:4 50:4
talking 5:9 52:10
tape 30:16
taped 29:14
taping 30:19
taught 20:8,10
  21:18 23:1,5,19
  26:20,24 27:5
  27:17,20 28:1
  43:2 45:24 49:7
  49:11,18,19,24
teach 21:7 48:12
team 7:13,16
  20:11
technique 21:14
techniques 21:7
  23:20
tell 24:2 29:23
  30:1 31:24
  48:21 51:6
ten 1:21 2:2 28:23
test 12:22
testified 3:5,17
  3:19,23
testify 58:10
testimony 5:1
  58:16
thank 56:6
thanks 6:16 56:11
  57:4
thats 4:20 5:14
  5:19 7:3,13 8:1
  9:3 10:10 11:9
  13:17 14:20,21
  15:20 16:6
  17:18 18:9
  19:16,17 26:11
  27:16 29:10
  30:8,9 32:4
  35:17 37:3,7
  38:1 39:18 43:2
  46:22 47:8,9,17
  47:23 50:2
  51:14 53:4,5
  54:23
theft 6:6
theres 12:10,11
  19:12,13 21:13
  21:21 23:12
  25:4,5 31:3,11
  35:9
theyll 12:18,20,21

13:3
theyre 7:19 9:22
  13:11 16:2,3,4
  16:20 18:2
  19:22 20:1 21:6
  26:16 41:3
  43:16 45:11,12
  50:16,18 51:14
thigh 50:10
thing 7:14 13:3
  30:8 35:1 37:5
things 9:19 16:21
  18:1,16 19:11
  36:1 38:2,7
  47:22 48:21
  49:3,5,12,19,24
  50:9
think 10:6,15
  30:4,8 39:12
  40:7 47:15
  48:18 49:6
third 19:2,4 20:21
thomas 1:6
thought 6:5
threats 42:17
three 6:2,7 8:7
  10:10 20:20
  21:2 47:24 48:3
tier 6:22,24 30:1
tiers 7:23
tightly 24:10
time 11:10 14:15
  29:5 30:17 31:5
  31:14 32:5,17
  35:5 38:13
  39:15 40:20
  43:10 52:24
  56:17,19 58:18
times 8:13,17 9:4
  9:16 13:11,11
  16:7 28:14,20
  28:22 29:12
title 7:4
today 5:1
told 31:23 32:24
  33:9,15,19 36:9
  36:14
top 18:5,6 46:17
toro 1:8
totally 39:14
touch 37:8
touched 39:19
touching 42:3
  43:7 55:9
traceable 11:7
training 11:17,18
  11:21 12:2,7
  13:8,12,21
  14:22 28:5
  31:17,19,21
  48:10,12
transcript 57:6
transferred 21:12
transition 30:7
transporting
  37:17
treatment 36:5

