**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY HILL, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 897 |
| | ) | |
| vs. | ) | Honorable Judge |
| | ) | Suzanne B. Conlon |
| THOMAS DART, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS' EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COPY

```
ANTHONY HILL,                    )
                                 )
     Plaintiff,                  )
                                 )
     vs.                         )  No. 1:10-cv-00897
                                 )
COOK COUNTY, THOMAS J.           )
DART, WILLIE LEWIS, ROBERT       )
BONAKOWSKI, NICHOLAS             )
BOHLSEN, MICHAEL CONTRERAS,      )
BRIAN TORO, JAMES HOLMES,        )
PETER CHICO, LEON MARMAL,        )
DANIEL MORECI, CRYSTAL           )
SPIVEY, HUGH WALSH,              )
CLARENCE LACY, JOHN DOES         )
1-20,                            )
                                 )
     Defendants.                 )
                                 )
```

THE DEPOSITION OF PETER CHICO, called for

examination, taken pursuant to the Federal Rules of

Civil Procedure of the United States District Courts

pertaining to the taking of depositions, taken before

April Hargett, a Certified Shorthand Reporter duly

certified in the State of Illinois, on November 15,

2011, at Ten South Wacker Drive, Suite 3000, Chicago,

Illinois, pursuant to notice.

APRIL D. HARGETT

License No.: 084-004735

## Page 2

1  APPEARANCES:
2
3  BANNER & WITCOFF, LTD
   BY: MR. BINAL PATEL
         -and-
4      MR. SEAN JUNGLES
         -and-
5      MR. ERIC HAMP,
   10 South Wacker Drive
6  Suite 3000
   Chicago, Illinois 60606
7  (312) 463-5000
       Appeared on behalf of Plaintiff;
8
9  COOK COUNTY STATE'S ATTORNEY'S OFFICE
   BY: MR. AARON BOND
10 50 West Washington
   Suite 500
11 Chicago, Illinois 60602
   (312) 603-5440
12     Appeared on behalf of Defendants.
13
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1                 I N D E X
2  Witness:                    Page
3  PETER CHICO
4    EXAMINATION BY MR. PATEL          4
     EXAMINATION BY MR. BOND          64
5
6           EXHIBITS
7  Chico
   Exhibit Nos.                Page
8
9  5   ERT Response Report          29
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1          (WHEREUPON, the witness was
2       duly sworn.)
3       PETER CHICO,
4  called as a witness herein, having been first duly
5  sworn, was EXAMINED and testified as follows:
6       EXAMINATION
7  BY MR. PATEL:
8     Q.  Could you please state your name for the
9  record?
10    A.  My name is Peter Chico, C-h-i-c-o.
11    Q.  And have you been deposed before?
12    A.  No, I haven't.
13    Q.  This is your first time.  Have you
14 testified at trial?
15    A.  No, I haven't.
16    Q.  Okay.
17    A.  I've gone to court, but I've never been
18 called to testify.
19    Q.  You've never been on the stand.  Okay.
20 Well, just let me lay some ground rules to this
21 deposition.  I'm going to ask you a series of
22 questions.  You're going to be asked to answer them
23 now that you've been sworn in.  The questions are
24 similar to the types of questions that you would be

## Page 5

1  asked in a courtroom in front of a judge or a jury,
2  and the testimony that you provide today is going --
3  is expected to be similar to the type of testimony
4  that you would provide in a courtroom; is that fair?
5     A.  Yes.
6     Q.  And we have a court reporter here that's
7  going to transcribe everything that's said between us
8  today.  Just some ground rules to make sure that the
9  transcription is accurately done.  Let's try to avoid
10 talking over each other.  When I'm asking a question,
11 hopefully you won't interrupt.  Then the same thing
12 when you're answering a question, I will do my best
13 not to interrupt.
14         Answers need to be audible.  A nod
15 or a shrug won't get accurately transcribed.  You
16 need to give a yes or no or some other answer.  If
17 you don't understand a question, just let me know,
18 and I'd be happy to paraphrase it or ask it again;
19 but it's important that you understand the questions
20 that I ask.  If you don't understand, let me know.
21 If you do answer the question, I'll assume that you
22 understood the question; is that fair?
23    A.  That's fair.
24    Q.  Okay.  And is there any reason why you

Elite Deposition Services
312-445-0005

## Page 6

1   cannot give honest and truthful and complete
2   testimony today?
3       A.   No.
4       Q.   You're not under any medication or
5   anything like that?
6       A.   The only thing is if I ask you to repeat
7   the question -- I'm a little hard of hearing, so
8   that's the only thing.
9       Q.   Okay.  Not a problem.  I'll be sure to
10  speak up then.
11      A.   Okay.
12      Q.   Well, let's start with your background.
13  Can you give us a brief history of your education?
14      A.   My educational background?  I have a
15  bachelor's in political science from Benedict, and
16  currently I'm getting my master's at DePaul.
17      Q.   What are you getting your master's in?
18      A.   Public service, public administration.
19      Q.   And when did you get your bachelor's?
20      A.   I graduated in May of 2005.
21      Q.   And how long have you been working at
22  Cook County?
23      A.   Roughly four years and six or
24  seven months.

## Page 7

1       Q.   Did you have employment before that?
2       A.   What was that?
3       Q.   Did you have any full-time employment
4   before that?
5       A.   Yes, I had several positions.  I was in
6   social services.  I was a caseworker for DCFS.  Prior
7   to that, I worked at a shelter home in connection
8   with DCFS.
9       Q.   When was the -- your time at the shelter
10  home?
11      A.   The shelter -- that was from about '07 to
12  about '08, and I was a caseworker for about a year
13  after -- wait.  I was at Maryville Academy -- I
14  graduated college in '05 and went to Maryville about
15  six months after that.  I stayed there until about --
16  oh, all I know is I started the County the 16th of
17  April, '07.  I was a caseworker up until the week
18  before the 16th of April, '07.
19      Q.   Okay.  And then you were a caseworker for
20  about a year?  Is that -- roughly?
21      A.   Yes.
22      Q.   And before that, you were at the shelter?
23      A.   Yes.
24      Q.   Now, at the shelter, what was your

## Page 8

1   responsibility?
2       A.   The shelter was facilitating groups with
3   the wards of the State, supervising them, making sure
4   nothing was going wrong with them yesterday.  That's
5   pretty much about it.
6       Q.   What type of groups were they?
7       A.   Life skills groups.  You know, obviously,
8   these kids are put out at an early age and get them
9   familiar with life and how to live life -- decorum --
10  that was the types of groups we'd have.  We'd take
11  them out to field trips, expose them to things that
12  they normally wouldn't be exposed to.
13      Q.   And then your time at DCFS, you were a
14  caseworker?
15      A.   Well, it was Volunteers of America, but
16  it was DCFS funded.  It was a private foster care
17  agency.  What I did there was -- basically, I was
18  responsible for 18 children -- my caseload was 18
19  children.  Basically, I was -- ultimately, I was a
20  parent.  You know, I had to know -- I was the first
21  one to know to if they ran away, first one to know
22  about their schooling, doctor appointments, and
23  everything going on in their life.  It was my
24  responsibility.  I had to go to court, juvenile

## Page 9

1   court, and testify on how they were doing and the
2   foster parents and the biological parents.
3       Q.   Okay.  So you have testified actually in
4   court?
5       A.   Yeah, not in this capacity.  I have
6   testified in juvenile court as a caseworker.
7       Q.   How many times have you testified?
8       A.   As a caseworker, 30, 40 times.
9       Q.   Okay.  Have you testified any other time
10  outside of your capacity as an officer?
11      A.   No.
12      Q.   Have you been deposed at any other time
13  outside of your capacity as an officer?
14      A.   No.
15      Q.   Okay.  And since April of '07, you've
16  been at Cook County?
17      A.   Yes.
18      Q.   Well, what have your job responsibilities
19  been?
20      A.   Upon graduating from the academy, I
21  started in Division 5, which is a minimum/medium
22  building.  It houses minimum/medium detainees.  I
23  started on midnights.  After that, I moved to 3:00 to
24  11:00.  I was there for roughly two years.  I tested

3 (Pages 6 to 9)

## Page 10

1  out for ERT, made the team, and I've been there ever
2  since.
3      Q.  Okay.  What's Division 5?
4      A.  Division 5 is a -- it's a building that
5  houses minimum/medium inmates.
6      Q.  Okay.  And where was that?  Where is
7  that?
8      A.  26th and California.
9      Q.  Okay.  And what did you do at Division 5?
10     A.  Basically, I was a tier officer
11 responsible for 40 inmates on the tier, making sure
12 they were fed, making sure they got their time out in
13 the dayroom, making sure their medical needs were
14 met, and so forth.
15     Q.  Okay.  And then 3/11?  What is 3/11?
16     A.  3/11?
17     Q.  After Division 5, you went to --
18     A.  I tested out for ERT, which is what I'm
19 doing right now.
20     Q.  Before ERT --
21     A.  I went straight from Division 5 to ERT.
22     Q.  Okay.  I think I misheard you then.  So
23 you were in Division 5 for about two years?
24     A.  Right.

## Page 11

1      Q.  I see.  And you've been an ERT, and
2  what's your responsibility within ERT?
3      A.  We have several different
4  responsibilities.  We are charged with taking high
5  risk movements to court, we do random searches in the
6  tiers, we do random searches throughout the compound
7  looking for contraband and other things that
8  shouldn't be in the jail, and that's about it.
9      Q.  When you say, "we," that includes
10 yourself, right?
11     A.  Yeah.
12     Q.  And in either your capacity at Division 5
13 or in your capacity as an ERT, have you ever had
14 occasion to use force on an inmate?
15     A.  Yes, I have.
16     Q.  How many times?
17     A.  Between Division 5 and ERT, I want to say
18 between three and four times.
19     Q.  And you filled out reports as a result of
20 that?
21     A.  Correct.
22     Q.  And you filled out a report each time?
23     A.  Correct.
24     Q.  And does that include the incident with

## Page 12

1  Anthony Hill?
2      A.  Correct.
3      Q.  Before the time with Anthony Hill, when
4  was the last time you had to use force?
5      A.  The last time prior to that?
6      Q.  Yes.
7      A.  Probably seven, eight months prior to
8  that.
9      Q.  And what were the circumstances of that?
10     A.  It was a run-in on a tier.  An inmate
11 wouldn't comply, so we secured him -- took him to the
12 ground and secured him.
13     Q.  And did anything else happen?
14     A.  No.
15     Q.  How long did that incident -- what was
16 the span of that incident?
17     A.  Oh, 20, 30 seconds.
18     Q.  So after you used force, the inmate
19 complied shortly thereafter?
20     A.  Correct.
21     Q.  And you filled out a report?
22     A.  Correct.
23     Q.  Was there ever any complaint --
24     A.  No.

## Page 13

1      Q.  -- logged against you?
2      A.  No.
3      Q.  Let's talk about the incident before
4  then -- the time before the incident that occurred
5  that you just testified about where you had to use
6  force, could you tell me about the incident before
7  that?
8      A.  I don't remember the incident prior to
9  that.
10     Q.  Okay.  Can you remember any other
11 incident?
12     A.  No.
13     Q.  But you recalled there is at least three
14 or four total?
15     A.  Correct.
16     Q.  Okay.  But you can recall this one, and
17 then we'll talk about the Anthony Hill one.
18     A.  Correct.
19     Q.  So there's one or two others that
20 happened, but you don't have a specific memory of it?
21     A.  Correct.
22     Q.  Was it as part of -- in your capacity as
23 an ERT or Division 5?
24     A.  Both.  I believe one was in Division 5

4 (Pages 10 to 13)

## Page 14

1 and one was ERT.

2 Q. So it looks like there was probably about

3 four incidences?

4 A. Yeah.

5 Q. With the Division 5 incident, do you know

6 roughly what time frame it was?

7 A. No, I don't.

8 Q. That would have been your first time that

9 you used force?

10 A. Correct.

11 Q. Are you aware of any grievances or

12 complaints being filed against you for handling of

13 the inmates?

14 A. I'm not aware.

15 Q. Have you ever been sued by any inmate?

16 A. To my knowledge, no.

17 Q. Other than this incident?

18 A. Other than this lawsuit.

19 Q. So this is your first time that you're

20 aware of having been personally sued?

21 A. To my knowledge, yes.

22 Q. Okay. Let's talk a little bit about your

23 training. What type of training have you had as a

24 police officer -- hold on. Let me just finish -- as

## Page 15

1 a police officer specifically with respect to when

2 and how to use force on inmates?

3 A. In the academy, we go through training --

4 familiarize yourself with the use of force paradigm

5 and go step by step on the situations that force

6 would be used and the type of appropriate force to be

7 used. Every year we have what is called an

8 in-service training, which we refresh on the use of

9 force model. We go through it, and we break it down.

10 That's about it.

11 Q. Do you have any training other than the

12 yearly training?

13 A. As far as?

14 Q. Other than the in-service training, any

15 other training?

16 A. On the ERT, we do have different

17 training. We have training on -- we've had training

18 on how to write reports. I mean, obviously, the

19 academy teaches that, but refresher -- refresher

20 courses. We've had different defensive tactic

21 training. We've had shotgun training. We've had OC

22 can training. We've had taser training. We've had

23 some training since I've been on ERT.

24 Q. Okay. Outside of the annual in-service

## Page 16

1 training, any other training specifically with

2 respect to the use of force?

3 A. Well, our use of force paradigm was

4 recently advised, so all officers had to go back and

5 get taught the use of force paradigm. I just went to

6 that class roughly two, two and a half months ago.

7 Q. Okay. What were the changes that were

8 made?

9 A. The main changes were a high risk -- a

10 high risk detainee was now -- was now factored in to

11 the use of force paradigm; therefore, given that

12 knowledge that he's high risk, force can be used on

13 that -- on that particular knowledge that this

14 detainee is high risk.

15 Q. Okay. I'm going to hand you what's

16 already been marked as Plaintiff's Exhibit No. 1.

17 A. Okay.

18 MR. PATEL: Do you need a copy?

19 MR. BOND: If you have an extra one.

20 BY MR. PATEL:

21 Q. Are familiar with this document --

22 Plaintiffs's Exhibit 1, by the way, is identified by

23 Bates No. CCSAO 337 through CCSAO 345.

24 Officer, could you describe for me

## Page 17

1 what Plaintiff's Exhibit 1 is?

2 A. It is a general order for the Department

3 of Corrections regarding use of force and enclosed in

4 it is the use of force paradigm, which we are to

5 follow when dealing with an inmate.

6 Q. Okay. And where is the use of force

7 paradigm? Is that the last page?

8 A. Yes.

9 Q. And that document is identified by CCSAO

10 345?