| | | | | |
|---|---|---|---|---|
| 54:5,10 | **video** 29:22 30:4 | **working** 6:11,17 | **1** 1:5,23 14:5 | 59:10 |
| **trial** 1:7 3:17,20 | 30:9 35:10 | 6:21 32:17,20 | 43:22 44:16 | **9** |
| **triton** 5:18 | 39:13 40:8,19 | **works** 4:9 | 51:1,4,17,18 | |
| **true** 58:15 | 40:21 41:12,15 | **worse** 7:20 | 53:8,11 60:11 | |
| **truth** 58:10 | 41:19,24 42:21 | **wouldnt** 22:7 | **10** 32:18 | |
| **truthful** 5:1 | 43:5,21 44:2,15 | 31:7 54:9 | **10cv00897** 1:5 | |
| **try** 4:2,6 20:18,21 | 44:19 51:2,9,16 | **wraps** 24:10 | **12** 40:20 | |
| 21:24 22:1 | 51:20 53:9,10 | **writing** 3:24 | **120** 1:10 | |
| 30:23 | 53:13 54:17,24 | **wrong** 12:19 | **12th** 59:3 | |
| **trying** 10:15 19:7 | 55:13 56:9,12 | 23:23 45:2 | **13** 1:23 | |
| 21:5 27:12 | **videos** 12:19,23 | | **14** 59:8 60:11 | |
| 38:17 45:2 46:5 | 13:7 14:1 48:24 | | **15** 28:19 | |
| 50:17,21 | 49:2 | **X** | **18** 43:23 | |
| **tug** 17:14 | **videotape** 28:8 | **x** 21:4 60:1,8 | | |
| **turn** 15:2 30:4,7,9 | 29:6 30:12 | | | |
| **turned** 55:2 | **videotaped** 12:24 | **Y** | **2** | |
| **twisting** 26:22 | 29:1,16 34:19 | **yeah** 7:17 9:7,24 | **2** 32:18 53:8,11 | |
| **two** 6:7 27:3 | **videotaping** 28:6 | 10:1,15 20:17 | **20** 28:19 59:8 | |
| 40:12 41:11 | 29:20 31:17 | 22:6 23:3,4,21 | **2000** 5:21 | |
| 46:13 53:19 | **visible** 56:16 | 23:4,4 28:4,18 | **2002** 6:13 | |
| **type** 5:3,7 50:15 | **visual** 22:10 | 29:23 30:13 | **2004** 6:12,13,18 | |
| **types** 8:16 21:17 | **voice** 54:19 | 31:6,10,22 | 6:19 | |
| 25:10 26:21 | **vs** 1:5 | 32:19 33:6,22 | **2009** 10:6 32:3 | |
| **typewriting** | | 34:13 35:3,11 | **2011** 1:23 59:4 | |
| 58:14 | **W** | 37:3 38:11,21 | **25** 56:8 | |
| | **wacker** 1:21 2:2 | 39:3 40:13 | **26** 41:21 43:20 | |
| **U** | **wait** 4:11 | 41:17 44:12 | 44:17 51:1 | |
| **uhhuh** 10:8 15:19 | **waiting** 38:18 | 56:7 | **28** 53:8 | |
| 21:10 22:23 | **waive** 57:5,8,9 | **year** 5:22 10:3 | | |
| 47:18 | **walking** 17:15 | 11:23 13:7,14 | **3** | |
| **undercover** 6:3 | **wall** 46:4,9,13,23 | 13:17 14:18 | **3** 40:17 60:4,12 | |
| **understand** 4:15 | 47:1 48:13 52:7 | 28:15,17,21 | **3000** 1:21 2:2 | |
| 8:18 | 52:15,23 53:3 | 29:1,6 | **30th** 1:22 | |
| **understood** 4:19 | **walsh** 1:10 | **years** 6:2,7,7,8,10 | **31** 40:23 56:5 | |
| **united** 1:1,15 | **want** 4:4 7:1 14:7 | 8:7 10:10 32:1 | **3124635000** 2:3 | |
| **upcoming** 8:7 | 24:6,8 28:15 | **yep** 32:7 42:22 | **3126035153** | |
| **update** 13:8 | 31:23 40:9 | **youd** 54:1 | 2:10 | |
| **updated** 14:17 | 42:19 51:14 | **youll** 20:15 21:24 | **345** 14:6 | |
| **upper** 27:6,9 45:5 | 56:5 57:5,6 | 22:1 | | |
| 52:6 | **wants** 4:3 | **youre** 4:13 5:3 | **4** | |
| **upright** 52:14 | **washington** 2:9 | 16:7 17:17 | **40** 60:12 | |
| **use** 4:4,4 8:11,17 | **wasnt** 4:17 8:20 | 20:14,20 21:5 | **40hour** 13:15 | |
| 9:10,13,17 10:7 | 51:23 54:4 | 21:17,20 23:1 | | |
| 10:9,11 11:10 | 55:16,20,23 | 23:21 24:13 | **5** | |
| 11:19 12:4 13:4 | **watch** 6:4,22 | 26:20 27:12,17 | **50** 2:9 | |
| 13:5,16,18 14:1 | **water** 40:10 | 27:20 28:1 | **53** 51:5 | |
| 14:13,16 20:1,9 | **way** 21:22 24:7 | 29:21,24 30:19 | **55** 44:14 51:18 | |
| 22:13,14,22 | 25:5,6 26:22 | 42:23 43:2 | 53:11 | |
| 23:2,3,5,8,10,15 | 37:9,18 39:23 | 45:24 46:22 | **56** 60:5 | |
| 25:7 30:10 31:3 | 46:5 | 47:19 49:7,11 | **59** 40:20,23 41:21 | |
| 36:20 40:1 43:3 | **ways** 26:24 | 49:11,18,19,21 | 43:20 44:13 | |
| 43:8 45:2 46:17 | **weapon** 10:18 | 50:19 52:20 | 56:7 | |
| 48:10,11 55:5 | 17:5 | **youve** 28:13 29:5 | **5912** 41:18 56:10 | |
| | **wed** 22:14 | 30:12,16 31:16 | **5925** 56:5 | |
| **V** | **went** 53:5 | 51:9 | **5931** 56:4 | |
| **valley** 5:18 13:22 | **west** 2:9 | | **5th** 2:9 10:6 32:3 | |
| 13:24 | **whereof** 59:2 | **Z** | 32:15 | |
| **various** 34:2 | **willie** 1:6 | | | |
| **verbal** 16:9,17,23 | **witcoff** 2:2 | **0** | **6** | |
| 17:6 42:17 | **witness** 3:1,4 | **0** 43:23 44:17 | **60** 5:13 | |
| 55:18 | 47:6 57:8 58:9 | 51:1,4 | **60602** 2:10 | |
| **verbally** 38:2 | 58:9 59:2 60:2 | **00** 32:18,18 | **60606** 2:3 | |
| 48:23 55:16 | **wonder** 15:2 | **04** 59:8 | | |
| **verbals** 55:19 | **wooden** 22:6 | **09** 11:5 | **7** | |
| **versions** 19:22 | **words** 54:17 | **09328** 40:18 | | |
| **vertical** 24:4 | **work** 5:24 | | **8** | |
| **vertically** 45:9 | **worked** 6:4 | **1** | **844272** 1:21 58:7 | |