11 A. Correct.

12 Q. Can you describe this use of force

13 paradigm for me?

14 A. The use of force is broken down in

15 different subjects, cooperative subject, resister,

16 active and passive, and an assailant, and on the

17 bottom portion is the appropriate force that should

18 be used when dealing with these types of inmates.

19 Q. Okay. And let's start on the type of --

20 subject's actions. Cooperative subject, can you

21 describe the two categories that are listed there?

22 A. A cooperative subject is a subject who

23 is -- doesn't need direction, and that's --

24 basically, our presence alone -- the subject

## Page 18

1 understands my role and their role, and they're not
2 causing any problems or any trouble. A cooperative
3 subject and responds to direction is a subject who
4 not causes problems or trouble, but my presence alone
5 isn't always enough -- he needs to have verbal orders
6 given to him, go back to your cell, go here, and he
7 will follow and comply.
8     Q. Okay. And in that circumstance, the
9 appropriate conduct is what -- the appropriate type
10 of force, if any, that an officer can use is what?
11     A. For a cooperative subject?
12     Q. Yes.
13     A. There should be no force per se, but my
14 actions -- my presence and/or my verbals, and they
15 should -- they comply.
16     Q. That should be adequate?
17     A. Yes.
18     Q. Let's go on. We've got a resister. Can
19 you describe what type of conduct qualifies someone
20 who's resisting?
21     A. There's passive and active. A passive is
22 a non-movement and responds to verbal and other
23 direction, variable positioning. An example would be
24 if I walked into a day room, an inmate is on the

## Page 19

1 phone, I tell him to please hang up and go lock up,
2 and he's not responding to my presence nor my verbal
3 commands; therefore, he is a passive resister.
4     An active resister is somebody
5 who's -- I give him an order, not complying, I use a
6 physical hold, and he's squirming away from me and
7 doesn't want to be engaged in physical altercation;
8 therefore, he's just kind of moving from me.
9     Q. Okay. If the inmate is a passive
10 resister, what type of force is appropriate?
11     A. In a passive resister, we could -- we
12 could use some different type of holding techniques.
13 You grab his arm, place it behind his back, handcuff
14 him, and stuff like that.
15     Q. Okay. What's neuromuscular holding?
16 What is that?
17     A. Neuromuscular is major muscle groups, so
18 thighs is -- thighs is a major muscle.
19     Q. So what's an example of a neuromuscular
20 hold?
21     A. Well --
22     Q. This chart is describing that if the
23 inmate is a passive resister, holding is appropriate,
24 but neuromuscular only --

## Page 20

1     A. Oh, I'm sorry. As far as like the hand
2 and stuff, I could hold -- grab hold of his hand and
3 place it behind his back.
4     Q. Okay. What other examples?
5     A. Controls his -- controls his feet, so he
6 doesn't kick or get away.
7     Q. Okay. How would you control his feet?
8     A. Hold them.
9     Q. Can you put him in some sort of a twist
10 or anything like that?
11     A. For a passive resister?
12     Q. Yes.
13     A. No.
14     Q. If an inmate is on the ground, for
15 example, facedown, can you bend the legs or anything
16 like that?
17     A. If an inmate is on the ground, yes, we
18 can bend the legs. If he's using the legs as a
19 weapon to kick us or squirm or try to get out of the
20 hold, we'd use -- usually, we'd cross the legs and
21 keep them still.
22     Q. Okay. Where is that? Is that something
23 that you're trained on to cross the legs?
24     A. Yes. In our defensive tactics in the

## Page 21

1 academy, we train on several holds. And when an
2 inmate is on the ground, we are trained to cross the
3 legs so he's not kicking or doing anything else.
4     Q. Okay. And if you're crossing the legs
5 and holding the legs down in that fashion, is it
6 because the inmate is an active resister?
7     A. Yes.
8     Q. Is it appropriate to do that if the
9 inmate is a passive resister?
10     A. If he's a passive resister, it could be
11 appropriate. If the inmate's coming down, we have to
12 come down with him. And if we feel he's calm, we can
13 release the legs and go by -- he's setting the pace
14 at where we need to be at.
15     Q. If he's on the ground and he's not moving
16 and he's -- he's not resisting --
17     A. He could be making verbal threats; and if
18 we feel that it is threatening to us or somebody
19 else, we hold them.
20     Q. So -- okay. So if an inmate is giving
21 verbal threats, that could be cause for providing
22 more --
23     A. If he's taken down as a passive resister
24 and he's not moving or squirming, but he's making

## Page 22

1   verbal threats, yes.
2   Q. Okay. And then let's go to when an
3 inmate is an active resister, and the description –
4 there's a statement that you can use some sort of
5 stunning diffused pressure striking. What is that?
6   A. Stunning is basically maybe a jab to kind
7 of advert him so we could take control of the
8 subject.
9   Q. And what's diffused pressure striking?
10   A. Basically, a strike to the elbow or on
11 the shoulder. It's not going to do too much to him;
12 but hopefully advert his attention and help us get
13 control of the subject.
14   Q. Okay. Is there a procedure or protocol
15 that you follow with respect to videotaping an inmate
16 when force is being applied?
17   A. There are several inmates that are
18 videotaped all of the time. ERT -- we have a list of
19 inmates that we're responsible for as far as
20 movement. I believe we have one or two that get
21 videotaped or at least they were being videotaped all
22 of the time. If a supervisor feels that a detainee
23 has a history of acting up or he has acted up that
24 day, we will send an officer responsible for

## Page 23

1   videotaping. We will tell -- if the inmate acts up,
2 we turn the video camera on and start videotaping.
3   Q. Okay. And is it the supervisor's
4 decision whether or not they're videotaped?
5   A. Well, he'll send another officer with a
6 video camera and tell that officer if force is going
7 to be used -- if force is used, videotape it.
8   Q. Okay. But is that the supervisor's
9 decision whether or not to videotape?
10   A. To actually turn the camera on? The
11 supervisor, more times than not, isn't going to be
12 directly with us, so it's the officer's, I guess,
13 call. I mean, obviously, if we're using force, we're
14 using force. That's not debatable, so you should
15 turn the camera on or if that's the supervisor's
16 instructions to.
17   Q. So one time you would turn on the
18 videotape is when the supervisor tells you to do so?
19   A. Right.
20   Q. And is it fair to say another time that
21 you turn it on is if you or someone on your team is
22 using force on an inmate, and then it's appropriate
23 to turn on the videotape?
24   A. Correct.

## Page 24

1   Q. Okay. And is that generally the policy?
2   A. Right.
3   Q. So whenever force is being applied to an
4 inmate, the policy is to turn on the videotape and to
5 videotape the incident?
6   A. If there's a video camera. We do moves.
7 When I say, "moves," we transport where we don't have
8 a camera person with us, so it's not readily
9 available. But if a supervisor assigns another
10 officer to hold the video camera and his instructions
11 were, if force is going to be used, videotape it,
12 then we do.
13   Q. Are these video cameras kept in various
14 places throughout the facility, or is there a
15 designated location?
16   A. Our video cameras are kept in our CP,
17 which is a command post for ERT in the supervisor's
18 office.
19   Q. Okay. Is there just one video camera, or
20 are there multiple?
21   A. For our ERT team? I believe we have
22 three that are functioning as of right now.
23   Q. Do you have battery backups for these
24 cameras?

## Page 25

1   A. Correct. We have -- actually, I think
2 these are charged through a --
3   Q. So if you're in the middle of an incident
4 and the battery goes out --
5   A. We usually take two cameras.
6   Q. All right. And if you're in the middle
7 of the incident and the battery goes out, you switch
8 from one camera to other?
9   A. Correct.
10   Q. What if you didn't bring both cameras?
11 Is that --
12   A. If we didn't bring both cameras, usually
13 what would happen is -- we would want the -- the
14 supervisor hopefully is with us; but if not, we would
15 call and make notification that the battery life is
16 going to expire, and he would try to send somebody
17 over with another camera.
18   Q. What if you run out of memory?
19   A. What was that?
20   Q. What if you run out of memory? Same
21 thing?
22   A. Memory?
23   Q. Memory on the camera?
24   A. It's the same protocol. We make

Elite Deposition Services
312-445-0005

## Page 26

1  notification, and the supervisor will send over
2  another memory card.
3     Q.  Okay.  And once you start videotaping,
4  how long do you keep the videotape on?
5     A.  It depends.  When force is used and we
6  start videotaping, we usually will keep the videotape
7  on as a supervisor -- as the supervisor deems fit.
8  If he feels that the video camera should be on them
9  from the time the incident occurred all the way to
10  when the inmate is secure in the cell, then that's
11  what we'll do.  The supervisor is notified, and they
12  usually make the call.
13    Q.  Is there a general guideline in terms of
14  what you should be videotaping?
15    A.  When force is being used?
16    Q.  Yes.
17    A.  Yes.  Tape as much as you can get of the
18  situation occurring.
19    Q.  Okay.  But you keep taping it until the
20  supervisor says, okay, now you could turn it off?
21    A.  Correct.
22    Q.  Okay.  When -- well, going back to use of
23  force.  When force is being applied on an inmate
24  for -- you know, according to the protocol identified

## Page 27

1  in Plaintiff's Exhibit 1, do you take into account
2  any sort of injuries that the inmate may have or
3  certain weaknesses that they may have?
4     A.  A lot of times we're not privy to that
5  information.  We don't know.  We deal with thousands
6  and thousands of inmates.  I don't know every medical
7  condition that everyone has.  A lot of times that
8  information isn't readily available to us when
9  dealing with an inmate.
10    Q.  Okay.  If an inmate, for example, tells
11  you that he's got, you know, a bad shoulder, you
12  know, do you take that into account in the force that
13  you're applying?
14    A.  You know, let's say we're cuffing an
15  inmate, and he's not doing anything, we're just
16  cuffing him to -- say, we're going to tier search, we
17  take every inmate out, and we cuff them.  He's not
18  doing anything, but we're cuffing him for everybody's
19  safety and security.  If he tells us that he has a
20  shoulder problem, we try to accommodate him as best
21  we can.  However, if an inmate is combative, if he's
22  an active resister, we have to do what we have to do
23  to control the situation for the safety and security
24  of us, of him, and the other inmates on the deck.

## Page 28

1     Q.  Okay.  So at that point, you do what you
2  have to do, and you don't necessarily take into
3  account --
4     A.  Correct.
5     Q.  All right.  Let's start talking about
6  Anthony Hill now.  When was the first time that you
7  ever came into contact with Anthony Hill?
8     A.  The first time was -- that I could
9  remember specifically is the incident in Cermak
10  Hospital.
11    Q.  You're not aware of any incident
12  before?
13    A.  I'm not aware of who he was prior to
14  that.
15    Q.  Okay.  Did you have occasion to interact
16  with him after that incident at Cermak?
17    A.  No.
18    Q.  So the only interaction that you've had
19  with Anthony Hill was on that date and the events
20  that we'll be talking about in Cermak?
21    A.  Correct.
22    Q.  And that was on November 5th,
23  2009?
24    A.  Correct.

## Page 29

1            (The document was thereupon
2             marked for identification
3             as Chico Exhibit No. 5, as
4             of November 15, 2011.)
5  BY MR. PATEL:
6     Q.  Okay.  I'm going to hand to you what's
7  being marked as Plaintiff's Exhibit 5.  It's a
8  document identified by Production No. CCSAO 319
9  through CCSAO 322.
10         Officer, take a look at this
11  document, and let me know if you're familiar with
12  this document.
13    A.  (Witness complied.)  Yes.
14    Q.  You are?
15    A.  Yes.
16    Q.  What is this document?
17    A.  The first page is an emergency response
18  team ERT activity report.  Basically, we fill these
19  out on activity that we have throughout the day to
20  account for our time during our shift.
21    Q.  And is this -- let's just stick with the
22  first page.  Did you fill this out?
23    A.  Yes, I did.
24    Q.  That's your handwriting?

Elite Deposition Services
312-445-0005

Page 30

1  A. That's my handwriting.
2  Q. And you filled it out on November 5th?
3  A. Correct.
4  Q. And it was a walk and transport of inmate
5  Anthony Hill?
6  A. Uh-huh.
7  Q. Yes?
8  A. Yes.
9  Q. Okay. Again, sorry, but the court
10 reporter needs to hear you say everything. It
11 reflects that there was a videotape, ERT 09-361?
12 A. Correct.
13 Q. And there was one videotape, correct?
14 A. Correct.
15 Q. There is not a second or a third?
16 A. Correct.
17 Q. What is a tracking number?
18 A. Tracking number is when a supervisor
19 assesses an incident report that they need to report
20 to our central control, and they are given a tracking
21 number.
22 Q. Okay. For that incident?
23 A. Yes.
24 Q. I understand. And this is a report

Page 31

1  relating to the transport of Anthony Hill from Cermak
2  to Division 9.
3  A. Right.
4  Q. So you were taking him from Cermak back
5  to the cell?
6  A. Correct. After he was going to get done
7  whatever he needed to get done at Cermak, we were
8  responsible for taking him back.
9  Q. And it occurred between 1400 hours -- it
10 started at 1400 hours and ended around 1600 hours?
11 A. Approximately.
12 Q. That's the time frame that you were
13 involved with this situation?
14 A. Correct.
15 Q. And the ERT members involved in this
16 situation were yourself, Officer Holmes, and Officer
17 Bohlsen, correct?
18 A. Yes.
19 Q. Was there anybody else?
20 A. Yes. Actually, later, I believe, Officer
21 Toro and Officer Contreras showed up.
22 Q. When did they show up?
23 A. While we were still in Cermak.
24 Q. Okay. By then, was the incident going in

Page 32

1  the midst of --
2  A. We were right in the middle of the
3  incident.
4  Q. And when we're talking about the
5  incident, we're talking about an incident where
6  Anthony Hill was allegedly acting up, and you were
7  responding accordingly?
8  A. Correct.
9  Q. And Officer Toro and Contreras showed up
10 in the middle of that?
11 A. Correct.
12 Q. Was there anyone else?
13 A. No.
14 Q. Any other non-ERT officers that were
15 involved in this incident?
16 A. No.
17 Q. Were Officers Toro or Contreras at Cermak
18 prior at all to the incident?
19 A. Prior to?
20 Q. Prior to this incident occurring, were
21 they at Cermak, or did they show up --
22 A. No, the supervisor sent them there.
23 Q. I see. Who was the supervisor?
24 A. I believe it was Sergeant Cobble that was

Page 33

1  the sergeant on duty.
2  Q. Sergeant Cobble?
3  A. Yes.
4  Q. He would have instructed in terms of
5  whether or not to turn on the videotape or turn off
6  the videotape?
7  A. He sent another officer, which was
8  Officer Holmes, with the video camera and told him,
9  if force was being used, turn on the videotape.
10 Q. So there was another officer involved,
11 Officer Holmes?
12 A. Officer Holmes was charged with holding
13 the video camera and taping it if something was to
14 happen.
15 Q. So did he show up at Cermak?
16 A. Officer Holmes?
17 Q. Yes. Or did he go back to get the
18 videotape and then come back?
19 A. At the beginning of our shift, Officer
20 Bohlsen and Officer Holmes and myself were assigned
21 to go to Cermak to relieve the day shift officers,
22 and we all walked over together.
23 Q. And then at some point, Officer Holmes
24 was videotaping. Did he just take over the

9 (Pages 30 to 33)

## Page 34

1 videotape -- the camera that was there, or did he go
2 back and get another one?
3    A. He never left Cermak. I don't remember
4 if he -- if there was a video camera from day shift
5 already there or if he took one when we left. That I
6 can't recall.
7    Q. And did Officer Holmes start videotaping
8 in response to instruction by Sergeant Cobble, or did
9 he just do it because an incident was going to occur?
10    A. He did it because an incident was going
11 to occur.
12    Q. Okay. Okay. Let's go on to the next
13 page; and the page thereafter, it looks like that's
14 another document. What is that document, CCSAO 320
15 and 321?
16    A. This document is a Department of
17 Corrections incident report. We fill this out when
18 an incident has occurred.
19    Q. Is this your handwriting?
20    A. No, it's not my handwriting.
21    Q. Oh, this is Officer -- appears to be
22 Officer Bohlsen's report. Did you fill out an
23 incident report?
24    A. No, I did not.