| COOK COUNTY DEPARTMENT OF CORRECTIONS GENERAL ORDER | DISTRIBUTION ALL SWORN PERSONNEL | EFFECTIVE DATE 9/20/02 | GENERAL ORDER NO. 9.16 |
|---|---|---|---|
| **CHAPTER** SECURITY AND CONTROL | **AMENDS** | | **RESCINDS** 9.16 eff. 10/1/91 |
| **SUBJECT** USE OF FORCE | | | **PAGE(S)** 1 of 7 |

I. **PURPOSE**

The purpose of this order is to establish:

    A.    The Cook County Sheriff's Office (CCSO) policy, guidelines and procedure for the use of force necessary for a Peace Officer to accomplish a lawful task.

    B.    The Cook County Sheriff's Office members will use the <u>minimum amount of force</u> necessary to accomplish the law enforcement purpose and recognition of the Cook County Sheriff's Office values regarding life.

    C.    The Use of Force Report.

    D.    The Use of Force Model.

II. **ACTION**

All sworn CCSO members are required to familiarize themselves with the contents of this order and to adhere to the policy established herein.

III. **ENCLOSURE**

    A.    Use of Force Report

    B.    Use of Force Model

IV. **ILLINOIS COMPILED STATUTES**

    A.    Chapter 720, Section 5/7-5, Illinois Compiled Statutes provides that;

        "Peace Officer's Use of Force in making arrest.

        (a)    A Peace Officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest. <u>However</u>, he is justified in using force likely to cause death or great bodily harm <u>only</u> when he reasonably believes that such force is

PLAINTIFF'S EXHIBIT

1

Hill v. Cook County et al.