## Page 35

1    Q. Should you have?
2    A. No.
3    Q. Why not?
4    A. Because Officer Bohlsen filled out the
5 incident report for everything that happened.
6    Q. Okay. Take a look at the statement of
7 facts narrative that's on CCSAO 320. If you -- could
8 you review that, and let me know when you're done.
9    A. (Witness complied.) Okay.
10    Q. Is that an accurate summary of what
11 occurred?
12    A. Yes.
13    Q. Is there anything that you would clarify
14 or --
15    A. No.
16    MR. BOND: Can we go off the record?
17       (WHEREUPON, a discussion
18       was had off the record.)
19    MR. PATEL: Can we go back on? Sorry about
20 the interruption.
21 BY MR. PATEL:
22    Q. In the statement, it says that the
23 filming was commenced after Sergeant Cobble was
24 notified. So did Sergeant Cobble instruct the

## Page 36

1 filming to occur, or was that just being done?
2    A. I don't know. That's Officer Holmes --
3 Officer Holmes has to answer that.
4    Q. Once you film, what happens to the
5 videotape?
6    A. It is placed in a videotape brown
7 envelope and is turned over the to supervisor; and
8 from there, they do what they do with it.
9    Q. The whole camera isn't placed in the
10 envelope --
11    A. No, the memory card --
12    Q. Just the memory card?
13    A. -- is placed in a brown videotape
14 envelope, and it's labelled with the videotaping
15 officer, the incident, brief summary. It's given to
16 the supervisor, which in ERT is the sergeant, and
17 we're done with it from there.
18    Q. In this case, would it have been Sergeant
19 Cobble that would have received the brown envelope
20 with the videotape in it?
21    A. Right.
22    Q. Okay. Let's go to the last page, CCSAO
23 322. What is this?
24    A. This is a sheriff's office use of force

## Page 37

1 report. Whenever a -- force is used on an inmate,
2 you are required to fill this out.
3    Q. This is something that you filled out?
4    A. Correct.
5    Q. On November 5th, 2009?
6    A. Correct.
7    Q. It looks like you filled it out around
8 1500 hours?
9    A. I don't know if I filled that out. That
10 wouldn't be accurate to what -- what the first
11 page -- it could be approximate time when force was
12 being used; but as far as me filling this report out,
13 I don't think that that would be accurate.
14    Q. Okay. So you're saying -- but you put in
15 the time, right? Is that your handwriting?
16    A. That -- I can't verify that that is my
17 handwriting, the actual time.
18    Q. Okay. Thank you. Let's go back to the
19 incident report, which is CCSAO 320 through 321. I
20 asked you to read the statement of facts narrative
21 that was filled out by what appears to be Officer
22 Bohlsen; is that fair?
23    A. Correct.
24    Q. Okay. And then there is a signature by

10 (Pages 34 to 37)

## Page 38

1  the supervisor, which appears to be Sergeant Cobble,
2  correct?
3     A.  Correct.
4     Q.  And then there's an administrative
5  assessment section, correct?
6     A.  Yes.
7     Q.  And in that administrative assessment
8  section, I take it that that's the section that
9  Sergeant Cobble fills out assessing the situation?
10    A.  Yes.
11    Q.  And that's what he fills out after he has
12 had an opportunity to talk to the officers?
13    A.  Yes.
14    Q.  Can you take a look -- and his assessment
15 goes on from page 320 and spills over to 321?
16    A.  321 is this?  No, it doesn't.  This is a
17 continuation.
18    Q.  Oh, the narrative.
19    A.  Okay.  So this is Officer Bohlsen.
20    Q.  I understand.  Fair point.  So I asked
21 you to read the statement of facts, and I believe we
22 broke this down to the narrative that was on 320.  We
23 did not go on and read the narrative that was on 321.
24       Can you take a look at the narrative

## Page 39

1  that carries over to 321, and let me know when you're
2  done.
3     A.  (Witness complied.)  Okay.
4     Q.  Is that an accurate description of what
5  occurred?
6     A.  Yes.
7     Q.  Okay.  All right.  So if I understand,
8  this inmate, Anthony Hill, was at Cermak, and he was
9  waiting for medical attention at the time?
10    A.  Correct.
11    Q.  And at some point, the report says that
12 he became an active resister by jerking away from an
13 officer?
14    A.  Correct.
15    Q.  As a result, he was taken to the ground?
16    A.  Correct.
17    Q.  And at some point, you responded with
18 shackles and blue box?
19    A.  Negative.  Officer Toro and Contreras
20 responded with shackles and blue box.
21    Q.  Okay.  Right.  So it was those two
22 officers?  What that means is shackles and a blue box
23 were put on Anthony Hill by Officer Contreras and
24 Toro?

## Page 40

1     A.  Correct.
2     Q.  What are shackles?
3     A.  Shackles are basically leg restraints.
4  Handcuffs are for wrists; shackles are for the
5  ankles.
6     Q.  Okay.  And they look just like handcuffs
7  except they're used for --
8     A.  They're bigger in size.
9     Q.  Okay.  And what's a blue box?
10    A.  A blue box is a -- is placed on the links
11 of the handcuff.  It is secured, and a chain goes
12 through the blue box, placed around the subject's, I
13 guess, midsection for further security and for
14 further -- to keep his arms and hands closer to his
15 body.
16    Q.  I see.  So it is used to further secure
17 the inmate around the arms and the hands?
18    A.  Correct.
19    Q.  And the inmate already had handcuffs on?
20    A.  Correct.
21    Q.  So after the shackles and the blue box
22 were put on Anthony Hill -- he already had handcuffs
23 on at the time, correct?
24    A.  Correct.

## Page 41

1     Q.  He then became cooperative and sat down?
2     A.  Yes.
3     Q.  Okay.  So then he had medical attention;
4  and at that point, the filming was stopped, correct?
5     A.  Correct.
6     Q.  And then after he had seen the doctor, it
7  seems like there was another -- the report says that
8  there was another point where he became a passive
9  resister?
10    A.  Correct.
11    Q.  What was he doing there?
12    A.  He refused to move -- refused to walk
13 back to Division 9.
14    Q.  And the camera was turned back on again?
15    A.  Correct.
16    Q.  And who was filming at that time?  Was it
17 still Officer Holmes?
18    A.  Correct.
19    Q.  And what did you do in response to him
20 being a passive resister at that time?
21    A.  We just assume the escort position, me
22 and Officer Bohlsen, and we began moving the detainee
23 accordingly back to Division 9.
24    Q.  And what is an escort position?

11 (Pages 38 to 41)

## Page 42

1  A. Escort position is a -- is a position we
2  place the detainee in -- my arm coming through his
3  arm onto his back, and it's a -- it's a technique we
4  use for a passive resister who don't want to move so
5  we can get him from one place to another.
6  Q. So there's an officer holding each arm of
7  the detainee?
8  A. The way we're positioned is as if we're
9  coming through the arm when he's secure and our hand
10  upon his back.
11  Q. Okay. But you're on one side, and the
12  other officer is on the other side?
13  A. Correct.
14  Q. And he's still handcuffed?
15  A. Yes.
16  Q. Shackled and blue boxed?
17  A. Correct.
18  Q. At that time, is there any diffused
19  pressure striking applied?
20  A. No.
21  Q. Was there any neuromuscular holding
22  applied?
23  A. No.
24  Q. So you're holding him in the description

## Page 43

1  that you've just provided, and that's not considered
2  a neuromuscular hold?
3  A. Oh, a hold? We weren't striking him, no.
4  Yes, he was in -- well, he was restrained. So the
5  way we're -- the way our arms are positioned, I guess
6  you could refer to it as a hold, but it's just coming
7  through -- coming through here, and our hands ending
8  up on his back. (Indicating.)
9  Q. Okay.
10  MR. BOND: Just for the record, when he said,
11  "coming through here," he was talking about the space
12  between the elbow and the chest. Would that be
13  accurate to say?
14  THE WITNESS: Yes.
15  BY MR. PATEL:
16  Q. When you're putting your arm -- when
17  you're holding him, you're basically putting your arm
18  between his arm and his torso?
19  A. Right.
20  Q. And then your arm is coming around --
21  it's coming from the front going to the back, and
22  your hand is up against his shoulder blade?
23  A. Right. Right.
24  Q. And during that -- this whole time that

## Page 44

1  he was then becoming a passive resister and you were
2  escorting him and he was being held, he was being
3  videotaped, correct?
4  A. Yes.
5  Q. Was he saying anything at the time?
6  A. That I can't recall.
7  Q. Was he walking, or did you have to drag
8  him?
9  A. We placed him in this position because he
10  refused to move.
11  Q. And then after you placed him in that
12  position, was he moving?
13  A. Then he became compliant.
14  Q. At any point from when you were
15  transporting from Cermak to Division 9, did you drag
16  the inmate?
17  A. No.
18  Q. He was walking -- he walked the whole
19  time?
20  A. No. We put him in the escort position.
21  When we got to RCDC, he became compliant; therefore,
22  there was no further use for the escort position.
23  Q. Okay. Did you use a cart to transport
24  him?

## Page 45

1  A. Yes.
2  Q. What kind of cart? Why did you have to
3  use a cart?
4  A. Basically, we just thought it would be
5  easier.
6  Q. Because he was resisting or because of
7  any other reason?
8  A. For a number of reasons. You know, he
9  had leg restraints on, and it's quite a walk from
10  where we were to Division 9. It just made it easier
11  for everybody involved.
12  Q. Was he -- did you notice a limp or
13  anything like that on him?
14  A. Excuse me?
15  Q. That he was limping?
16  A. No.
17  Q. After -- after he started becoming
18  compliant, was he compliant all the way until the
19  end, or was there a time after that that he became
20  resistant in any way?
21  A. We got to Division 9, and he was -- he
22  was yelling -- yelling obscenities when we got to
23  Division 9.
24  Q. What did you do in response to him

12 (Pages 42 to 45)

Elite Deposition Services
312-445-0005

## Page 46

1  yelling?
2      A.  At that point, we didn't do nothing.  We
3  don't take it personal, you know, if he's yelling.
4      Q.  Why didn't you take it personal?  Why
5  didn't you use force at that time?
6      A.  We were already at our destination,
7  Division 9.  He wasn't making any movements toward
8  us.
9      Q.  Okay.  And the whole time the videotape
10  was running?
11      A.  That I'm not 100 percent certain of.
12      Q.  Okay.  But at least it should have been
13  going?
14      A.  Yeah, whatever -- yeah, whatever Officer
15  Holmes should have -- whatever his directives were or
16  his instructions were.
17      Q.  Are you aware of Officer Holmes being
18  instructed to stop videotaping at any point?
19      A.  I'm not aware of that.
20      Q.  Okay.  Do you know how he was cleared by
21  the ER?
22      A.  Do I know how he was cleared?
23      Q.  Yes.  Do you know what the ER -- what
24  sort of treatment he received by the ER?

## Page 47

1      A.  No.
2      Q.  Do you know what treatment he was
3  given -- when he went to see the ER physician, was he
4  handcuffed, shackled, and blue boxed?
5      A.  Yeah, he was still shackled and blue
6  boxed.
7      Q.  And do you know what type of treatment he
8  received?
9      A.  No, I don't.
10      Q.  Are you aware of any -- of Anthony Hill
11  complaining about any injuries to his knee?
12      A.  I'm not aware.
13      Q.  Do you remember him telling you or
14  anybody else that he has pins in his knees?
15      A.  That I don't remember.
16      Q.  Had you known that he had pins in his
17  knees, would that have affected your conduct towards
18  him?
19      A.  Excuse me?
20      Q.  Had you been aware that he had pins in
21  the knees, would that have affected your conduct
22  towards him?
23      A.  If he was going to calm down -- I mean,
24  if he is an active resister, he's an active resister,

## Page 48

1  and I have to do what I need to do to take control of
2  the situation.  If he has pins in his knees and he's
3  still actively resisting, it ain't hurting him or it
4  ain't bothering him that much, so I would need to do
5  what I need to do to gain control of the situation.
6      Q.  Okay.  We've been going about an hour.
7  Do you want to take a quick five minutes break, or we
8  could keep going.  We're going to jump over to the
9  videotape.  If you want to get some coffee, get some
10  water, that's fine, or we can keep going.
11      A.  Keep going.
12      Q.  Okay.  Now we're going to get to the
13  multimedia part of the deposition.  I'm going to play
14  for you portions of the videotape that was taken.
15      A.  Okay.
16      MR. PATEL:  And for the record, what I'm
17  playing is the videotape identified as Plaintiff's
18  Exhibit 3.  It's been identified as Videotape No. ERT
19  09-328.
20      MR. BOND:  Off the record for one second.
21      MR. PATEL:  Yes, let's go off the record.
22              (WHEREUPON, a discussion
23               was had off the record.)
24      MR. PATEL:  Back on.