1

337
CCSAO

necessary to prevent death or great bodily harm to himself or such other person, or when he reasonably believes **both that**:

    (1) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and

    (2) The person to be arrested has committed or attempted a <u>forcible felony that involves the infliction or threatened infliction of great bodily harm</u> or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will <u>endanger human life or inflict great bodily harm</u> unless arrested without delay.

  (b) A Peace Officer making an arrest pursuant to an invalid warrant is justified in the use of any force which he would be justified in using if the warrant were valid, unless he knows that the warrant is invalid."

B.    Chapter 720, Section 5/7-8, Illinois Compiled Statutes provides that;

"Force likely to cause death or great bodily harm.

  (a) Force which is likely to cause death or great bodily harm, within the meaning of Section 7-5, includes:

    (1) The firing of a firearm in the direction of the person to be arrested, even though no intent exists to kill or inflict great bodily harm; and

    (2) The firing of a firearm at a vehicle in which the person to be arrested is riding.

  (b) A Peace Officer's discharge of a firearm using ammunition designed to disable or control an individual without creating the likelihood of death or great bodily harm shall not be considered force likely to cause death or great bodily harm within the meaning of Section 7-5."

## V.  DEFINITIONS

A.    USE OF FORCE – Any physical force used to effect, influence or persuade an individual to comply with an order from a Peace Officer. The term includes deadly force and non-deadly force but does not include unresisted handcuffing.

B.    NON-DEADLY FORCE – Any use of force other than that which is considered deadly force.

C.    DEADLY FORCE – Any use of force likely to cause death or serious physical injury, including, but not limited to the use of a firearm or a strike to the head with a large object. Firing at someone is always deadly force.

D.    DEFENSIVE TACTICS – Including skills in verbal commands, handcuffing, uncooperative subject control, self-defensive tactics and the use of intermediate weapons.

338
CCSAO

force. If such are found to be ineffective in accomplishing a legal objective, a member may resort to the use of non-deadly physical force necessary to accomplish their legal objective.

F.     Peace Officers are permitted to use only the force necessary to effect lawful objectives. The determination of what is or is not reasonable force is based on each individual situation and is a judgment decision that the individual officer must make. The decision should be based on factors that include, but are not limited to the age, size or mental state of the individual, or the availability of assistance as well as the circumstances of the particular situation. In every instance where force is to be used, the Peace Officer contemplating the use of force will have:

1.     An articulable and reasonable belief that the use of force in that situation is required.

2.     An articulable and reasonable belief that the amount of force contemplated is required.

Officers will not unnecessarily or unreasonably endanger themselves to conform to this policy.

G.     CCSO members using excessive force, unwarranted physical force or verbal abuse will be subject to disciplinary action up to and including termination.

H.     Use of Non-Lethal Weapons/Techniques

1.     Procedures

a.     Before CCSO members are allowed to carry any Departmental authorized less than lethal weapon(s) they will be issued a copy of, and receive instruction in the Department's use of force policies and will be trained in the use of said weapon(s).

b.     A Peace Officer's authority to use any force, as well as the degree of force that he may employ, is governed by the United States Constitution, Illinois Statutes, case law and Departmental policy.

2.     Oleoresin Capsicum (O.C.) Spray

a.     Oleoresin Capsicum Spray will be used only when an individual exhibits behavior, which shows intent to actively resist or attack the Peace Officer or to prevent injury to another person. The use of Oleoresin Capsicum Spray is not regarded as use of force that would result in great bodily harm.

(1)     Decontamination will be rendered to individuals who have been sprayed with O.C. Spray as soon as possible. The appropriate level of assistance includes:

4

339
CCSAO

E.  IMPACT WEAPON – A weapon designed to establish control by means of impact.

F.  COMBATIVE BEHAVIOR – Mannerisms displayed by a subject that is actively fighting the sworn officer.

G.  AGGRESSIVE BEHAVIOR – Mannerisms displayed by a subject that indicate to the sworn officer that the subject is escalating to a higher level of force.