## Page 49

1  BY MR. PATEL:
2      Q.  Okay.  I'm going to play portions of this
3  videotape.  The videotape is fairly long.  I'm going
4  to start and stop at various points.  If you need to
5  see other parts to get perspective or anything, just
6  let me know.  For purposes of the record, I will
7  identify the videotape based upon the time that's
8  marked on the DVD in terms of when -- where we are on
9  that videotape.
10          There isn't a time stamp per se, but
11  it will tell you how many minutes into the video
12  we're on.  So let's start at roughly 49 minutes.
13  We're at 49:32, and let's play a little bit.
14      A.  Okay.
15              (WHEREUPON, a video
16               recording was played.)
17      MR. PATEL:  Okay.  Let's pause it right
18  there.  I'm pausing it at 50:01.
19  BY MR. PATEL:
20      Q.  So it starts when Anthony Hill is already
21  on the ground.  And there's a few officers holding
22  him down; is that correct?
23      A.  Correct.
24      Q.  You didn't start the videotape before

13 (Pages 46 to 49)

## Page 50

1  when he was acting up?
2      A.  I wasn't -- I didn't start nothing.  I
3  wasn't in charge of the videotape.
4      Q.  What happened before this?  Was he
5  engaging in any physical activity?
6      A.  He pulled away from Officer Bohlsen.
7      Q.  Why did he pull away from Officer
8  Bohlsen?
9      A.  He was getting loud at Cermak.  Officer
10  Bohlsen went to take him to another location, and he
11  pulled away from him.
12      Q.  Can you explain that again?  What was
13  Officer Bohlsen intending to do?
14      A.  Take him -- he was being loud and
15  belligerent and further bothering medical staff and
16  other detainees receiving treatment.  He was going to
17  take him to another area to calm him down and see
18  what the problem was so he wasn't a distraction to
19  the hospital and everything else that was going on.
20      Q.  Okay.  And someone is holding down his
21  legs.  Do you see that?
22      A.  Yes.
23      Q.  Who's that?
24      A.  That's me.

## Page 51

1      Q.  Is that a hold you learned during
2  training?
3      A.  Correct.
4      Q.  And this is the type of hold that is
5  allowed to restrain --
6      A.  Correct.
7      Q.  -- according to your training?
8      A.  Correct.
9      Q.  Are there other holds that you can put on
10  somebody's knee?
11      A.  As far as their legs?
12      Q.  Yes.
13      A.  This is pretty much the standard hold
14  that they want us to use.
15      Q.  And why is that?
16      A.  It's easy crossing over the legs and
17  controlling them.
18      MR. PATEL:  Okay.  Let's keep playing.
19          (WHEREUPON, a video
20           recording was played.)
21      MR. PATEL:  Okay.  Let's pause it.  We're at
22  59:20.
23      BY MR. PATEL:
24      Q.  You hear somebody talking on the intercom

## Page 52

1  or the radio it seems -- somebody saying, keep the
2  videotaping going?
3      MR. BOND:  I'm sorry.  59:20.
4      MR. PATEL:  Yes.
5      BY MR. PATEL:
6      Q.  The person talking --
7      A.  The person talking, I believe, is
8  Sergeant Cobble.
9      Q.  And he's instructing you to keep the
10  videotape going?
11      A.  Instructing Officer Holmes.
12      MR. PATEL:  All right.  And let's keep
13  playing.
14          (WHEREUPON, a video
15           recording was played.)
16      MR. PATEL:  Okay.  Let's pause it.
17      BY MR. PATEL:
18      Q.  At this point, is he resisting in any
19  way?
20      A.  I believe he's in force -- using force
21  with his legs trying to get out of the hold.
22      MR. PATEL:  Okay.  Let's keep going.
23          (WHEREUPON, a video
24           recording was played.)

## Page 53

1      MR. PATEL:  Okay let's pause it.  We've
2  paused it at 52:07.
3  BY MR. PATEL:
4      Q.  At this point -- by the way, there's
5  somebody asking about the battery, and there was
6  apparently a statement by Sergeant Cobble?
7      A.  Yes.
8      Q.  And Sergeant Cobble is saying that he's
9  going to send another battery or another camera?
10      A.  Another camera, I believe.
11      Q.  Okay.  At this point, is Anthony Hill
12  still resisting?
13      A.  At this point, I cannot know if he's
14  still resisting with his legs.
15      Q.  Okay.  But what about the period that we
16  were watching up until 52:07?  Was he resisting
17  during those periods?
18      A.  I don't believe he was resisting.
19      Q.  If he wasn't resisting, does that mean
20  that you could take down the hold?
21      A.  At this point, he is obviously still
22  verbally aggressive and making threats.  This hold
23  was kept in place until further security -- the blue
24  box and shackles arrived on scene, so we could place

14 (Pages 50 to 53)

Page 54

1 them on him for further security.
2     Q. Okay. What threats was he making?
3     A. If you take these cuffs off, you know,
4 he's going to do whatever he's going to do.
5     MR. PATEL: Okay. Okay. Let's keep playing.
6          (WHEREUPON, a video
7          recording was played.)
8     MR. PATEL: Okay. Let's pause it right now.
9 We paused it at 53:02.
10 BY MR. PATEL:
11     Q. At this point, the minute or so that we
12 played, it didn't appear that Anthony Hill was even
13 saying anything, right?
14     A. No.
15     Q. Would you consider him to be a resister
16 at that point?
17     A. My verbal was "relax," so I probably told
18 him to relax because he might have been resisting
19 with his feet.
20     Q. Okay. If he was resisting with his feet,
21 what could have happened?
22     A. Explain.
23     Q. What -- let me rephrase the question.
24     What exactly were you trying to

Page 55

1 prevent --
2     A. He was --
3     Q. Hold on. Hold on just for the court
4 reporter. What exactly were you trying to prevent by
5 holding his knees or holding his legs the way you
6 were?
7     A. Kicking.
8     Q. And if he was to kick, what would have
9 happened?
10     A. He could have struck me, struck my
11 partner, or hurt himself on the concrete floor.
12     Q. Okay. Even though he was down --
13 facedown with handcuffs on?
14     A. His feet weren't shackled, so his feet
15 were free.
16     MR. PATEL: Okay. Let's keep playing.
17          (WHEREUPON, a video
18          recording was played.)
19     MR. PATEL: Let's pause it. We're pausing it
20 at 53:47.
21 BY MR. PATEL:
22     Q. At some point earlier on, do you recall
23 him saying that he's got pins in his knees?
24     A. I don't recall.

Page 56

1     MR. PATEL: Okay. Let's go back to -- let's
2 play it at 53:01.
3          (WHEREUPON, a video
4          recording was played.)
5     MR. PATEL: Okay. Let's pause it. We're
6 pausing at 53:11.
7 BY MR. PATEL:
8     Q. At some point in there, do you hear
9 Anthony Hill telling you that he has pins in his
10 knees?
11     A. Correct.
12     Q. Did that play into how you were going to
13 treat him?
14     A. No, I was going to keep that hold.
15     Q. Why is that?
16     A. Well, number one, he could be lying, not
17 telling the truth, saying that so I let go of his
18 legs and possibly kick me. He was an active
19 resister, and that's why he's on the ground. That's
20 why this hold is on him. So until the blue box and
21 shackles arrived, this is what we needed to do to get
22 him under control and wait for that.
23     Q. Okay. Do you know why he went to Cermak?
24     A. I'm not aware of why he went to Cermak.

Page 57

1     Q. You just showed up?
2     A. I was assigned.
3     Q. You weren't -- there wasn't any comments
4 or passing comments in terms of why he was there?
5     A. I don't believe so.
6     MR. PATEL: Okay. Let's jump ahead to
7 55 minutes. We're at 54:57.
8          (WHEREUPON, a video
9          recording was played.)
10     MR. PATEL: Let's pause it at 55:55.
11 BY MR. PATEL:
12     Q. Again, he tells you at that point -- at
13 some point during this videotape that he has pins in
14 his knees again?
15     A. Correct.
16     Q. Okay. This is the second time that he
17 has told everybody that he has pins in his knees,
18 right?
19     A. Yes.
20     MR. PATEL: Okay. Let's move up to 56:20.
21 All right. We're at 56:18.
22          (WHEREUPON, a video
23          recording was played.)
24     MR. PATEL: Okay. Let's pause it. We're at

15 (Pages 54 to 57)

## Page 58

1  57:12.
2  BY MR. PATEL:
3  Q.  Again, at that time, he tells you that he
4  broke his leg?
5  MR. BOND:  I object to the form.  He said,
6  you know, that's my broken leg.
7  BY MR. PATEL:
8  Q.  Well, he said something about a broken
9  leg; is that fair?
10  A.  Do you want to replay that?
11  MR. PATEL:  Let's go back to 56:30.  We're at
12  56:29.
13  (WHEREUPON, a video
14  recording was played.)
15  MR. PATEL:  I paused it at 57:05.
16  BY MR. PATEL:
17  Q.  Do you need to hear more?
18  A.  No.
19  Q.  Okay.  What he did say was that you --
20  that my -- he said something along the lines of
21  that's my broke leg; is that fair?
22  A.  Yes.
23  Q.  So he advised you that he's got -- he's
24  telling you that he has a broken leg?

## Page 59

1  A.  That's what he's telling me, correct.
2  Q.  And you're still maintaining the hold,
3  correct?
4  A.  Correct.
5  Q.  Was he resisting?
6  A.  He was given several verbals to relax.
7  It appears that he's tensing up, and that's why I'm
8  telling him to relax.
9  Q.  Okay.  But is tensing up a form of
10  resisting?
11  A.  It could be.
12  MR. PATEL:  Okay.  Let's jump ahead to just
13  before 58 minutes.  We're at 57:54.
14  (WHEREUPON, a video
15  recording was played.)
16  MR. PATEL:  Okay.  Let's pause it.  We're at
17  58:38.
18  BY MR. PATEL:
19  Q.  It looks like the other officer -- who is
20  the other officer that's holding his arms?
21  A.  That's Officer Bohlsen.
22  Q.  That's Officer Bohlsen.  It looks like at
23  this point Officer Bohlsen has let go of holding the
24  arms, and now he's just holding one of the forearms,

## Page 60

1  right?
2  A.  Correct.
3  Q.  And -- but you still have him in the knee
4  brace?
5  A.  Correct.
6  Q.  Why is that?
7  A.  Well, his hands and arms are restrained
8  by handcuffs, and his feet and legs weren't
9  restrained by anything.
10  MR. PATEL:  Okay.  Let's move ahead to 59:30.
11  59:27 is where we're starting.
12  (WHEREUPON, a video
13  recording is played.)
14  MR. PATEL:  Okay.  Let's pause it there.  We
15  paused it at 59:53.
16  BY MR. PATEL:
17  Q.  At this point, you put on shackles or
18  someone put on shackles?
19  A.  Correct.
20  Q.  And then he was lifted up -- Anthony
21  Hill was lifted up off the ground and onto his
22  feet?
23  A.  Correct.
24  Q.  Did someone have to go get these

## Page 61

1  shackles, or did you have them on you?
2  A.  The shackles were brought to us by
3  Officer Toro and Officer Contreras.
4  MR. PATEL:  Okay.  Let's keep going.
5  (WHEREUPON, a video
6  recording was played.)
7  MR. PATEL:  Okay.  Let's pause it here.
8  We're at 1:00:28.
9  BY MR. PATEL:
10  Q.  At this point, he was on his feet, but
11  he's now being pushed down -- his upper body is being
12  pushed down towards his legs.  What is he doing here?
13  A.  He appeared to come off the wall -- was
14  placed on the wall for the restraint.  He appeared to
15  jump off the wall a little bit.
16  Q.  Okay.  But why is he being pushed down
17  like this?
18  A.  As a further restraint to control him
19  until we get his blue box.
20  MR. PATEL:  Okay.  Let's keep playing.
21  (WHEREUPON, a video
22  recording was played.)
23  MR. PATEL:  Okay.  Let's pause it.  This is
24  at 1:00:54.

16 (Pages 58 to 61)

Page 62

BY MR. PATEL:
1    Q.   Who is the gentleman on the left?
2    A.   The left is Officer Bohlsen.
3    Q.   And the gentleman on his right?
4    A.   Well, you see his patch, it's Officer
5    Contreras.
6    Q.   And Officer Contreras is the one who's
7    putting on the blue box?
8    A.   Correct.
9         MR. PATEL:  Okay.  Let's keep playing.
10             (WHEREUPON, a video
11                recording was played.)
12        MR. PATEL:  Let's pause it here.  We're at
13   1:02:37.
14   BY MR. PATEL:
15        Q.   At this point, he was pretty unable to
16   walk; is that fair?
17        A.   Fair to say.
18        Q.   I'm sorry.  Say that again?
19        A.   It appears he's unable to walk, correct.
20        Q.   At that point, he has calmed down, and
21   you're -- no one is using any force on him, right?
22        A.   Correct.
23        MR. PATEL:  Okay.  Let's keep playing.

Page 63

1             (WHEREUPON, a video
2                recording is played.)
3         MR. PATEL:  Okay.  And it ended at
4    1:02:55 roughly.
5    BY MR. PATEL:
6         Q.   And that's when the videotape goes off?
7         A.   Yes.
8         Q.   Who ordered -- why did the videotape go
9    off?
10        A.   I believe he was about to receive medical
11   attention; therefore, giving the laws of privacy,
12   videotape is --
13        Q.   Okay.  At that point, he was still
14   talking to you -- to the officers, correct?
15        A.   Correct.
16        Q.   Did -- do you know if any further force
17   was applied on him after the videotape was turned
18   off?
19        A.   I don't believe so.
20        Q.   Okay.  Somebody at the end asked if the
21   video camera was off.  Do you know who that was?
22        A.   Do you want to play it back?
23        MR. PATEL:  Sure.  Let's play it
24   back.

Page 64

1             (WHEREUPON, a video
2                recording was played.)
3    BY THE WITNESS:
4         A.   I don't know.
5         MR. PATEL:  All right.  I have no further
6    questions.
7         MR. BOND:  Do you mind just rewinding it to
8    54:57 and play it through 55:55?
9             (WHEREUPON, a video
10               recording was played.)
11            EXAMINATION
12   BY MR. BOND:
13        Q.   Officer Chico, did you have a chance to
14   just listen to that portion of the videotape?
15        A.   Yes.
16        Q.   And you're still maintaining a hold of
17   Mr. Hill's legs at that point?
18        A.   Yes.
19        Q.   In listening to that approximately minute
20   of the videotape, do you recall some of the things
21   that Mr. Hill was saying during that period of time?
22        A.   Yes.
23        Q.   Would you have qualified him as being
24   verbally combative during that time?