H.  REASONABLE BELIEF – The person concerned, acting in a reasonable manner believes that the described facts exist.

I.  GREAT BODILY HARM – A bodily injury that creates a substantial risk of death, causes serious, permanent disfigurement, or results in long term loss or impairment of any bodily member or organ.

J.  FORCIBLE FELONY – Treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnapping, kidnapping, aggravated battery resulting in great bodily harm or permanent disability or disfigurement and any other felony which involves the use or threat of physical force or violence against any individual.

K.  USE OF FORCE MODEL – The use of force paradigm adopted by the Sheriff's Office is a guide that suggests a reasonable response to a subject's actions. Officers will not unnecessarily or unreasonably endanger themselves to conform to these suggested guidelines.

VI.  POLICY AND GUIDELINES

A.  All CCSO members will be trained in the principles that apply to the Use of Force Model.

B.  Deadly force may be used in defense of human life (Officer or another) or to protect a person from immediate danger of serious physical injury. The protection of life is paramount. Peace Officers are not to use deadly force to prevent an arrest from defeat by resistance or escape merely because the offense committed or attempted is categorized as a Forcible Felony, but is permissible if the threat to life is imminent.

C.  Peace Officers must identify themselves and give verbal warnings to any suspect prior to using any force, except under exigent circumstances.

D.  While the use of non-deadly force may be necessary to attain control in certain situations, Peace Officers should not resort to such force unless other reasonable alternatives have been unsuccessfully attempted or would be ineffective under the circumstances involved.

E.  Peace Officers, whenever possible, will exercise advice, persuasion, verbal commands and warnings prior to the consideration of non-deadly physical

3

(a) Exposure to fresh air.
(b) Flushing exposed areas with cool water.
(c) Washing with soap and water.
(d) Medical treatment when necessary.
(e) Universal precautions will apply when rendering decontamination and personal protection equipment will be utilized when appropriate.

b. CCSO Members will only be allowed to carry Department approved Oleoresin Capsicum Spray after satisfactory completion of formal training by a certified instructor.

3. Baton/Expandable Baton

A Peace Officer may use their Department authorized impact weapon, baton/expandable baton, only when a lesser degree of force would be insufficient in overcoming resistance by an arrestee.

4. Defensive Tactics

It shall be the responsibility of the Sheriff's Training Institute to instruct all recruits and officers in the defensive tactics approved by the Department for use in addressing subjects exhibiting aggressive or combative behavior.

I. Peace Officer's Use of Deadly Force Guidelines

1. An Officer is justified in using force likely to cause death or great bodily harm only when the officer reasonably believes that such force is necessary for the protection of life:

a. To prevent death or great bodily harm to the Officer or another person; or

b. To prevent the defeat of the arrest by resistance or escape and the person to be arrested is using a firearm and indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

The use of a firearm in any case is a last resort measure. Peace Officers may resort to the lawful use of firearms only after all other reasonable means at their disposal to effect apprehension and control of an individual have been attempted without success.

2. The following acts are prohibited:

a. Firing into crowds.

b. Firing warning shots.

5

c. Firing at an individual against whom the use of deadly force is authorized by law when there is a likelihood of serious injury to persons other than the person to be apprehended.

d. Firing into buildings, through doors, windows or other openings when the person lawfully fired at is not clearly visible.

e. Firing at or in the direction of a vehicle or person against whom he/she may legally use such force if there is a likelihood of serious injury to innocent persons or if the use of such force would likely outweigh the law enforcement purpose served.

f. Firing solely to protect property interests or to stop an individual on mere suspicion of a crime simply because the individual runs away.

## VII. NOTIFICATION AND REPORTING PROCEDURE

1. Every use of force by a CCSO member will be reported immediately in compliance with departmental procedures.

2. Any member using physical force will immediately submit a Use of Force Report, via the chain of command. A Use of Force Report not made within one (1) hour will be considered in breach of the notification procedure and is to be explained in an additional report.

3. Any member with knowledge of any unreported use of force or allegation thereof will immediately report this information to his/her watch commander.