Page 65

1         A.   Yes.
2         Q.   Do you recall Mr. Hill stating that I'm
3    going to break your fucking neck during that period
4    of time?
5         A.   Yes.
6         Q.   Did you also hear him state, I'm going to
7    get you?
8         A.   Yes.
9         Q.   Did you also hear him state, take these
10   cuffs off, I'll fight you bitches?
11        A.   Yes.
12        Q.   Those statements that you heard Mr. Hill
13   make, would those be a basis to maintain the hold
14   that you have of his legs there?
15        A.   Yes.
16        Q.   And why is that?
17        A.   He was making verbal threats at me
18   creating an unsafe situation.
19        Q.   Why did you maintain your leg hold of
20   Mr. Hill until that blue box and shackles arrived?
21        A.   Can repeat your question?
22        Q.   Why did you maintain your leg hold of
23   Mr. Hill until the blue box and shackles arrived?
24        A.   Because we felt that it was the safest

17 (Pages 62 to 65)

## Page 66

1    for all involved, given that he was at Cermak
2    Hospital, that we would restrain him like that so
3    nobody else gets hurt.
4         MR. BOND: I don't have any more questions.
5         MR. PATEL: I have no follow-up. Thank you
6    for your time, Officer.
7                   (WHEREUPON, a discussion
8                   was had off the record.)
9         MR. BOND: We'll reserve.
10                  (WHEREUPON, at 11:37 p.m.
11                  the deposition was
12                  concluded.)
13
14
15
16
17
18
19
20
21
22
23
24

## Page 67

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION
3    ANTHONY HILL,                )
                                   )
4        Plaintiff,                )
                                   )
5        vs.                       ) No. 1:10-cv-00897
                                   )
6    COOK COUNTY, THOMAS J.        )
     DART, WILLIE LEWIS, ROBERT    )
7    BONAKOWSKI, NICHOLAS          )
     BOHLSEN, MICHAEL CONTRERAS,   )
8    BRIAN TORO, JAMES HOLMES,     )
     PETER CHICO, LEON MARMAL,     )
9    DANIEL MORECI, CRYSTAL        )
     SPIVEY, HUGH WALSH,           )
10   CLARENCE LACY, JOHN DOES      )
     1-20,                         )
11                                 )
         Defendants.               )
12
13       I hereby certify that I have read the foregoing
14   transcript of my deposition given at the time and
15   place aforesaid, consisting of Pages 1 to 65,
16   inclusive, and I do again subscribe and make oath
17   that the same is a true, correct and complete
18   transcript of my deposition so given as aforesaid,
19   and includes changes, if any, so made by me.
20
21   _____
         PETER CHICO
22   SUBSCRIBED AND SWORN TO before me
     this      day of      2011.
23
         NOTARY PUBLIC
24

## Page 68

1                   CERTIFICATE
2                        OF
3            CERTIFIED SHORTHAND REPORTER
4         I, APRIL D. HARGETT, a Certified
5    Shorthand Reporter of the State of Illinois, CSR
6    License No. 84-4735, do hereby certify:
7         That previous to the commencement of
8    the examination of the aforesaid witness, the witness
9    was duly sworn by me to testify the whole truth
10   concerning the matters herein;
11        That the foregoing deposition
12   transcript was stenographically reported by me and
13   was thereafter reduced to typewriting under my
14   personal direction and constitutes a true and
15   accurate record of the testimony given and the
16   proceedings had at the aforesaid deposition;
17        That the said deposition was taken
18   before me at the time and place specified;
19        That I am not a relative or employee or
20   attorney or counsel for any of the parties herein,
21   nor a relative or employee of such attorney or
22   counsel for any of the parties hereto, nor am I
23   interested directly or indirectly in the outcome of
24   this action.

## Page 69

1         IN WITNESS WHEREOF, I do hereunto set
2    my hand at Chicago, Illinois, this 30th day of
3    November, 2011.
4
5         _____
          April D. Hargett, CSR
6         License No. 084-004735
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

18 (Pages 66 to 69)

Page 67

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3    ANTHONY HILL,                    )
                                       )
 4        Plaintiff,                   )
                                       )
 5        vs.                          ) No. 1:10-cv-00897
                                       )
 6    COOK COUNTY, THOMAS J.           )
      DART, WILLIE LEWIS, ROBERT )
 7    BONAKOWSKI, NICHOLAS             )
      BOHLSEN, MICHAEL CONTRERAS,)
 8    BRIAN TORO, JAMES HOLMES,        )
      PETER CHICO, LEON MARMAL,        )
 9    DANIEL MORECI, CRYSTAL           )
      SPIVEY, HUGH WALSH,              )
10    CLARENCE LACY, JOHN DOES         )
      1-20,                            )
11                                     )
          Defendants.                  )
12                                     )

13        I hereby certify that I have read the foregoing

14    transcript of my deposition given at the time and

15    place aforesaid, consisting of Pages 1 to 65,

16    inclusive, and I do again subscribe and make oath

17    that the same is a true, correct and complete

18    transcript of my deposition so given as aforesaid,

19    and includes changes, if any, so made by me.