4. Any member discharging a weapon while off-duty will immediately notify the Sheriff's Communications Center by telephone at (847) 294-4733 and the local jurisdiction. The Communications Center dispatcher will notify the appropriate Command Duty Officer.

5. The responding supervisor shall respond to the scene of the incident and conduct a competent inquiry into the circumstance surrounding the use of force and the justification for its use. Responding Supervisors shall make appropriate notifications in compliance with Department procedure.

6. The responding supervisor will submit a report of his findings before completing his tour of duty in compliance with Departmental procedures.

7. The responding supervisor will ensure that an Offense/Incident report is completed in compliance with Departmental procedures.

8. A copy of all reports and attachments prepared and/or collected in conjunction with the investigation be forwarded to the Office of the Inspector General, (I.G.) in addition to any copies forwarded to its Department of Internal Affairs or through the chain of command. This copy should be maintained by the I.G. as the CCSO's permanent record.

342
CCSAO

9.   The Inspector General shall review all reports forwarded to the Inspector General's Office and will assign any follow-up investigation deemed appropriate to the respective department.

## VIII.   MEDICAL AID AFTER USE OF FORCE

If after application of force, personnel observe injury, or the suspect complains of an injury, immediate medical attention must be obtained.

Decontamination of individuals who have been sprayed with Oleoresin Capsicum Spray is explained in H. Section 2 (a.)(1).

## IX.   ADMINISTRATIVE RESPONSIBILITY

A.   Unit heads and supervisory members will assure that all sworn members under their command are in possession of this order. This order will be read at roll call and reviewed twice annually during the months of June and December.

B.   The Director of the Training Division will be responsible for:

1.   Issuing this General Order to all recruits prior to graduation from the Academy.

2.   Training all CCSO members in the Use of Force Model.

3.   Insuring that the recruits fully understand the Department's policy regarding their conduct and responsibilities in the performance of their duties.

C.   In the event a civil complaint comes to the attention of the Sheriff's Office, alleging excessive or unwarranted physical force, that has not been the subject of internal investigation, an internal investigation will be initiated immediately.

## X.   APPLICABILITY

This order is applicable to all sworn CCSO members and is for strict compliance. Any conflicts with previous Orders, Policies or Procedures will be resolved in favor or this Order.

BY THE ORDER OF THE COOK COUNTY SHERIFF:

MICHAEL F. SHEAHAN

7

343
CCSAO



## Cook County Sheriff's Office
### USE OF FORCE REPORT

DATE_____

TIME_____

REPORTING OFFICER'S NAME_____ STAR #_____

TYPE OF FORCE USED (CHECK)

PHYSICAL FORCE_____BATON_____ OC SPRAY____OTHER (EXPLAIN)_____

TYPE OF INCIDENT_____

LOCATION OF INCIDENT_____

OFFICER/WITNESS PRESENT_____

PERSON(S) FORCE WAS USED AGAINST

NAME_____CHARGE(S)_____

NAME_____CHARGE(S)_____

DESCRIBE WHY THE USE OF FORCE WAS NECESSARY_____

_____

_____

_____

_____

IF OC SPRAY WAS USED, LIST ACTION TAKEN BY OFFICER TO MITIGATE THE EFFECTS OF THE SPRAY

WHEN_____WHERE_____

WAS FIRST AID REQUIRED? NO_____ YES_____ BY WHOM_____

WAS MEDICAL ATTENTION REQUIRED? NO_____ YES_____ BY WHOM_____

REPORTING OFFICER'S SIGNATURE_____ DATE_____

WATCH COMMANDER/SUPERVISOR'S SIGNATURE_____

344
CCSAO

# Use of Force Model
## The Use of Force Paradigm for Enforcement and Corrections



Copyright 1982, 1986, 1990, 1995 John C. Desmedt, All rights reserved

345
CCSAO

# Exhibit 3 – DVD

# Attached to transcript of Willie Lewis

**Date**: November 14, 2011
**Volume**: I

**Case**: Hill v. Cook County