20                        _____

21                             PETER CHICO

22    SUBSCRIBED AND SWORN TO before me
      this 15th day of December 2011
23
         NOTARY PUBLIC
24
```

"OFFICIAL SEAL"
JOANNE KENNER
Notary Public, State of Illinois
My Commission Expires April 7, 2013

**A**

aaron 2:9
academy 7:13
  9:20 15:3,19
  21:1
accommodate
  27:20
account 27:1,12
  28:3 29:20
accurate 35:10
  37:10,13 39:4
  43:13 68:15
accurately 5:9,15
acted 22:23
acting 23:23 32:6
  50:1
action 68:24
actions 17:20
  18:14
active 17:16
  18:21 19:4 21:6
  22:3 27:22
  39:12 47:24,24
  56:18
actively 48:3
activity 29:18,19
  50:5
acts 23:1
actual 37:17
adequate 18:16
administration
  6:18
administrative
  38:4,7
advert 22:7,12
advised 16:4
  58:23
aforesaid 67:15
  67:18 68:8,16
age 8:8
agency 8:17
aggressive 53:22
ago 16:6
ahead 57:6 59:12
  60:10
aint 48:3,4
allegedly 32:6
allowed 51:5
altercation 19:7
america 8:15
ankles 40:5
annual 15:24
answer 4:22 5:16
  5:21 36:3
answering 5:12
answers 5:14
anthony 1:3 12:1
  12:3 13:17 28:6
  28:7,19 30:5
  31:1 32:6 39:8
  39:23 40:22
  47:10 49:20
  53:11 54:12
  56:9 60:20 67:3
anybody 31:19
  47:14
apparently 53:6

appear 54:12
appearances 2:1
appeared 2:7,12
  61:13,14
appears 34:21
  37:21 38:1 59:7
  62:20
applied 22:16
  24:3 26:23
  42:19,22 63:17
applying 27:13
appointments
  8:22
appropriate 15:6
  17:17 18:9,9
  19:10,23 21:8
  21:11 23:22
approximate
  37:11
approximately
  31:11 64:19
april 1:17,23 7:17
  7:18 9:15 68:4
  69:5
area 50:17
arm 19:13 42:2,3
  42:6,9 43:16,17
  43:18,20
arms 40:14,17
  43:5 59:20,24
  60:7
arrived 53:24
  56:21 65:20,23
asked 4:22 5:1
  37:20 38:20
  63:20
asking 5:10 53:5
assailant 17:16
assesses 30:19
assessing 38:9
assessment 35:5
  38:7,14
assigned 33:20
  57:2
assigns 24:9
assume 5:21
  41:21
attention 22:12
  39:9 41:3 63:11
attorney 68:20,21
attorneys 2:9
audible 5:14
available 24:9
  27:8
avoid 5:9
aware 14:11,14
  14:20 28:11,13
  46:17,19 47:10
  47:12,20 56:24

**B**

bachelors 6:15
  6:19
back 16:4 18:6
  19:13 20:3
  26:22 31:4,8
  33:17,18 34:2

35:19 37:18
  41:13,14,23
  42:3,10 43:8,21
  48:24 56:1
  58:11 63:22,24
background 6:12
  6:14
backups 24:23
bad 27:11
banner 2:2
based 49:7
basically 8:17,19
  10:10 17:24
  22:6,10 29:18
  40:3 43:17 45:4
basis 65:13
bates 16:23
battery 24:23
  25:4,7,15 53:5,9
becoming 44:1
  45:17
began 41:22
beginning 33:19
behalf 2:7,12
believe 13:24
  22:20 24:21
  31:20 32:24
  38:21 52:7,20
  53:10,18 57:5
  63:10,19
belligerent 50:15
bend 20:15,18
benedict 6:15
best 5:12 27:20
bigger 40:8
binal 2:3
biological 9:2
bit 14:22 49:13
  61:15
bitches 65:10
blade 43:22
blue 39:18,20,22
  40:9,10,12,21
  42:16 47:4,5
  53:23 56:20
  61:19 62:8
  65:20,23
body 40:15 61:11
bohlsen 1:7 31:17
  33:20 35:4
  37:22 38:19
  41:22 50:6,8,10
  50:13 59:21,22
  59:23 62:3 67:7
bohlsens 34:22
bonakowski 1:7
  67:7
bond 2:9 3:4
  16:19 35:16
  43:10 48:20
  52:3 58:5 64:7
  64:12 66:4,9
bothering 48:4
  50:15
bottom 17:17
box 39:18,20,22
  40:9,10,12,21

53:24 56:20
  61:19 62:8
  65:20,23
boxed 42:16 47:4
  47:6
brace 60:4
break 15:9 48:7
  65:3
brian 1:8 67:8
brief 6:13 36:15
bring 25:10,12
broke 38:22 58:4
  58:21
broken 17:14
  58:6,8,24
brought 61:2
brown 36:6,13,19
building 9:22
  10:4

**C**

california 10:8
call 23:13 25:15
  26:12
called 1:13 4:4,18
  15:7
calm 21:12 47:23
  50:17
calmed 62:21
camera 23:2,6,10
  23:15 24:6,8,10
  24:19 25:8,17
  25:23 26:8 33:8
  33:13 34:1,4
  36:9 41:14 53:9
  53:10 63:21
cameras 24:13,16
  24:24 25:5,10
  25:12
cant 34:6 37:16
  44:6
capacity 9:5,10
  9:13 11:12,13
  13:22
card 26:2 36:11
  36:12
care 8:16
carries 39:1
cart 44:23 45:2,3
case 36:18
caseload 8:18
caseworker 7:6
  7:12,17,19 8:14
  9:6,8
categories 17:21
cause 21:21
causes 18:4
causing 18:2
ccsao 16:23,23
  17:9 29:8,9
  34:14 35:7
  36:22 37:19
cell 18:6 26:10
  31:5
central 30:20
cermak 28:9,16
  28:20 31:1,4,7

31:23 32:17,21
  33:15,21 34:3
  39:8 44:15 50:9
  56:23,24 66:1
certain 27:3
  46:11
certificate 68:1
certified 1:17,18
  68:3,4
certify 67:13 68:6
chain 40:11
chance 64:13
changes 16:7,9
  67:19
charge 50:3
charged 11:4
  25:2 33:12
chart 19:22
chest 43:12
chicago 1:19 2:6
  2:11 69:2
chico 1:8,13 3:3,7
  4:3,10,10 29:3
  64:13 67:8,21
children 8:18,19
circumstance
  18:8
circumstances
  12:9
civil 1:15
clarence 1:10
  67:10
clarify 35:13
class 16:6
cleared 46:20,22
closer 40:14
cobble 32:24 33:2
  34:8 35:23,24
  36:19 38:1,9
  52:8 53:6,8
coffee 48:9
college 7:14
combative 27:21
  64:24
come 21:12 33:18
  61:13
coming 21:11
  42:2,9 43:6,7,11
  43:20,21
command 24:17
commands 19:3
commenced
  35:23
commencement
  68:7
comments 57:3,4
complaining
  47:11
complaint 12:23
complaints 14:12
complete 6:1
  67:17
compliant 44:13
  44:21 45:18,18
complied 12:19
  29:13 35:9 39:3
comply 12:11

18:7,15
complying 19:5
compound 11:6
concerning 68:10
concluded 66:12
concrete 55:11
condition 27:7
conduct 18:9,19
  47:17,21
connection 7:7
consider 54:15
considered 43:1
consisting 67:15
constitutes 68:14
contact 28:7
continuation
  38:17
contraband 11:7
contreras 1:7
  31:21 32:9,17
  39:19,23 61:3
  62:6,7 67:7
control 20:7 22:7
  22:13 27:23
  30:20 48:1,5
  56:22 61:18
controlling 51:17
controls 20:5,5
cook 1:6 2:9 6:22
  9:16 67:6
cooperative
  17:15,20,22
  18:2,11 41:1
copy 16:18
correct 11:21,23
  12:2,20,22
  13:15,18,21
  14:10 17:11
  23:24 25:1,9
  26:21 28:4,21
  28:24 30:3,12
  30:13,14,16
  31:6,14,17 32:8
  32:11 37:4,6,23
  38:2,3,5 39:10
  39:14,16 40:1
  40:18,20,23,24
  41:4,5,10,15,18
  44:1,5,13 44:3
  49:22,23 51:3,6
  51:8 56:11
  57:15 59:1,3,4
  62:9,20,23
  63:14,15 67:17
corrections 17:3
  34:17
counsel 68:20,22
county 1:6 2:9
  6:22 7:16 9:16
  67:6
courses 15:20
court 1:1 4:17 5:6
  8:24 9:1,4,6
  11:5 30:9 55:3
  67:1
courtroom 5:1,4

courts 1:15
cp 24:16
creating 65:18
cross 20:20,23
21:2
crossing 21:4
51:16
crystal 1:9 67:9
csr 68:5 69:5
cuff 27:17
cuffing 27:14,16
27:18
cuffs 54:3 65:10
currently 6:16

**D**

d 1:23 3:1 68:4
69:5
daniel 1:9 67:9
dart 1:6 67:6
date 28:19
day 18:24 22:24
29:19 33:21
34:4 67:22 69:2
dayroom 10:13
dcfs 7:6,8 8:13,16
deal 27:5
dealing 17:5,18
27:9
debatable 23:14
decision 23:4,9
deck 27:24
decorum 8:9
deems 26:7
defendants 1:11
2:12 67:11
defensive 15:20
20:24
department 17:2
34:16
depaul 6:16
depends 26:5
deposed 4:11
9:12
deposition 1:13
4:21 48:13
66:11 67:14,18
68:11,16,17
depositions 1:16
describe 16:24
17:12,21 18:19
describing 19:22
description 22:3
39:4 42:24
designated 24:15
destination 46:6
detainee 16:10
16:14 22:22
41:22 42:2,7
detainees 9:22
50:16
didnt 25:10,12
46:2,4,5 49:24
50:2 54:12
different 11:3
15:16,20 17:15
19:12

diffused 22:5,9
42:18
direction 17:23
18:3,23 68:14
directives 46:15
directly 23:12
68:23
discussion 35:17
48:22 66:7
distraction 50:18
district 1:1,1,15
67:1,1
division 1:2 9:21
10:3,4,9,17,21
10:23 11:12,17
13:23,24 14:5
31:2 41:13,23
44:15 45:10,21
45:23 46:7 67:2
doctor 8:22 41:6
document 16:21
17:9 29:1,8,11
29:12,16 34:14
34:14,16
doesnt 17:23 19:7
20:6 38:16
doing 9:1 10:19
21:3 27:15,18
41:11 61:12
dont 5:17,20 13:8
13:20 14:7 24:7
27:5,6 28:2
34:3 36:2 37:9
37:13 42:4 46:3
47:9,15 53:18
55:24 57:5
63:19 64:4 66:4
drag 44:7,15
drive 1:19 2:5
duly 1:17 4:2,4
68:9
duty 33:1
dvd 49:8

**E**

e 3:1
earlier 55:22
early 8:8
easier 45:5,10
eastern 1:2 67:2
easy 51:16
education 6:13
educational 6:14
eight 12:7
either 11:12
elbow 22:10
43:12
emergency 29:17
employee 68:19
68:21
employment 7:1
7:3
enclosed 17:3
ended 31:10 63:3
engaged 19:7
engaging 50:5
envelope 36:7,10

36:14,19
er 16:21,23,24
47:3
eric 2:5
ert 3:9 10:1,18,20
10:21 11:1,2,13
11:17 13:23
14:1 15:16,23
22:18 24:17,21
29:18 30:11
31:15 36:16
48:18
escort 41:21,24
42:1 44:20,22
escorting 44:2
events 28:19
everybody 45:11
57:17
everybodys
27:18
exactly 54:24
55:4
examination
1:14 3:4,4 4:6
64:11 68:8
examined 4:5
example 18:23
19:19 20:15
27:10
examples 20:4
excuse 45:14
47:19
exhibit 3:7 16:16
16:22 17:1 27:1
29:3,7 48:18
exhibits 3:6
expected 5:3
expire 25:16
explain 50:12
54:22
expose 8:11
exposed 8:12
extra 16:19

**F**

facedown 20:15
55:13
facilitating 8:2
facility 24:14
factored 16:10
facts 35:7 37:20
38:21
fair 5:4,22,23
23:20 37:22
38:20 58:9,21
62:17,18
fairly 49:3
familiar 8:9 16:21
29:11
familiarize 15:4
far 15:13 20:1
22:19 37:12
51:11
fashion 21:5
fed 10:12
federal 1:14
feel 21:12,18

feels 22:22 26:8
feet 20:5,7 54:19
54:20 55:14,14
60:8,22 61:10
felt 65:24
field 8:11
fight 65:10
filed 14:12
fill 29:18,22 34:17
34:22 37:2
filled 11:19,22
12:21 30:2 35:4
37:3,7,9,21
filling 37:12
fills 38:9,11
film 36:4
filming 35:23
36:1 41:4,16
fine 48:10
finish 14:24
first 4:4,13 8:20
8:21 14:8,19
28:6,8 29:17,22
37:10
fit 26:7
five 48:7
floor 55:11
follow 17:5 18:7
22:15
follows 4:5
followup 66:5
force 11:14 12:4
12:18 13:6 14:9
15:2,4,5,6,9
16:2,3,5,11,12
17:3,4,6,12,14
17:17 18:10,13
19:10 22:16
23:6,7,13,14,22
24:3,11 26:5,15
26:23,23 27:12
33:9 36:24 37:1
37:11 46:5
52:20,20 62:22
63:16
forearms 59:24
foregoing 67:13
68:11
form 58:5 59:9
forth 10:14
foster 8:16 9:2
four 6:23 11:18
13:14 14:3
frame 14:6 31:12
free 55:15
front 5:1 43:21
fucking 65:3
fulltime 7:3
functioning
24:22
funded 8:16
further 40:13,14
40:16 44:22
50:15 53:23
54:1 61:18
63:16 64:5

**G**

gain 48:5
general 17:2
26:13
generally 24:1
gentleman 62:2,4
getting 6:16,17
50:9
give 5:16 6:1,13
19:5
given 16:11 18:6
30:20 36:15
47:3 59:6 66:1
67:14,18 68:15
giving 21:20
63:11
go 8:24 15:3,5,9
16:4 18:6,6,18
19:1 21:13 22:2
33:17,21 34:1
34:12 35:16,19
36:22 37:18
38:23 48:21
56:1,17 58:11
59:23 60:24
63:8
goes 25:4,7 38:15
40:11 63:6
going 4:21,22 5:2
5:7 8:4,23
16:15 22:11
23:6,11 24:11
25:16 26:22
27:16 29:6 31:6
31:24 34:9,10
43:21 46:13
47:23 48:6,8,8
48:10,11,12,13
49:2,3 50:16,19
52:2,10,22 53:9
54:4,4 56:12,14
61:4 65:3,6
grab 19:13 20:2
graduated 6:20
7:14
graduating 9:20
grievances 14:11
ground 4:20 5:8
12:12 20:14,17
21:2,15 39:15
49:21 56:19
60:21
groups 8:2,6,7,10
19:17
guess 23:12
40:13 43:5
guideline 26:13

**H**

half 16:6
hamp 2:5
hand 16:15 20:1,2
29:6 42:9 43:22
69:2
handcuff 19:13
40:11
handcuffed 42:14

47:4
handcuffs 40:4,6
40:19,22 55:13
60:8
handling 14:12
hands 40:14,17
43:7 60:7
handwriting
29:24 30:1
34:19,20 37:15
37:17
hang 19:1
happen 12:13
25:13 33:14
happened 13:20
35:5 50:4 54:21
55:9
happens 36:4
happy 5:18
hard 6:7
hargett 1:17,23
68:4 69:5
havent 4:12,15
hear 30:10 51:24
56:8 58:17 65:6
65:9
heard 65:12
hearing 6:7
held 44:2
hell 23:5
help 22:12
hereto 68:22
hereunto 69:1
hes 16:12 19:2,6
19:8 20:18 21:3
21:10,12,13,15
21:15,16,16,23
21:24,24 27:11
27:15,17,21
42:9,14 46:3
47:24 48:22 52:9
52:20 53:8,13
56:19 58:23,23
59:1,7,24 61:11
62:20
high 11:4 16:9,10
16:12,14
hill 1:3 12:1,3
13:17 28:6,7,19
30:5 31:1 32:6
39:8,23 40:22
47:10 49:20
53:11 54:12
56:9 60:21
64:21 65:2,12
65:20,23 67:3
hills 64:17
history 6:13
22:23
hold 14:24 19:6
19:20 20:2,2,8
20:20 21:19
24:10 43:2,3,6
51:1,4,13 52:21
53:20,22 55:3,3
56:14,20 59:2

64:16 65:13,19
65:22
**holding** 19:12,15
19:23 21:5
33:12 42:6,21
42:24 43:17
49:21 50:20
55:5,5 59:20,23
59:24
**holds** 21:1 51:9
**holmes** 1:8 31:16
33:8,11,12,16
33:20,23 34:7
36:2,3 41:17
46:15,17 52:11
67:8
**home** 7:7,10
**honest** 6:1
**hopefully** 5:11
22:12 25:14
**hospital** 28:10
50:19 66:2
**hour** 48:6
**hours** 31:9,10,10
37:8
**houses** 9:22 10:5
**hugh** 1:9 67:9
**hurt** 55:11 66:3
**hurting** 48:3

**I**

**id** 5:18
**identification**
29:2
**identified** 16:22
17:9 26:24 29:8
48:17,18
**identify** 49:7
**ill** 5:21 6:9 65:10
**illinois** 1:1,18,20
2:6,11 67:1
68:5 69:2
**im** 4:21 5:10 6:7
6:16 10:18
14:14 16:15
20:1 28:13 29:6
46:11,19 47:12
48:13,16 49:2,3
49:18 52:3
56:24 59:7
62:19 65:2,6
**important** 5:19
**incidences** 14:3
**incident** 11:24
12:15,16 13:3,4
13:6,8,11 14:5
14:17 24:5 25:3
25:7 26:9 28:9
28:11,16 30:19
30:22 31:24
32:3,5,5,15,18
32:20 34:9,10
34:17,18,23
35:5 36:15
37:19
**include** 11:24
**includes** 11:9

67:19
**inclusive** 67:16
**indicating** 43:8
**indirectly** 68:23
**information** 27:5
27:8
**injuries** 27:2
47:11
**inmate** 11:14
12:10,18 14:15
17:5 18:24 19:9
19:23 20:14,17
21:2,6,9,20 22:3
22:15 23:1,22
24:4 26:10,23
27:2,9,10,15,17
27:21 30:4 37:1
39:8 40:17,19
44:16
**inmates** 10:5,11
14:13 15:2
17:18 21:11
22:17,19 27:6
27:24
**inservice** 15:8,14
15:24
**instruct** 35:24
**instructed** 33:4
46:18
**instructing** 52:9
52:11
**instruction** 34:8
**instructions**
23:16 24:10
46:16
**intending** 50:13
**interact** 28:15
**interaction** 28:18
**intercom** 51:24
**interested** 68:23
**interrupt** 5:11,13
**interruption**
35:20
**involved** 31:13,15
32:15 33:10
45:11 66:1
**isnt** 18:5 23:11
27:8 36:9 49:10
**ive** 4:17,17 10:1
15:23

**J**

**j** 1:6 67:6
**jab** 22:6
**jail** 11:8
**james** 1:8 67:8
**jerking** 39:12
**job** 9:18
**john** 1:10 67:10
**judge** 5:1
**jump** 48:8 57:6
59:12 61:15
**jungles** 2:4
**jury** 5:1
**juvenile** 8:24 9:6

**keep** 20:21 26:4,6
26:19 40:14
48:8,10,11
51:18 52:1,9,12
52:22 54:5
55:16 56:14
61:4,20 62:10
62:24
**kept** 24:13,16
53:23
**kick** 20:6,19 55:8
56:18
**kicking** 21:3 55:7
**kids** 8:8
**kind** 19:8 22:6
45:2
**knee** 47:11 51:10
60:3
**knees** 47:14,17
47:21 48:2 55:5
55:23 56:10
57:14,17
**know** 5:17,20
7:16 8:7,20,20
8:21,21 14:5
26:24 27:5,6,11
27:12,14 29:11
35:8 36:2 37:9
39:1 45:8 46:3
46:20,22,23
47:2,7 49:6
53:13 54:3
56:23 58:6
63:16,21 64:4
**knowledge** 14:16
14:21 16:12,13
**known** 47:16

**L**

**labelled** 36:14
**lacy** 1:10 67:10
**laws** 63:11
**lawsuit** 14:18
**lay** 4:20
**learned** 51:1
**left** 34:3,5 62:2,3
**leg** 40:3 45:9 58:4
58:6,9,21,24
65:19,22
**legs** 20:15,18,18
20:20,23 21:3,4
21:5,13 50:21
51:11,16 52:21
53:14 55:5
56:18 60:8
61:12 64:17
65:14
**leon** 1:8 67:8
**lewis** 1:6 67:6
**license** 1:24 68:6
69:6
**life** 8:7,9,9,23
25:15
**lifted** 60:20,21
**limp** 45:12
**limping** 45:15
**lines** 58:20

**links** 40:10
**list** 22:10
**listed** 17:21
**listen** 64:14
**listening** 64:19
**little** 6:7 14:22
49:13 61:15
**live** 8:9
**location** 24:15
50:10
**lock** 19:1
**logged** 13:1
**long** 6:21 12:15
26:4 49:3
**look** 29:10 35:6
38:14,24 40:6
**looking** 11:7
**looks** 14:2 34:13
37:7 59:19,22
**lot** 27:4,7
**loud** 50:9,14
**lying** 56:16

**M**

**m** 66:10
**main** 16:9
**maintain** 65:13
65:19,22
**maintaining** 59:2
64:16
**major** 19:17,18
**making** 8:3 10:11
10:12,13 21:17
21:24 46:7
53:22 54:2
65:17
**marked** 16:16
29:2,7 49:8
**marmal** 1:8 67:8
**maryville** 7:13,14
**masters** 6:16,17
**matters** 68:10
**mean** 15:18 23:13
47:23 53:19
**means** 39:22
**medical** 10:13
27:6 39:9 41:3
50:15 63:10
**medication** 6:4
**medium** 9:21,22
10:5
**members** 31:15
**memory** 13:20
25:18,20,22,23
26:2 36:11,12
**met** 10:14
**michael** 1:7 67:7
**middle** 25:3,6
32:2,10
**midnights** 9:23
**midsection** 40:13
**midst** 32:1
**mind** 64:7
**minimum** 9:21,22
10:5
**minute** 54:11
64:19

**minutes** 48:7
49:11,12 57:7
59:13
**misheard** 10:22
**model** 15:9
**months** 6:24 7:15
12:7 16:6
**moreci** 1:9 67:9
**move** 41:12 42:4
44:10 57:20
60:10
**moved** 9:23
**movement** 22:20
**movements** 11:5
46:7
**moves** 24:6,7
**moving** 19:8
21:15,24 41:22
44:12
**multimedia** 48:13
**multiple** 24:20
**muscle** 19:17,18

**N**

**n** 3:1
**name** 4:8,10
**narrative** 35:7
37:20 38:18,22
38:23,24
**necessarily** 28:2
**neck** 65:3
**need** 5:14,16
16:18 17:23
21:14 30:19
48:1,4,5 49:4
58:17
**needed** 31:7
56:21
**needs** 10:13 18:5
30:10
**negative** 39:19
**neuromuscular**
19:15,17,19,24
42:1 43:2
**never** 4:17,19
34:3
**nicholas** 1:7 67:7
**nod** 5:14
**nonert** 32:14
**nonmovement**
18:22
**normally** 8:12
**northern** 1:1 67:1
**nos** 3:7
**notary** 67:23
**notice** 1:20 45:12
**notification**
25:15 26:1
**notified** 26:11
35:24
**november** 1:18
28:22 29:4 30:2
37:5 69:3
**number** 30:17,18
30:21 45:8
56:16

**O**

**oath** 67:16
**object** 58:5
**obscenities** 45:22
**obviously** 8:7
15:18 23:13
53:21
**oc** 15:21
**occasion** 11:14
28:15
**occur** 34:9,11
36:1
**occurred** 13:4
26:9 31:9 34:18
35:11 39:5
**occurring** 26:18
32:20
**office** 2:9 24:18
36:24
**officer** 9:10,13
10:10 14:24
15:1 16:24
18:10 22:24
23:5,6 24:10
29:10 31:16,16
31:20,21 32:9
33:7,8,10,11,12
33:16,19,20,23
34:7,21,22 35:4
36:2,3,15 37:21
38:19 39:13,19
39:23 41:17,22
42:6,12 46:14
46:17 50:6,7,9
50:13 52:11
59:19,20,21,22
59:23 61:3,3
62:3,5,7 64:13
66:6
**officers** 16:4
23:12 32:14,17
33:21 38:12
39:22 49:21
63:14
**oh** 7:16 12:17
20:1 34:21
38:18 43:3
**okay** 4:16,19 5:24
6:9,11 7:19 9:3
9:9,15 10:3,6,9
10:15,22 13:10
13:16 14:22
15:24 16:7,15
16:17 17:6,19
18:8 19:9,15
20:4,7,22 21:4
21:20 22:2,14
23:3,8 24:1,19
26:3,19,20,22
27:10 28:1,15
29:6 30:9,22
31:24 34:12,12
35:6,9 36:22
37:14,18,24
38:19 39:3,7,21
40:6,9 41:3
42:11 43:9

44:23 46:9,12
46:20 48:6,12
48:15 49:2,14
49:17 50:20
51:18,21 52:16
52:22 53:1,11
53:15 54:2,5,5,8
54:20 55:12,16
56:1,5,23 57:6
57:16,20,24
58:19 59:9,12
59:16 60:10,14
61:4,7,16,20,23
62:10,24 63:3
63:13,20
**once** 26:3 36:4
**opportunity**
38:12
**order** 17:2 19:5
**ordered** 63:8
**orders** 18:5
**outcome** 68:23
**outside** 9:10,13
15:24

_____
**P**
**p** 66:10
**pace** 21:13
**page** 3:2,7 17:7
29:17,22 34:13
34:13 36:22
37:11 38:15
**pages** 67:15
**paradigm** 15:4
16:3,5,11 17:4,7
17:13
**paraphrase** 5:18
**parent** 8:20
**parents** 9:2,2
**part** 13:22 48:13
**particular** 16:13
**parties** 68:20,22
**partner** 55:11
**parts** 49:5
**passing** 57:4
**passive** 17:16
18:21,21 19:3,9
19:11,23 20:11
21:9,10,23 41:8
41:20 42:4 44:1
**patch** 62:5
**patel** 2:3 3:4 4:7
16:18,20 29:5
35:19,21 43:15
48:16,21,24
49:1,17,19
51:18,21,23
52:4,5,12,16,17
52:22 53:1,3
54:5,8,10 55:16
55:19,21 56:1,5
56:7 57:6,10,11
57:20,24 58:2,7
58:11,15,16
59:12,16,18
60:10,14,16
61:4,7,9,20,23

62:1,10,13,15
62:24 63:3,5,23
64:5 66:5
**pause** 49:17
51:21 52:16
53:1 54:8 55:19
56:5 57:10,24
59:16 60:14
61:7,23 62:13
**paused** 53:2 54:9
58:15 60:15
**pausing** 49:18
55:19 56:6
**percent** 46:11
**period** 53:15
64:21 65:3
**periods** 53:17
**person** 24:8 52:6
52:7
**personal** 46:3,4
68:14
**personally** 14:20
**perspective** 49:5
**pertaining** 1:16
**peter** 1:8,13 3:3
4:3,10 67:8,21
**phone** 19:1
**physical** 19:6,7
50:5
**physician** 47:3
**pins** 47:14,16,20
48:2 55:23 56:9
57:13,17
**place** 19:13 20:3
42:2,5 53:23,24
67:15 68:18
**placed** 36:6,9,13
40:10,12 44:9
44:11 61:14
**places** 24:14
**plaintiff** 1:4 2:7
67:4
**plaintiffs** 16:16
17:1 27:1 29:7
48:17
**plaintiffss** 16:22
**play** 48:13 49:2
49:13 56:2,12
63:22,23 64:8
**played** 49:16
51:20 52:15,24
54:7,12 55:18
56:4 57:9,23
58:14 59:15
60:13 61:6,22
62:12 63:2 64:2
64:10
**playing** 48:17
51:18 52:13
54:5 55:16
61:20 62:10,24
**please** 4:8 19:1
**point** 28:1 33:23
38:20 39:11,17
41:4,8 44:14
46:2,18 52:18
53:4,11,13,21

54:11,16 55:22
56:8 57:12,13
59:23 60:17
61:10 62:16,21
63:13 64:17
**points** 49:4
**police** 14:24 15:1
**policy** 24:1,4
**political** 6:15
**portion** 17:17
64:14
**portions** 48:14
49:2
**position** 41:21,24
42:1,1 44:9,12
44:20,22
**positioned** 42:8
43:5
**positioning** 18:23
**positions** 7:5
**possibly** 56:18
**post** 24:17
**presence** 17:24
18:4,14 19:2
**pressure** 22:5,9
42:19
**pretty** 8:5 51:13
62:16
**prevent** 55:1,4
**previous** 44:9
**prior** 7:6 12:5,7
13:8 28:13
32:18,19,20
**privacy** 63:11
**private** 8:16
**privy** 27:4
**probably** 12:7
14:2 54:17
**problem** 6:9
27:20 50:18
**problems** 18:2,4
**procedure** 1:15
22:14
**proceedings**
68:16
**production** 29:8
**protocol** 22:14
25:24 26:24
**provide** 52:1
**provided** 43:1
**providing** 21:21
**public** 6:18,18
67:23
**pull** 50:7
**pulled** 50:6,11
**purposes** 49:6
**pursuant** 1:14,20
**pushed** 61:11,12
61:16
**put** 8:8 20:9
37:14 39:23
40:22 44:20
51:9 60:17,18
**putting** 43:16,17
62:8

_____
**Q**

**qualified** 64:23
**qualifies** 18:19
**question** 5:10,12
5:17,21,22 6:7
54:23 65:21
**questions** 4:22,23
4:24 5:19 64:6
66:4
**quick** 48:7
**quite** 45:9

_____
**R**
**radio** 52:1
**ran** 8:21
**random** 11:5,6
**rcdc** 44:21
**read** 37:20 38:21
38:23 67:13
**readily** 24:8 27:8
**reason** 5:24 45:7
**reasons** 45:8
**recall** 13:16 34:6
44:6 55:22,24
64:20 65:2
**recalled** 13:13
**receive** 63:10
**received** 36:19
46:24 47:8
**receiving** 50:16
**record** 4:9 35:16
35:18 43:10
48:16,20,21,23
49:6 66:8 68:15
**recording** 49:16
51:20 52:15,24
54:7 55:18 56:4
57:9,23 58:14
59:15 60:13
61:6,22 62:12
63:2 64:2,10
**reduced** 68:13
**refer** 43:6
**reflects** 30:11
**refresh** 15:8
**refresher** 15:19
15:19
**refused** 41:12,12
44:10
**regarding** 17:3
**relating** 31:1
**relative** 68:19,21
**relax** 54:17,18
59:6,8
**release** 21:13
**relieve** 33:21
**remember** 13:8
13:10 28:9 34:3
34:17,22,23
37:13,15
**repeat** 6:6 65:21
**rephrase** 54:23
**replay** 58:10
**report** 3:9 11:22
12:21 29:18
30:19,19,24
34:17,22,23
35:5 37:1,12,19
39:11 41:7

**reported** 68:12
**reporter** 1:17 5:6
30:10 55:4 68:3
68:5
**reports** 11:19
15:18
**required** 37:2
**reserve** 44:9
**resistant** 45:20
**resister** 17:15
18:18 19:3,4,10
19:11,23 20:11
21:6,9,10,23
22:3 27:22
39:12 41:9,20
42:4 44:1 47:24
47:24 54:15
56:19
**resisting** 18:20
21:16 45:6 48:3
52:18 53:12,14
53:16,18,19
54:18,20 59:5
59:10
**respect** 15:1 16:2
22:15
**responded** 39:17
39:20
**responding** 19:2
32:7
**responds** 18:3,22
**response** 3:9
29:17 34:8
41:19 45:24
**responsibilities**
9:18 11:4
**responsibility** 8:1
8:24 11:2
**responsible** 8:18
10:11 22:19,24
31:8
**restrain** 51:5 66:2
**restrained** 43:4
60:7,9
**restraint** 61:14
61:18
**restraints** 40:3
45:9
**result** 11:19
39:15
**review** 35:8
**rewinding** 64:7
**right** 10:19,24
11:10 23:19
24:2,22 25:6
28:5 31:3 32:2
36:21 37:15
39:7,21 43:19
43:23,23 49:17
52:12 54:8,13
57:18,21 60:1
62:4,22 64:5
**risk** 11:5 16:9,10
16:12,14
**robert** 1:6 67:6
**role** 18:1,1
**room** 18:24

**roughly** 6:23 7:20
9:24 14:6 16:6
49:12 63:4
**rules** 1:14 4:20
5:8
**run** 25:18,20
**runin** 12:10
**running** 46:10

_____
**S**
**safest** 65:24
**safety** 27:19,23
**sat** 41:1
**saying** 37:14 44:5
52:1 53:8 54:13
55:23 56:17
64:21
**says** 26:20 35:22
39:11 41:7
**scene** 53:24
**schooling** 8:22
**science** 6:15
**se** 18:13 49:10
**sean** 2:4
**search** 27:16
**searches** 11:5,6
**second** 30:15
48:20 57:16
**seconds** 12:17
**section** 38:5,8,8
**secure** 26:10
40:16 42:9
**secured** 12:11,12
40:11
**security** 27:19,23
40:13 53:23
54:1
**see** 11:1 32:23
40:16 47:3 49:5
50:17,21 62:5
**seen** 41:6
**send** 22:24 23:5
25:16 26:1 53:9
**sent** 32:22 33:7
**sergeant** 32:24
33:1,2 34:8
35:23,24 36:16
36:18 38:1,9
52:8 53:6,8
**series** 4:21
**service** 6:18
**services** 7:6
**set** 69:1
**setting** 21:13
**seven** 6:24 12:7
**shackled** 42:16
47:4,5 55:14
**shackles** 39:18,20
39:22 40:2,3,4
40:21 53:24
56:21 60:17,18
61:1,2 65:20,23
**shelter** 7:7,9,11
7:22,24 8:2
**sheriffs** 36:24
**shift** 29:20 33:19
33:21 34:4

shorthand 1:17
68:3,5
shortly 12:19
shotgun 15:21
shoulder 22:11
27:11,20 43:22
shouldnt 11:8
show 31:22 32:21
33:15
showed 31:21
32:9 57:1
shrug 5:15
side 42:11,12
signature 37:24
similar 4:24 5:3
situation 26:18
27:23 31:13,16
38:9 48:2,5
65:18
situations 15:5
six 6:23 7:15
size 40:8
skills 8:7
social 7:6
somebody 19:4
21:18 25:16
51:24 52:1 53:5
63:20
somebodys 51:10
sorry 20:1 30:9
35:19 52:3
62:19
sort 20:9 22:4
27:2 46:24
south 1:19 2:5
space 43:11
span 12:16
speak 6:10
specific 13:20
specifically 15:1
16:1 28:9
specified 68:18
spills 38:15
spivey 1:9 67:9
squirm 20:19
squirming 19:6
21:24
staff 50:15
stamp 49:10
stand 4:19
standard 51:13
start 6:12 17:19
23:2 26:3,6
28:5 34:7 49:4
49:12,24 50:2
started 7:16 9:21
9:23 31:10
45:17
starting 60:11
starts 49:20
state 1:18 4:8 8:3
65:6,9 68:5
statement 22:4
35:6,22 37:20
38:21 53:6
statements 65:12
states 1:1,15 2:9

67:1
stating 65:2
stayed 7:15
stenographically
68:12
step 15:5,5
stick 29:21
stop 46:18 49:4
stopped 41:4
straight 10:21
strike 22:10
striking 22:5,9
42:19 43:3
struck 55:10,10
stuff 19:14 20:2
58:3
stunning 22:5,6
subject 17:15,20
17:22,22,24
18:3,3,11 22:8
22:13
subjects 17:15,20
40:12
subscribe 67:16
subscribed 67:22
sued 14:15,20
suite 1:19 2:6,10
summary 35:10
36:15
supervising 8:3
supervisor 22:22
23:11,18 24:9
25:14 26:1,7,7
26:11,20 30:18
32:22,23 36:7
36:16 38:1
supervisors 23:3
23:8,15 24:17
sure 5:8 6:9 8:3
10:11,12,13
63:23
switch 25:7
sworn 4:2,5,23
67:22 68:9

**T**

tactic 15:20
tactics 20:24
take 8:10 22:7
25:5 27:1,12,17
28:2 29:10
33:24 35:6 38:8
38:14,24 46:3,4
48:1,7 50:10,14
50:17 53:20
54:3 65:9
taken 1:14,16
21:23 39:15
48:14 68:17
talk 13:3,17 14:22
38:12
talking 5:10 28:5
28:20 32:4,5
43:11 51:24
52:6,7 63:14
tape 26:17
taping 26:19
33:13

taser 15:22
taught 16:5
teaches 15:19
team 10:1 23:21
24:21 29:18
technique 42:3
techniques 19:12
tell 13:6 19:1 23:1
23:6 49:11
telling 47:13 56:9
56:17 58:24
59:1,8
tells 23:18 27:10
27:19 57:12
58:3
ten 1:19
tensing 59:7,9
terms 26:13 33:4
49:8 57:4
tested 9:24 10:18
testified 4:5,14
9:3,6,7,9 13:5
testify 4:18 9:1
68:9
testimony 5:2,3
6:2 68:15
thank 37:18 66:5
thats 5:6,7,23 6:8
8:4 11:8 15:10
17:23 23:14,15
26:10 29:24
30:1 31:12
34:13 35:7 36:2
38:8,11 43:1
48:10 49:7
50:24 56:19,19
58:6,21 59:1,7
59:20,21,22
63:6
theres 13:19
18:21 22:4 24:6
38:4 42:6 49:21
53:4
theyre 18:1 23:4
40:7,8
thighs 19:18,18
thing 5:11 6:6,8
25:21
things 8:11 11:7
64:20
think 10:22 25:1
37:13
third 30:15
thomas 1:6 67:6
thought 45:4
thousands 27:5,6
threatening
21:18
threats 21:17,21
22:1 53:22 54:2
65:17
three 11:18 13:13
24:22
tier 10:10,11
12:10 27:16
tiers 11:6
time 4:13 7:9

8:13 9:9,12
10:12 11:22
12:3,4,5 13:4
14:6,8,19 22:18
22:22 23:17,20
26:9 28:6,8
29:20 31:12
37:11,15,17
39:9 40:23
41:16,20 42:18
43:24 44:5,19
45:19 46:5,9
49:7,10 57:16
58:3 64:21,24
65:4 66:6 67:14
68:18
times 9:7,8 11:16
11:18 23:11
27:4,7
today 5:2,8 6:2
told 33:8 54:17
57:17
toro 1:8 31:21
32:9,17 39:19
39:24 61:3 67:8
torso 43:18
total 13:14
tracking 30:17,18
30:20
train 21:1
trained 20:23
21:2
training 14:23,23
15:3,8,11,12,14
15:15,17,17,17
15:21,21,22,22
15:23 16:1,1
51:2,7
transcribe 5:7
transcribed 5:15
transcript 67:14
67:18 68:12
transcription 5:9
transport 24:7
30:4 31:1 44:23
transporting
44:15
treat 56:13
treatment 46:24
47:2,7 50:16
trial 4:14
trips 8:11
trouble 18:2,4
true 67:17 68:14
truth 56:17 68:9
truthful 6:1
try 5:9 20:19
25:16 27:20
trying 52:21
54:24 55:4
turn 23:2,10,15
23:17,21,23
24:4 26:20 33:5
33:5,9
turned 36:7 41:14
63:17
twist 20:9

two 9:24 10:23
13:19 16:6,6
17:21 22:20
25:5 39:21
type 5:3 8:6
14:23 15:6
17:19 18:9,19
19:10,12 47:7
51:4
types 4:24 8:10
17:18
typewriting
68:13

**U**

uhhuh 30:6
ultimately 8:19
unable 62:16,20
understand 5:17
5:19,20 30:24
38:20 39:7
understands 18:1
understood 5:22
united 1:1,15
67:1
unsafe 65:18
upper 61:11
use 11:14 12:4
13:5 15:2,4,8
16:2,3,5,11 17:3
17:4,6,12,14
18:10 19:5,12
20:20 22:4
26:22 36:24
42:4 44:22,23
45:3 46:5 51:14
usually 20:20
25:5,12 26:6,12

**V**

variable 18:23
various 24:13
49:4
verbal 18:5,22
19:2 21:17,21
22:1 54:17
65:17
verbally 53:22
64:24
verbals 18:14
59:6
verify 37:16
video 23:2,6 24:6
24:10,13,16,19
26:8 33:8,13
34:4 49:11,15
51:19 52:14,23
54:6 55:17 56:3
57:8,22 58:13
59:14 60:12
61:5,21 62:11
63:1,21 64:1,9
videotape 23:7,9
23:18,23 24:4,5
24:11 26:4,6
30:11,13 33:5,6
33:9,18 34:1

36:5,6,13,20
46:9 48:9,14,17
48:18 49:3,3,7,9
49:24 50:3
52:10 57:13
63:6,8,12,17
64:14,20
videotaped 22:18
22:21,21 23:4
44:3
videotaping
22:15 23:1,2
26:3,6,14 33:24
34:7 36:14
46:18 52:2
volunteers 8:15
vs 1:5 67:5

**W**

wacker 1:19 2:5
wait 7:13 56:22
waiting 39:9
walk 30:4 41:12
45:9 62:17,20
walked 18:24
33:22 44:18
walking 44:7,18
wall 61:13,14,15
walsh 1:9 67:9
want 11:17 19:7
25:13 42:4 48:7
48:9 51:14
58:10 63:22
wards 8:3
washington 2:10
wasnt 46:7 50:2,3
50:18 53:19
57:3
watching 53:16
water 48:10
way 16:22 26:9
42:8 43:5,5
45:18,20 52:19
53:4 55:5
weaknesses 27:3
weapon 20:19
wed 8:10,10
20:20,20
week 7:17
went 7:14 10:17
10:21 16:15 47:3
50:10 56:23,24
west 2:10
weve 15:17,20,21
15:21,22,22
18:18 48:6 53:1
whats 10:3 11:2
16:15 19:15,19
22:9 29:6 40:9
whereof 69:1
whos 18:20 19:5
50:23 62:7
willie 1:6 67:6
witcoff 2:2
witness 3:2 4:1,4
29:13 35:9 39:3
43:14 64:3 68:8

68:8 69:1
**wont** 5:11,15
**worked** 7:7
**working** 6:21
**wouldnt** 8:12
12:11 37:10
**wrists** 40:4
**write** 15:18
**wrong** 8:4

---
### X

**x** 3:1

---
### Y

**yeah** 9:5 11:11
14:4 46:14,14
47:5
**year** 7:12,20 15:7
**yearly** 15:12
**years** 6:23 9:24
10:23
**yelling** 45:22,22
46:1,3
**yesterday** 8:4
**youre** 4:22 5:12
6:4 14:19 20:23
21:4 25:3,6
27:13 28:11
29:11 35:8
37:14 39:1
42:11,24 43:16
43:17,17 59:2
62:22 64:16
**youve** 4:19,23
9:15 11:1 28:18
43:1

---
### Z

---
### 0

**00** 9:23,24 61:8
61:24
**01** 49:18 56:2
**02** 54:9 62:14
63:4
**05** 7:14 58:15
**07** 7:11,17,18
9:15 53:2,16
**08** 7:12
**084004735** 1:24
69:6
**09328** 48:19
**09361** 30:11

---
### 1

**1** 1:5 16:16,22
17:1 27:1 61:8
61:24 62:14
63:4 67:5,15
**10** 2:5
**100** 46:11
**10cv00897** 1:5
67:5
**11** 9:24 10:15,15
10:16 56:6
66:10

---
**12** 58:1
**120** 1:10 67:10
**1400** 31:9,10
**15** 1:18 29:4
**1500** 37:8
**1600** 31:10
**16th** 7:16,18
**18** 8:18,18 57:21

---
### 2

**20** 12:17 51:22
52:3 57:20
**2005** 6:20
**2009** 28:23 37:5
**2011** 1:19 29:4
67:22 69:3
**26th** 10:8
**27** 60:11
**28** 61:8
**29** 3:9 58:12

---
### 3

**3** 9:23 10:15,15
10:16 48:18
**30** 9:8 12:17
58:11 60:10
**3000** 1:19 2:6
**30th** 69:2
**312** 2:7,11
**319** 29:8
**32** 49:13
**320** 34:14 35:7
37:19 38:15,22
**321** 34:15 37:19
38:15,16,23
39:1
**322** 29:9 36:23
**337** 16:23
**345** 16:23 17:10
**37** 62:14 66:10
**38** 59:17

---
### 4

**4** 3:4
**40** 9:8 10:11
**4635000** 2:7
**47** 55:20
**49** 49:12,13

---
### 5

**5** 3:9 9:21 10:3,4
10:9,17,21,23
11:12,17 13:23
13:24 14:5 29:3
29:7
**50** 2:10 49:18
**500** 2:10
**52** 53:2,16
**53** 54:9 55:20
56:2,6 60:15
**54** 57:7 59:13
61:24 64:8
**55** 57:7,10,10
63:4 64:8,8
**56** 57:20,21 58:11
58:12
**57** 57:7 58:1,15

---
59:13 64:8
**58** 59:13,17
**59** 51:22 52:3
60:10,11,15
**5th** 28:22 30:2
37:5

---
### 6

**6035440** 2:11
**60602** 2:11
**60606** 2:6
**64** 3:4
**65** 67:15

---
### 7

---
### 8

**844735** 68:6

---
### 9

**9** 31:2 41:13,23
44:15 45:10,21
45:23 46:7



# COOK COUNTY DEPARTMENT OF CORRECTIONS
## EMERGENCY RESPONSE TEAM
### ACTIVITY REPORT

**PLAINTIFF'S EXHIBIT**
**5**
Hill v. Cook County et al.

### Type of Activity

| | | | | Check All That Apply |
|---|---|---|---|---|
| ✕ | Transport/Escort | | Suicide Attempt | Riot |
| | Cell/Tier Search | | Suicide | Cell Extraction |
| | Inmate Fight | | Added Security | Special Assignment |
| | Training | | Disturbance | |

Special Assignment: WATCH AND TRANSPORT INMATE HILL ANTHONY

Location: CERMAK TO DIV 9 TIER 2H

Date: 05 NOV 09   Time: Start 1400 HRS   End 1600 HRS

Video Tape no.1: ERT09361   no.2: N/A   no.3: N/A

Tracking no#: 09-11-2R 0134

ERT Members Present: Name/ Star # and Assignment

| | |
|---|---|
| OFC. CHICO #9131 | |
| OFC. HOLMES #8499 | |
| OFC. BOIKSON #9177 | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

### Inmates Involved:

| Name | ID Number | D.O.B | Inmate's Behavior: |
|---|---|---|---|
| 1. HILL, ANTHONY | 09-0057009 | 7/30/67 | COMBATIVE |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |

### List of Contraband Found:

| | Where: |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. N/A | N/A |
| 5. | |
| 6. | |
| 7. | |
| 8. | |

319
CCSAO

1

2009 ERT

## COOK COUNTY DEPARTMENT OF CORRECTIONS
## INCIDENT REPORT

Please Print All Information                                    Effective: 04/09

| Division/Unit: ERT | Living Unit/Location: Cermak to Division 9 |
|---|---|
| Incident Date: 05 NOV 09 | Incident Time: 1500 |

| | | | | | |
|---|---|---|---|---|---|
| Injuries/Hospitalization: | ☐ Yes | ☒ No | Contraband Found: | ☐ Yes | ☒ No |
| Restraints/Force Used: | ☒ Yes | ☐ No | Property Damage: | ☐ Yes | ☒ No |
| Weapon(s) Involved: | ☐ Yes | ☒ No | OPR Notified: | ☐ Yes | ☒ No |
| Arrest(s) Made: | ☐ Yes | ☒ No | ADO Notified: | ☐ Yes | ☒ No |
| Incident Videotaped | ☒ Yes | ☐ No | Videotape No. N/A | | |
| Videotape No. ERJ 0936/ | | | Videotape No. N/A | | |

| Inmate(s)/Personnel Involved: | ID/Star #: | Witnesses to Incident: | ID/Star #: |
|---|---|---|---|
| Hill, Anthony ID # 2009-0057009 | | | |
| Bohlsen   Star #9177 | | | |
| Chico   Star # 9130 | | | |

### Statement of Facts: (Narrative)

In summary on 05 NOV 09 at approximately 1500 hrs R/o Bohlsen sta #9177, Ofc. Holmes #8499 and Ofc. Chico #9130 were assigned to Cermak with Detainee Hill, Anthony ID #2009-0057009. Detainee Hill became verbally abusive to CCNOC staff screaming "Ya'll a bunch o bitches" multiple times. R/o began to escort Detainee Hill to a location where he would not be disruptive to Medical Staff when Detainee Hill became an Active Resister by jerking away from R/o. R/o took Detainee Hill to the ground where Detainee Hill continued to Actively Resist R/o's control and orders to stop resisting. Ofc. Chico restrained Detainee Hill's legs and ofc. Holmes notified Sgt Cobble and began filming. R/o and ofc. Chico continued to restrain Detainee Hill on the ground until ofc. Contreras #8316 and ofc. Toro #8812 responded with shackles and Blue-box. Shackles and Blue-box were placed on Detainee Hill and he became cooperative and sat down. Filming was stopped due to Medical Attention. Detainee Hill was seen by Medical

| Signature & Star # of Reporting Personnel: #9177 | Date: 05 NOV 09 | Time: 1750 |
|---|---|---|
| Signature & Star # of Supervisor: | Date: 05 NOV 09 | Time: 1757 |

### Administrative Assessment:

P/Sgt Cobble #1117 Sent Above Officers to Relieve Officers from earlier incident (09-11ER-6122). Inmate Hill continued to be combative. Inmate Hill was placed back in cell 2000 Div9 2H without further incident. Capt Walsh 92T Notified by phone. CCC, CCSPD, ADO and OPR faxed copies. Original delivered to A/R files office. Notification made to Ex ops Venable #4917

| Signature & Star # of Supervisor: | Incident Tracking No.: 07-11-82-0134 | Date: 05 NOV 09 | Time: 1757 |
|---|---|---|---|

Part I – Executive Director (white)          Part III – Assistant Executive Director (pink)
Part II – Superintendent (canary)          Part IV – File (goldenrod)

320

CCSAO

Please Print All Information

**Incident Date:** 05NOV09

**Incident Time:**

GOU 04/09
Effective: 04/09

## Continuing Statement of Facts (Narrative):

Staff and cleared by the ER Doctor. Once cleared by the ER Doctor Detance Hill became a Passive Resister and refused to walk back to Division 9 and the camera was turned on again. R/O and Officer Chico assumed an escort position and began moving Detance Hill back to Division 9. After walking through RCDC Detance Hill became compliant and followed all orders given to him and walked on his own. Once we entered the tunnel ERT utilized Division 9's Cut to transport Detance Hill to Division 9. Once we entered 2H of Division 9 Detance Hill stated "Once you get these cuffs I'm fuckin ya'll up. Detance Hill was placed in cell 2060 on Tier 2H of Division 9 with no other incident. Use of Force report generated.

## Continuing Administrative Assessment:

rt I – Executive Director (white)
rt II – Superintendent (canary)

Part III – Assistant Executive Director (pink)
Part IV – File (goldenrod)

321
CCSAO

GOU 04/09



# Cook County Sheriff's Office
### USE OF FORCE REPORT

DATE __05 NOV 09__
TIME __1500__

Reporting Officer's Name __OFC. CHICO__     Star # __9131__

## TYPE OF FORCE USED (CHECK)

Physical Force __X__   Baton _____ OC Spray _____ Other (Explain) _____

Type of Incident __ACTIVE RESISTER__

Location of Incident __CERMAK HOSPITAL__

Officer / Witness Present __OFC. BOHLSEN__

## PERSON (S) FORCE WAS USED AGAINST

( me __HILL, ANTHONY #2009-005709__ Charge (s) _____

Name __N/A__     Charge (s) __N/A__

Describe Why the Use of Force Was Necessary __INMATE HILL WAS AN ACTIVE__
__RESISTER BY PULLING AWAY FROM OFC. BOHLSEN #9177__
__INMATE HILL THEN BECAME A PASSIVE RESISTOR REFUSING ALL__
__VERBAL ORDERS.__

If OC Spray Was Used, List Action Taken By Officer To Mitigate The Effects Of The Spray

When __N/A__     Where __N/A__

Was First Aid Required?   NO _____ YES _____ By Whom? _____

Was Medical Attention Required?   NO _____ YES _____ By Whom? _____

R( rting Officer's Signature: __Oc. Cl___ #9131   Date: __05 NOV 09__

Watch Commander / Supervisor's Signature: _____

322
CCSAO