**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANTHONY HILL,                               )
                                            )
              Plaintiff,                    )          10 C 897
                                            )
       vs.                                  )          Honorable Judge
                                            )          Suzanne B. Conlon
THOMAS DART, et. al.,                       )
                                            )
              Defendants.                   )

# DEFENDANTS' EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY HILL,                       )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )No. 1:10-cv-00897
                                    )The Honorable
COOK COUNTY, THOMAS J.              )Suzanne B. Conlon
DART, WILLIE LEWIS, ROBERT          )
BONAKOWSKI, NICHOLAS                )JURY TRIAL DEMANDED
BOHLSEN, MICHAEL                    )
CONTRERAS, BRIAN TORO,              )
JAMES HOLMES, PETER CHICO,          )
LEON MARMAL, DANIEL                 )
MORECI, CRYSTAL SPIVEY,             )
HUGH WALSH, CLARENCE LACY,          )
JOHN DOES 1-20,                     )
                                    )
            Defendants.             )

        The deposition of BRIAN TORO, called

for examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States

District Courts pertaining to the taking of

depositions, taken before ATHENA MIRMINGOS, a

Notary Public within and for the County of

DuPage, State of Illinois, and a Certified

Shorthand Reporter of said state, CSR

No. 84-4272, at Suite 3000, Ten South Wacker

Drive, Chicago, Illinois, on the 30th day of

November, 2011, at 2:32 p.m.

## Page 2

```
1   PRESENT:
2        BANNER & WITCOFF,
         (Ten South Wacker Drive, Suite 3000,
3        Chicago, Illinois 60606,
         312-463-5000), by:
4        MR. ERIC J. HAMP,
         MR. SEAN JUNGELS and
5        MR. BINAL J. PATEL,
6            appeared on behalf of the Plaintiff;
7
8        OFFICE OF THE STATE'S ATTORNEY,
         COOK COUNTY, ILLINOIS,
9        (Richard J. Daley Center,
         50 West Washington Street, 5th Floor,
10       Chicago, Illinois 60602,
         312-603-5153), by:
11       MR. AARON BOND,
         Assistant State's Attorney,
12
             appeared on behalf of the Defendants.
13
14
15
16
17
18
19
20
21
22
23
24   REPORTED BY:  ATHENA MIRMINGOS, CSR
```

## Page 3

```
1            (WHEREUPON, the witness was duly
2        sworn.)
3            BRIAN TORO,
4    called as a witness herein, having been first
5    duly sworn, was examined and testified as
6    follows:
7            EXAMINATION
8    BY MR. JUNGELS:
9        Q.   Can you state your name for the
10   record.
11       A.   Brian Toro.
12       Q.   Can you spell that?
13       A.   B-R-I-A-N T-O-R-O.
14       Q.   Okay.  Have you ever testified at a
15   trial before?
16       A.   No, I have not.
17       Q.   Have you ever taken a deposition?
18       A.   Yes, I have.
19       Q.   For what purpose?
20       A.   Use of force.
21       Q.   Okay.  So previous to this case?
22       A.   Previous to this case.
23       Q.   Okay.  We'll come back to that.  But
24   you probably know during the deposition we have
```

## Page 4

```
1    a court reporter who will be transcribing
2    everything we say.  So just try to answer
3    audibly.  Shakes of the head and nods won't show
4    up on the transcript.
5        A.   I know.  I'll try to speak up for the
6    mic.
7        Q.   Yes.  That will help, too.
8        A.   In fact, I'll probably lean forward
9    since I'm short.
10       Q.   Please, wait until I'm done asking a
11   question before you start responding, and I'll
12   do the same.  I'll let you answer fully before I
13   ask my next question.  If you need a break, this
14   probably won't take over two hours.  So if you
15   need a break, just let us know.  We can
16   accommodate you.
17           Is there any reason that you can't
18   give truthful testimony today?
19       A.   No.
20       Q.   There's no specific reason your memory
21   would be impaired?
22       A.   No specific.
23       Q.   Okay.  Just to go back to your
24   previous deposition, what case did you take a
```

## Page 5

```
1    deposition in before?
2        A.   Honestly, I -- it was four years ago.
3    It was a use of force case on a detainee.
4        Q.   Was the case against you personally?
5        A.   No.  It was actually a case I had on
6    him.
7        Q.   Okay.  So you sued an inmate?
8        A.   Well, it was a charge.  So I had to
9    give a deposition as far as what happened on my
10   end.
11       Q.   Can you quickly just describe the
12   incident that was the cause of that?
13       A.   It was during one of our shakedowns, a
14   team shakedown we do.  It's called a run in.
15   The detainee ran from me, which in our case
16   is -- was in Division 1, those corridors.  He
17   ran down the corridor dropping a shank.  Are you
18   familiar with shanks?  Should I describe that?
19       Q.   You could describe it.
20       A.   A handmade weapon, sharpened metal
21   weapon.  Dropped the shank, ran to his cell.
22   When I arrived at his cell, he swung at me.  So
23   I took him to the ground, handcuffed him.
24   Pretty basic simple daily operation.
```

Elite Deposition Services
312-445-0005

## Page 6

1    Q.   Okay. We'll come back and talk about
2  that incident a little more. But let's just get
3  a few background things first. Can you just
4  describe your educational background?
5    A.   Some college. High school graduate.
6    Q.   What college?
7    A.   Community college back in California.
8    Q.   Do you remember the classes that you
9  were taking, for what degree or --
10    A.   I was actually going to major in
11  English. A long time.
12    Q.   And what time was that? What year
13  about?
14    A.   That would be '96 through '98.
15    Q.   Okay. And can you describe your work
16  experiences up until the time that you started
17  working in the Cook County Jail?
18    A.   I bartended and managed clubs.
19  nightclubs.
20    Q.   And when did you start working at Cook
21  County Jail?
22    A.   2006, February.
23    Q.   And what position were you at?
24    A.   Officer working inside the jail. Same

## Page 7

1  position I am now, just inside the jail
2  constantly in a division.
3    Q.   Okay. So when you first started
4  working, you said you were inside the jail?
5    A.   Uh-huh.
6    Q.   As opposed to now?
7    A.   Well, we are inside the jail, but as
8  far as -- what I mean by that is attached to a
9  tier. Our team is free roaming.
10    Q.   Can you just describe your basic
11  duties as an officer at the jail?
12    A.   Safety and security of personnel and
13  detainees.
14    Q.   So just going off of the incident we
15  were talking about previously where you had to
16  use use of force on an inmate, were there any
17  other incidences at your time at the jail that
18  you used force on an inmate?
19    A.   Yes.
20    Q.   How many times?
21    A.   Several.
22    Q.   Approximate number?
23    A.   I can't even give an approximate.
24    Q.   More than ten?

## Page 8

1    A.   More than ten. I've been there for
2  almost six years, so, yes.
3    Q.   More than 20?
4    A.   Yes.
5    Q.   More than 30?
6    A.   No.
7    Q.   Okay. So you've been at the jail
8  since 2006?
9    A.   Uh-huh.
10    Q.   So approximately how many times a year
11  do you think you use -- do you have to use use
12  of force on an inmate?
13    A.   On a good year, three times, twice.
14  On a bad year you can look at five to six.
15    Q.   Can you describe the usual
16  circumstances that --
17    A.   Active resister, sometimes passive
18  resister. Anything to what we consider a 1010,
19  inmate on inmate, to an all available where it's
20  an officer versus an inmate. I've seen it all.
21    Q.   Can you describe any of the incidences
22  where you said that there was a passive resister
23  and you had to use force?
24    A.   Refuse to lock up, sitting in place.

## Page 9

1  Refusing handcuffing, just locking up
2  (indicating).
3    Q.   What kind of force would you have to
4  use?
5    A.   Minimal force. That's minimal force,
6  handcuffing. Basically, just handcuffing and
7  then moving him at that point. That's having to
8  use your hands, make contact with the detainee.
9    Q.   And then you said that you've dealt
10  with active resisters, also?
11    A.   Uh-huh. Active resister, taking him
12  to the ground for his safety and the others
13  around, security, and it's the same procedure
14  other than the fact that he's now actively
15  resisting you as opposed to just sitting there.
16  He's kicking, really trying not to be
17  handcuffed, possibly punching.
18    Q.   So in those circumstances, have you
19  had to use different types of force?
20    A.   Stun blows, OC.
21    Q.   What's OC?
22    A.   Oxycloron, I believe. Pepper spray.
23    Q.   And what kind of blows did you say?
24    A.   Stunning blows to large muscle groups

3 (Pages 6 to 9)

Page 10

1  makes them release.
2     Q.    Can you describe what a stunning blow
3  might be, an example?
4     A.    A strike with your hand to a large
5  muscle group, your thigh, bicep, helps free up
6  the lock.
7     Q.    Okay.  With all these incidences that
8  you've had experience, have you ever had a
9  grievance filed against you?
10    A.    Not to my knowledge.  Nothing that
11 I've received.
12    Q.    And have you ever been sued?
13    A.    No.
14    Q.    When you joined the Cook County Jail,
15 did you get any training on use of force?
16    A.    Yes.
17    Q.    Could you describe that?
18    A.    My academy in '06, and then we had
19 further use of force training when I made the
20 team.  And then now we just switched the use of
21 force module, so we're being trained on the new
22 use of force module.
23    Q.    And what training did have in 2006 at
24 the academy?

Page 11

1     A.    Classroom training.  Instructor,
2  student for the most part.
3     Q.    What kind of materials did they use?
4  Presentations?
5     A.    Yes.  Presentations.
6     Q.    Did they --
7     A.    And then we would use simulations,
8  Redman drills.
9     Q.    So there's actually hands-on training?
10    A.    There's hands-on training.
11    Q.    And they taught you specific holds or
12 specific use --
13    A.    Locks.
14    Q.    Specific locks?
15    A.    Uh-huh.
16    Q.    On how to deal with --
17    A.    How to escort, how to help control the
18 detainee from striking, keeping him on his --
19 keeping him on his stomach, keeping his wrists
20 in place so you can get the handcuffs on with as
21 little force as you possibly can.
22    Q.    Okay.  And you said you also received
23 training when you made your team?
24    A.    Uh-huh.

Page 12

1     Q.    And when was that about?
2     A.    Geez, I've been on the team for --
3  that would be '07, '08, around there.
4     Q.    And what kind of training did you
5  receive then?
6     A.    Same classroom training and Redman
7  training, on-the-job training with practicals.
8  Escort position, which we see in the video.
9  That's the exact same thing.  Just a little more
10 in depth as far as the Redman scenarios go.
11    Q.    What are the Redman scenarios?
12    A.    Another officer trainer playing the
13 person you're dealing with.
14    Q.    Have you ever had any informal
15 training?
16    A.    No.  All formal.
17    Q.    During your formal training, were you
18 ever taught how to blue box and shackle an
19 inmate?
20    A.    Yes.  I've been taught on blue box and
21 how to shackle an inmate.
22    Q.    Can you describe the proper way to
23 blue box and shackle an inmate?
24    A.    Proper way is to handcuff his wrists,

Page 13

1  hand up, hand down with the handcuffs on
2  vertically.  You attach the blue box, and you
3  take the blue box chain, put it through the
4  actual blue box, and bring it around him, bring
5  it close to his chest so that there's no
6  movement.  Restrain his arms from moving.
7  Restrains him from, obviously, being able to
8  grab anything.  And then you put shackles on him
9  on his ankles.
10    Q.    And what position does the inmate have
11 to be in when you're blue boxing and shackling
12 an inmate?
13    A.    He can be in any position to get a
14 blue box on him.  It could be -- if you're
15 dealing with an active resister and he's not
16 facing you or he's rolling on the ground, you
17 can do it reverse, behind his back.  You can do
18 it forward.  Whichever the situation calls for.
19    Q.    And what's the purpose of a blue box
20 and shackle?
21    A.    Safety and security, everyone
22 involved.
23    Q.    How many times have you had to use a
24 blue box and shackle?

4 (Pages 10 to 13)

## Page 14

1  A.  I couldn't honestly give you.  That's
2  a daily, day to day practically.
3  Q.  So very often?
4  A.  Often.
5  Q.  Almost on a daily basis?
6  A.  On a daily.  I could do it in my
7  sleep.
8  Q.  So what kind of scenario warrants
9  using a blue box and shackle instead of
10  handcuffs?
11  A.  For our team?  High-risk detainee for
12  daily use.  At that point, if our team is
13  dealing with them, the department has deemed
14  them high risk.  And for safety and security of
15  other detainees and being able to control the
16  situation as best we can, then it will be used.
17  Q.  So you usually use that in the
18  movement of inmates?
19  A.  We also use it when he's sitting in
20  place, taking him to a hospital, taking him to
21  court.  Any time that we're moving somebody, our
22  team will use a blue box.  It controls the
23  initial area that we're kind of in charge of
24  ourselves and the detainee.

## Page 15

1  Q.  And you said you're in charge of
2  high-risk inmates?
3  A.  High-risk movements, yeah.
4  Q.  So if there's an inmate that was not a
5  high-risk inmate, then normally blue box and
6  shackles would not be used on that inmate?
7  A.  It can be used on any inmate.  We for
8  the most part, we deal with high-risk detainees.
9  I have seen it used on -- can be used on any
10  inmate that the county feels to protect them and
11  to protect the officers escorting them.  It can
12  be put on anybody.
13  Q.  So in a case when you're not dealing
14  with a high-risk inmate, what kind of situation
15  would warrant being blue boxed and shackled?
16  A.  Aggressive inmate.  Any time they're
17  aggressive, we'll -- it's just easier to control
18  their joints and their arms from kicking
19  striking, fleeing, running.  It keeps himself
20  and ourselves safe.
21  Q.  So I understand, you do it on a daily
22  basis with high-risk inmates?
23  A.  Uh-huh.
24  Q.  When dealing with other not -- inmates

## Page 16

1  that are not high risk, would officers have to
2  be ordered to put on blue box and shackles?
3  A.  No.
4  Q.  So an officer can just at his own
5  discretion use a blue box and shackles if --
6  A.  If they feel that the detainee is --
7  there's -- if they are a known aggressive
8  inmate, if they feel that the safety and
9  security of the detainee warrants blue box and
10  shackles, they use blue box and shackles.
11  Q.  Is blue box and shackle uncomfortable
12  for an inmate?
13  A.  Yes.
14  Q.  So it usually causes discomfort?
15  A.  Yeah.
16  Q.  Can it be put on in a way that would
17  cause pain to the inmate?
18  A.  No.
19  Q.  So if it's put on properly, it
20  wouldn't--
21  A.  If it's put on properly, it's not
22  going to cause any pain.  Discomfort, yes.
23  Being handcuffed is discomfort.
24  Q.  I'm going to pass you a document

## Page 17

1  labeled Plaintiff's Exhibit 1 labeled CCSA0337
2  to CCSA0345.  I'll give you a second to take a
3  look.
4  Do you recognize what this document
5  is?
6  A.  Uh-huh.  Use of force model.
7  Q.  What is that?
8  A.  General order.
9  Q.  So you've seen this document before?
10  A.  Yes.
11  Q.  In what instances have you seen this
12  document?
13  A.  Studying for the sergeant exam,
14  studying to become a Cook County sheriff.
15  Q.  And this is the general order that
16  they use to train officers on --
17  A.  This is the general order that we
18  train with and the general order that we follow
19  except that this is the old one.
20  Q.  And you have a new one now?
21  A.  Yes, we do.
22  Q.  When did that get enacted?
23  A.  A month ago, I believe.  Two months
24  ago.

5 (Pages 14 to 17)

## Page 18

1    Q.   Have you been trained on the new
2  model?
3    A.   Yes. I've gone to class, yeah.
4    Q.   If you turn to the last page.
5      MR. BOND: Make sure you keep your
6  voice up.
7      THE WITNESS: I'm sorry. I speak so
8  deep.
9  BY MR. JUNGELS:
10    Q.   We're looking at CCSA0345.
11      Can you describe what's on this
12  page?
13    A.   (Indicating).
14    Q.   Yes. That's correct.
15    A.   Use of force model.
16    Q.   Okay. And what does this page
17  specifically describe, show? What is the use of
18  force model?
19    A.   It shows -- it shows a cooperative
20  subject, resister and assailant. It breaks it
21  all down to a resister, a passive resister,
22  active resister all the way up to assailant,
23  cooperative subject. And it shows the use of
24  force that you can use that is subject to how

## Page 19

1  the person you're dealing with is exacting.
2    Q.   Okay. So if you have a subject that
3  is being verbally combative, what would he be
4  characterized on the use of force model?
5    A.   Verbal combative?
6    Q.   Yes.
7    A.   Passive resister. Actually, that
8  would be a -- he can be a cooperative subject as
9  long as he's just arguing with you or trying to
10  attack you with just words.
11    Q.   So it would be -- verbally combative
12  would be --
13    A.   Would be a cooperative -- for the most
14  part it's a cooperative subject as long as he at
15  this point is -- you haven't given him any
16  orders at this point. If you're giving him
17  orders and he's not listening to any of the
18  orders you're giving him, refusing the orders
19  you're giving him, that's when it starts to
20  raise up. Cooperative at that point is someone
21  who you've just come into contact with.
22    Q.   And then can you describe what a
23  passive resister would be?
24    A.   Nonmoving, responds to your orders.

## Page 20

1  Can -- he can be verbally attacking you just
2  standing there not listening to orders. He can
3  be sitting there. It can be no movement at all.
4    Q.   But an inmate would not be a passive
5  resister until he was not following orders?
6    A.   Can you repeat that question, please?
7    Q.   If an inmate has -- if an inmate is
8  only being verbally combative and is not being
9  asked to follow orders --
10    A.   He's only being verbally combative,
11  but I haven't asked him to follow orders, he's a
12  cooperative subject. In other words, I haven't
13  actually contacted or said anything to him.
14    Q.   Yes. Correct.
15      Okay. And then what would cause an
16  inmate to raise -- rise to the level of an
17  active resister?
18    A.   Movement to resist, put handcuffs on,
19  try to move away from me after I've given him
20  orders. Handcuff -- let me handcuff him to lock
21  up, actual movement.
22    Q.   And on the side of the use of force
23  model, it describes the uses of force.
24      Can you describe where on this side

## Page 21

1  of the model where blue box and shackling would
2  be?
3    A.   As far as?
4    Q.   What category it would fit in?
5    A.   It would be social control, presence
6  of law enforcement representative, used with
7  means of physical control, which would be
8  handcuffing, blue boxing.
9    Q.   Would blue box and shackles also be
10  control instruments? That's on the third to
11  last line.
12    A.   Third to last line. Yes.
13    Q.   Okay. So blue box and shackling would
14  be --
15    A.   Handcuffs.
16    Q.   And handcuffs would be considered
17  control weapons or control --
18    A.   Instruments, yes.
19    Q.   What would an impact weapon be?
20    A.   Impact weapon, a baton. It can be any
21  of our nonlethal devices. Basically, something
22  that impacts.
23    Q.   Have you ever had to use an impact
24  weapon?

6 (Pages 18 to 21)

Page 22

A. No.
Q. Previously you said that you have used OC?
A. I have not used OC. I've been around where --
Q. So you have not used OC?
A. No. I have been around when the sergeant has used OC.
Q. Can you say what OC is again?
A. Oxion -- I can never pronounce it correctly. Opsium copsulum. It's pepper spray.
Q. Okay. And where on the use of force model would that fall?
A. That would fall --
Q. Would it be chemical agents?
A. Yes. I don't have my glasses on, which, unfortunately, I forgot them.
Q. Are you still able to read the --
A. Yes.
Q. -- use of force model?
A. Yeah. I'm following it from the passive side trying to follow the lines. Basically, OC is used with a resister.
Q. Have you ever had to use diffuse

Page 23

pressure striking before?
A. Yes, I have.
Q. And can you describe what type of diffuse pressure striking you've used?
A. Large muscle groups, strikes to the thighs.
Q. And what type of --
A. It's a stunning blow. So it's not a closed fist. It's the palm of your hand.
Q. And what type of situation have you had to use diffuse pressure striking?
A. Active resisters.
Q. Can you describe a situation that you've been in where you've dealt with an active resister and --
A. Detainee fights, detainee stabbings. Everybody to all availables. Officer on inmate to entire tier going up.
Q. Have you ever had to use direct mechanical, which is stated direct body mechanics against body structure?
A. Yes.
Q. Can you describe?
A. All availables where you're actually

Page 24

fighting to -- for your safety and your fellow officers protecting yourself.
Q. So --
A. Closed fist incident.
Q. And when have you had to use that before?
A. During all availables, riot situations where tiers have gone up.
Q. Does the use of force model take into consideration an inmate's injuries?
A. It takes into consideration protecting ourselves and the detainee. So it's -- it doesn't take into consideration knowing what somebody's injuries are. It's to keep them safe and ourselves safe.
Q. If you knew an inmate had an injury such as they had a cast on their arm, would your use of force on that inmate change because of that circumstance?
A. No. Because I'd follow my use of force standard, which if he's passive or active, if he's sitting there passive, I still need to handcuff him. In that instance we use shackles. We do have handcuffs that fit. A detainee can

Page 25

still be an active resister. A detainee can still be an assailant with a cast.
Q. So during your training on the use of force model, are you taught -- are you taught whether these -- these uses of force are supposed to cause pain to an inmate?
Would you like me to try to rephrase that?
A. Yeah.
Q. Are you taught to take into consideration an inmate's pain when using force on an inmate?
A. Can you rephrase that a little bit? I'm trying to get what you're --
Q. Are you taught to try to avoid causing pain to an inmate?
A. We're taught to use as little force as we can to deal with whatever situation that we're dealing with. The person we're dealing with dictates what we are doing.
Q. So for a given situation, you try to use the least amount of force possible to get control of the situation?
A. Correct.

## Page 26

1    Q.    So if an inmate had a specific injury
2    such as a broken leg that could not be used
3    against you, that he could not kick with, then
4    you would not use force against that leg
5    possibly -- strike that.
6          So you want to use the least amount
7    of force you can on an inmate?
8    A.    Yes.
9    Q.    So would you use a different amount of
10   force on an inmate that has a work -- a
11   perfectly fine working leg as opposed to a
12   broken leg?
13   A.    The inmate dictates the situation.
14   Q.    So if the inmate was unable to use his
15   leg?
16   A.    Is he resisting? Is he an active
17   resister?
18   Q.    Yeah. Let's take a couple situations.
19   He's an active resister and his good leg is
20   resisting, but his bad leg is not moving.
21   A.    How am I supposed to know that his leg
22   is broken?
23   Q.    Let's say that he's -- he told you he
24   said that his leg is broken.

## Page 27

1    A.    But he's still being an active
2    resister?
3    Q.    Yes.
4    A.    So he's actively avoiding movement.
5    I'm going to use -- he's going to dictate the
6    situation. So his -- is he laying there on the
7    ground trying to kick me?
8    Q.    Let's say yeah.
9    A.    No matter what the situation, the
10   detainee is going to dictate the situation. So
11   if he has a broken leg, he's not going to be
12   kicking me with that leg. Handcuffing him, he
13   has a broken leg, he's trying to kick me with
14   his other leg, still using the exact same amount
15   of force, he's dictating my use of force.
16   Q.    Have you ever been in a situation
17   where an inmate has expressed pain because of
18   how you're holding him?
19   A.    Yes.
20   Q.    Could you describe that situation,
21   what type of hold you had on that inmate?
22   A.    Handcuffing him.
23   Q.    Did you do anything to try to relieve
24   that pain, try to loosen his handcuffs or --

## Page 28

1    A.    His handcuffs were loose.
2    Q.    So did you do anything --
3    A.    I do not deviate from any of the
4    situations. The inmates dictate. My
5    handcuffing somebody that's active does not
6    change my handcuffing to somebody that's just --
7    I'm just moving. Handcuffs go on the same time.
8    The same way every single time.
9    Q.    So if you had an inmate in a hold and
10   then he stopped resisting --
11   A.    Handcuffs are still going on him.
12   Q.    Okay. Let's get in a different
13   hypothetical.
14         Say you have an inmate on the
15   ground and you have his legs in a hold because
16   he was resisting.
17   A.    He's already brought -- he's already
18   brought us to an active resister.
19   Q.    And then when he stops resisting,
20   would you release his hold?
21   A.    I'd wait until the cuffs were on.
22   He's brought us up to that spot. That's where
23   we are. I'm going to get the cuffs, the
24   shackles on, and then try to move him. But he

## Page 29

1    can still be an active resister with handcuffs,
2    shackles, blue box. They can still kick. They
3    can still punch. They can headbutt.
4    Q.    Okay. Let's move on to another
5    subject.
6          Have you ever gotten any training
7    in videotaping incidences?
8    A.    No, I have not.
9    Q.    Have you ever videotaped any
10   incidences at the jail?
11   A.    Describe.
12   Q.    Have you ever videotaped any
13   incidences at the jail?
14   A.    What kind of incident?
15   Q.    Anything.
16   A.    Just anything? Yes.
17   Q.    What have you videotaped?
18   A.    Searches.
19   Q.    Okay. And you weren't trained on how
20   to videotape?
21   A.    I was not trained on how to videotape.
22   Q.    Were you trained informally, just kind
23   of given the basics before you --
24   A.    I have had no training for

8 (Pages 26 to 29)

Page 30

1  videotaping.
2      Q.   And you've never had to videotape an
3  incident where an officer has had to use --
4      A.   No.
5      Q.   -- force on an inmate?
6          On a daily basis when you're moving
7  high-risk inmates, are those movements
8  videotaped?
9      A.   No.
10     Q.   Okay. The times that you said that
11  you've had to use force on an inmate, are those
12  usually videotaped?
13     A.   Yes. If they've become an active
14  resister, at that point we're putting the
15  videotape on. It protects him. It protects
16  ourselves.
17     Q.   Can you describe what the videographer
18  is trying to capture during those times?
19     A.   The entire incident unless we enter a
20  place that's a no videotape area. Cermak, a
21  hospital, you're not allowed to videotape in
22  there.
23     Q.   Are there special circumstances where
24  you can videotape in a hospital then?

Page 31

1      A.   Yes, there are. If he's become an
2  active resister, he's actively fighting us.
3      Q.   Okay. Let's go to the date of the
4  incident, November 5th, 2009.
5          Was that the first time that you
6  ever encountered Anthony Hill?
7      A.   Yes.
8      Q.   Have you ever encountered him
9  previously?
10     A.   No.
11     Q.   Did you ever hear about him
12  previously?
13     A.   No.
14     Q.   Did you have any encounters with
15  Mr. Hill after November 5th, 2009?
16     A.   No.
17     Q.   What was your shift on that day?
18     A.   I believe we were 3:00 to 11:00. It
19  could have been 3:00 to 11:00. It could have
20  been 2:00 to 10:00. Afternoon shift. So it
21  would be the third watch.
22     Q.   So did your shift begin at Cermak?
23     A.   Shift begins at roll call.
24     Q.   And when were you notified that you

Page 32

1  were going to --
2      A.   After roll call.
3      Q.   After roll call.
4          And do you recall why you were --
5      A.   To bring videotapes over for the
6  camera.
7      Q.   So it was your job to bring videotapes
8  over to Cermak?
9      A.   Yes.
10     Q.   Do you recall why you had to bring a
11  videotape -- or videotapes over to Cermak?
12     A.   The detainee was being an active
13  resister.
14     Q.   Did you go over to Cermak with any
15  other officers?
16     A.   Contreras, Officer Contreras.
17     Q.   Did Officer Contreras bring anything
18  to Cermak?
19     A.   He was with me with videotapes. He
20  could have been -- I don't recall if I was
21  carrying the videotapes or he was. But we go in
22  twos.
23     Q.   Were you guys also bringing a blue box
24  and shackles to Cermak?

Page 33

1      A.   Yeah.
2      Q.   Do you recall why?
3      A.   Active resister. Protect the detainee
4  from himself and officers.
5      Q.   Do you recall when you arrived at
6  Cermak around?
7      A.   No, I do not recall the time.
8      Q.   Do you recall what happened when you
9  arrived at Cermak?
10     A.   The detainee was resisting
11  handcuffing, was kicking. He was on the ground
12  rolling around fighting with officers, cursing.
13     Q.   Were there any officers using force on
14  Mr. Hill when you arrived?
15     A.   He was -- his legs were tied, and his
16  arms were behind his back.
17     Q.   So he was being held down on the
18  ground?
19     A.   Yes.
20     Q.   And what did you do when you arrived
21  on the scene?
22     A.   We stood him up to blue box him, and
23  he resisted being blue boxed.
24     Q.   And did you help in blue boxing --

9 (Pages 30 to 33)

Page 34

1    A.   Yes, I did.
2    Q.   -- Mr. Hill?
3         Did you ever touch Mr. Hill?
4    A.   I did.
5    Q.   Can you describe how you had to --
6    A.   Stood him up and put in him in what's
7    called an escort position. To bend him over so
8    that we can get his arms behind -- keep his arms
9    behind his back. Keeps him from punching,
10   kicking, and striking.
11   Q.   And who else was helping you blue
12   box --
13   A.   I do not recall. I just recall my --
14   my part.
15   Q.   And when you first arrived when
16   Mr. Hill was on the ground, you said he was
17   being verbally combative?
18   A.   Verbally combative and resisting the
19   officers' orders.
20   Q.   And what orders was he not following?
21   A.   To lay still, quit kicking, quit
22   fighting.
23   Q.   And you visibly saw him kicking?
24   A.   When I got there, he was trying to

Page 35

1    kick out from his legs being crossed.
2    Q.   Do you recall Mr. Hill saying anything
3    about his knee or leg?
4    A.   No, I do not.
5    Q.   Do you recall Mr. Hill screaming out
6    in pain at all?
7    A.   No, I do not.
8    Q.   Can you describe how you and the other
9    officers blue boxed and shackled Mr. Hill?
10   A.   We stood him up, put him in an escort
11   position to blue box him with his hands behind
12   his back.
13   Q.   And is it usual for an inmate to have
14   handcuffs behind his back while being blue
15   boxed?
16   A.   Yes.
17   Q.   And is it usual for an inmate to be in
18   an upright position while being blue boxed and
19   shackled?
20   A.   Yes.
21   Q.   Is an inmate usually standing up while
22   being blue boxed and shackled?
23   A.   If possible.
24   Q.   And while Mr. Hill was being blue

Page 36

1    boxed and shackled, was he being a cooperative
2    subject?
3    A.   No, he was not.
4    Q.   Can you describe his actions while you
5    were trying to blue box him?
6    A.   Resisting being handcuffed, resisting
7    being shackled. Moving away from me trying to
8    control him. Trying to free his arms, trying to
9    free his legs.
10   Q.   So what type of force did you and the
11   other officers have to use?
12   A.   Minimal force.
13   Q.   Can you describe what minimal force
14   means?
15   A.   Minimal force is -- minimal force
16   would be just putting him in an escort position
17   to be able to get the handcuffs on. No pain
18   compliance. No stuns, not striking. Just --
19   Q.   And after the blue box and shackles
20   were on Mr. Hill, did he become a cooperative
21   subject?
22   A.   I do not recall.
23   Q.   Was that the last incident where you
24   remember officers had to use force with

Page 37

1    Mr. Hill?
2    A.   Yes.
3    Q.   Did you help escort Mr. Hill back to
4    his cell after?
5    A.   I do not recall.
6    Q.   Do you recall why Mr. Hill was at
7    Cermak Hospital?
8    A.   No.
9    Q.   Did Mr. Hill receive any medical
10   attention while --
11   A.   Yes. He was at Cermak receiving
12   medical attention.
13   Q.   Did you personally see him receive
14   medical attention?
15   A.   No.
16   Q.   Did you ever see him go into another
17   room such as a doctor's office or --
18   A.   No, I do not.
19   Q.   And during the time that you were
20   there, was he always in your presence?
21   A.   During the time I was there, yes.
22   Q.   So during the time you were there, you
23   never saw Mr. Hill go into another room to
24   receive medical attention?

10 (Pages 34 to 37)

## Page 38

1    A.   I was there for the handcuffing, the
2  blue boxing, and dropping videotapes off and
3  blue box shackle and chain.
4    Q.   Do you recall who ordered you or the
5  other officers to take Mr. Hill back to his
6  cell?
7    A.   No, I do not recall.
8    Q.   All right. We're going to show the
9  video. Did you want to take a quick break, or
10  are you good?
11    A.   I'm fine.
12    Q.   Okay.
13        MR. BOND: Let me fill up my water real
14  quick.
15  BY MR. JUNGELS:
16    Q.   We're going to be showing Plaintiff's
17  Exhibit 3 marked ERT 09-328.
18        We're at 59 minutes, 21 seconds.
19        (WHEREUPON, the video was played.)
20        MR. JUNGELS: Can we go back to maybe
21  59 minutes and 8 -- 9 seconds?
22        (WHEREUPON, the video was played.)
23        MR. JUNGELS: All right. We're at
24  59 minutes, 25 seconds.

## Page 39

1  BY MR. JUNGELS:
2    Q.   Is this the time when you arrived on
3  the scene?
4    A.   (No response.)
5    Q.   Did you hear someone say that we're
6  going to blue box and shackle Mr. Hill now?
7    A.   (No response.)
8    Q.   We can replay it.
9    A.   Did I hear somebody on the video?
10    Q.   Yes.
11    A.   Yes.
12    Q.   Okay. So is this the time when you
13  arrived on the scene with Officer Contreras with
14  the blue box and shackle?
15    A.   Close to the scene at some point.
16    Q.   At this time, can you describe where
17  Mr. Hill is?
18    A.   On the ground in Cermak.
19    Q.   And can you describe his actions right
20  now?
21    A.   Right now he's a handcuffed detainee
22  being a passive resister.
23    Q.   And why is he a passive resister?
24    A.   Refusing orders.

## Page 40

1    Q.   But he's not an active resister?
2    A.   No, he's not.
3    Q.   And why is that?
4    A.   He's not moving away from the
5  officers.
6    Q.   So he's not physically resisting?
7    A.   No.
8        MR. JUNGELS: Okay. I'm going to keep
9  going. We're at 59 minutes, 25 seconds.
10        (WHEREUPON, the video was played.)
11  BY MR. JUNGELS:
12    Q.   Do you recall who was shackling
13  Mr. Hill?
14    A.   That would be me.
15    Q.   So you were shackling Mr. Hill?
16    A.   Yes.
17    Q.   And can you describe why you were
18  doing that?
19    A.   For the safety and security of myself
20  and my teammates there to help control the
21  situation.
22    Q.   And at this time, Mr. Hill is still
23  being a passive resister?
24    A.   At this time when I was attempting to

## Page 41

1  shackle him, he tried to separate his feet. So
2  he became an active. He didn't want me holding
3  on to his feet.
4    Q.   Throughout the video so far since you
5  arrived on the scene, have you heard Mr. Hill in
6  pain at all?
7        MR. BOND: Object as to basis of
8  knowledge.
9        If you know, you can answer.
10  BY THE WITNESS:
11    A.   No. I have no knowledge of pain.
12        MR. JUNGELS: We're at 59 minutes,
13  38 seconds.
14        (WHEREUPON, the video was played.)
15  BY MR. JUNGELS:
16    Q.   Did you hear someone say, "Let's blue
17  box him from the back" in that clip?
18    A.   No, I did not.
19        MR. JUNGELS: Let's just go back.
20  We're at 59 minutes, 34 seconds.
21        (WHEREUPON, the video was played.)
22        MR. JUNGELS: Okay. Pause it. We're
23  at 59 minutes, 48 seconds.
24

Page 42

1   BY MR. JUNGELS:
2       Q.   Did you hear an officer say, "Let's
3   blue box him from the back"?
4       A.   Yes.
5       Q.   And can you describe what that means?
6       A.   He'll remain handcuffed from behind.
7   The blue box itself will just go on the
8   handcuffs while he's handcuffed in the rear.
9       Q.   And what position does his hands have
10  to be in when you blue box him from the back?
11      A.   The cuffs will be lined up vertically
12  instead of horizontally.  So his hands can be --
13  in an ideal situation for us, our team, we do it
14  like this, it's safer (indicating).  This
15  situation just as long as we get the hands
16  facing this way (indicating).  So reverse behind
17  your back.
18      Q.   And to blue box someone, can he have
19  handcuffs on while you're doing that?
20      A.   You're going to take the handcuffs off
21  to readjust the handcuffs and his hands.
22           MR. JUNGELS:  All right.  Keep playing
23  the video.
24           (WHEREUPON, the video was played.)

Page 43

1   BY MR. JUNGELS:
2       Q.   Did you hear an officer say, "Let's
3   blue box him From the back.  Don't take them
4   off" or something along those lines?  We can
5   replay that and get the exact wording.
6            We're at 59 minutes, 52 seconds.
7            (WHEREUPON, the video was played.)
8   BY MR. JUNGELS:
9       Q.   Okay.  "Let's blue box him from the
10  back.  Don't take them off."  Did you hear an
11  officer say that?
12      A.   I do hear him say that.
13      Q.   What did he mean by don't take them
14  off?
15      A.   I do not recall.  He could be talking
16  about the shackles.  He could be talking about
17  the handcuffs.
18           MR. JUNGELS:  Okay.  Let's continue.
19           (WHEREUPON, the video was played.)
20  BY MR. JUNGELS:
21      Q.   Did you hear Mr. Hill say that, "You
22  guys broke my leg"?
23      A.   Yes.
24           MR. JUNGELS:  Okay.  Let's keep

Page 44

1   playing.
2            (WHEREUPON, the video was played.)
3            MR. JUNGELS:  Now, let's go back a few
4   seconds, and we'll play it again.  We're at
5   1 hour, 0 minutes, 4 seconds.
6            (WHEREUPON, the video was played.)
7   BY MR. JUNGELS:
8       Q.   Do you recall where you are in this?
9       A.   Escort, yes.  Right there
10  (indicating).
11      Q.   So you're the officer in the front?
12      A.   Yes.
13      Q.   And can you describe why you have
14  Mr. Hill in this position right now?
15      A.   Escort hold.
16      Q.   What's an escort hold?
17      A.   To help secure the handcuffs to keep
18  him from striking officers.
19           MR. JUNGELS:  We're at 1 hour,
20  0 minutes, 21 seconds on the video right now.
21  BY MR. JUNGELS:
22      Q.   So can you describe the usual
23  procedure for an escort hold?
24      A.   We bend them over.  It puts them in a

Page 45

1   position not to be able to -- keeps their arms
2   locked in place so they can't grab, strike.
3       Q.   Is an escort hold ever used to move
4   inmates?
5       A.   Yes.
6       Q.   And how would an escort hold be used
7   when you move an inmate?
8       A.   You can move him backwards, forwards,
9   sideways.  It's just a way to keep themselves
10  from harming themselves, harming us.
11      Q.   Do two officers usually put an inmate
12  in an escort hold?
13      A.   Yes.
14      Q.   So can you do an escort hold without
15  having an inmate bent over like this?
16      A.   As far as what?  Him standing
17  vertically?
18      Q.   Yeah.
19      A.   No, there's always a little bit of
20  bend.
21      Q.   But is -- is an inmate usually bent
22  this far over during an escort hold?
23      A.   He can be bent all the way over, mid,
24  a little bit.

12 (Pages 42 to 45)

Page 46

1    Q.    Why in this particular instance was he
2  bent over this far?
3    A.    Resisting and for control so the
4  officer can have access to his -- to handcuff
5  him.
6    Q.    So in this instance, you don't believe
7  that less force would have put Mr. Hill in
8  control -- or I'm sorry.  In this instance, you
9  don't believe less force would have kept
10  Mr. Hill in control?
11    A.    This is minimal force.  This is just a
12  restraining hold, an escort hold.
13    Q.    So do you have him in this hold just
14  to control him or to blue box?
15    A.    Control, control his arms.  I have him
16  with my arm to control that arm, that particular
17  arm.
18    Q.    So the hold that you have right now is
19  not in order to blue box him?
20    A.    The hold I have him in right now is to
21  handcuff and to blue box him.
22    MR. JUNGELS:  Okay.  Let's keep
23  playing.  We're at 1 hour, 0 minutes,
24  21 seconds.

Page 47

1    (WHEREUPON, the video was played.)
2  BY MR. JUNGELS:
3    Q.    At this point, what is Mr. Hill doing
4  to resist?
5    A.    Trying to stand up, to erect himself,
6  stand straight up.
7    Q.    And did you ever give him an order to
8  not stand up?
9    A.    The officers are controlling.  I'm
10  escort at that point.
11    Q.    Did any of the officers command him
12  not to stand up?
13    A.    Told him to stop resist.
14    Q.    So the reason he's a resister right
15  now is because he's trying to stand up?
16    A.    He's trying to erect, stand straight
17  up.
18    Q.    Is he trying to cause harm to any of
19  the officers right now?
20    A.    He's trying to stand up.  He's
21  resisting my control, my fellow officer's
22  control.
23    MR. JUNGELS:  Okay.  Let's keep
24  playing.  1 hour, 0 minutes, 46 seconds.

Page 48

1    (WHEREUPON, the video was played.)
2    MR. JUNGELS:  We're stopped at 1 hour,
3  1 minute, 44 seconds.
4  BY MR. JUNGELS:
5    Q.    The position that Mr. Hill's arms are
6  in right now, is that the position you were
7  describing?
8    A.    He's been in escort the entire time.
9    Q.    So the position of the arms that you
10  were describing previously when an inmate gets
11  blue boxed, is his arms in that position yet?
12    A.    I can't tell with the blur.
13    Q.    Could you tell during that clip at
14  all?
15    A.    No.
16    Q.    So you couldn't tell whether his arms
17  were in the position of being blue boxed?
18    A.    I can't tell if his arms --
19    Q.    Okay.
20    A.    The blew box itself can go over his --
21  you got a set of cuffs.  It just goes over the
22  links.  It just keeps the links from moving,
23  twisting itself.
24    Q.    So you would probably need a closer

Page 49

1  image of the cuffs?
2    A.    Yeah.  I can't tell what his arms are
3  doing other than the fact that I'm holding on to
4  his arm.
5    Q.    And that is -- so you're the officer
6  on the left right there?
7    A.    I am the officer on the far right.
8    Q.    Oh, on the far right.  And you're just
9  holding his arms?
10    A.    Yes.
11    MR. JUNGELS:  All right.  Let's keep
12  playing.
13    (WHEREUPON, the video was played.)
14    MR. JUNGELS:  We're at 1 hour,
15  2 minutes, 17 seconds.
16  BY MR. JUNGELS:
17    Q.    So at this point after you blue boxed
18  and shackled Mr. Hill, has he become a
19  cooperative subject?
20    A.    At this point, he's a cooperative
21  subject.  He's not resisting orders.
22    MR. JUNGELS:  Okay.  Let's continue
23  playing.
24    (WHEREUPON, the video was played.)

13 (Pages 46 to 49)

Page 50

1    MR. JUNGELS: So the video just ended
2    approximately around 1 hour, 2 minutes,
3    55 seconds.
4    BY MR. JUNGELS:
5        Q.    So, to your knowledge, once the video
6    camera was turned off, there was no more use of
7    force on Mr. Hill?
8        A.    To my knowledge, yes.
9        Q.    At the end of the video, was Mr. Hill
10   a cooperative subject?
11       A.    Sitting there, yes.
12       Q.    Was he becoming verbally combative at
13   the end?
14       A.    Yes. He still was verbally attacking
15   us.
16       Q.    Is there protocol that the camera
17   should not have been turned off at that point
18   since he was still being verbally combative?
19       A.    Not to my knowledge. He's in Cermak.
20   The only reason the camera was turned on is
21   because he became actively resisting.
22       Q.    And you don't recall Mr. Hill
23   receiving medical attention any time that you
24   were there at Cermak?

Page 51

1        A.    No, I do not recall.
2        Q.    Do you recall anything that happened
3    after the video camera was turned off?
4        A.    No.
5        Q.    Do you recall if you were relieved of
6    your duty at Cermak?
7        A.    I do not recall if I was relieved of
8    my duty.
9        MR. JUNGELS: Let's just go back to
10   1 hour, 2 minutes, and 7 seconds.
11       (WHEREUPON, the video was played.)
12       MR. JUNGELS: Let's just go back a few
13   more seconds. So we're at one hour and
14   2 minutes.
15       (WHEREUPON, the video was played.)
16   BY MR. JUNGELS:
17       Q.    Did you hear an officer state
18   something there?
19       A.    (No response.)
20       Q.    Did you hear an officer say, "We're
21   waiting on a real"?
22       A.    On a real?
23       Q.    Yeah.
24       A.    No.

Page 52

1        Q.    Let's play back that clip and see if
2    you can recall what that officer was saying.
3        (WHEREUPON, the video was played.)
4    BY MR. JUNGELS:
5        Q.    Can you make out what that officer was
6    saying?
7        A.    No.
8        Q.    So you don't recall what that officer
9    was saying at that point?
10       A.    No.
11       MR. JUNGELS: We have no further
12   questions.
13       MR. BOND: I have nothing.
14       You want to waive signature or
15   reserve? If you waive it, it just means that
16   you trust she's done a good job. And if you
17   want to reserve, you've got to read the
18   transcript, any typographical's, small stuff
19   like that.
20       THE WITNESS: No, I'm fine.
21       MR. BOND: We'll waive.
22       FURTHER DEPONENT SAITH NOT.
23
24

Page 53

1    STATE OF ILLINOIS  )
2                       )  SS:
3    COUNTY OF DUPAGE   )
4        I, ATHENA MIRMINGOS, a Notary Public
5    within and for the County of DuPage, State of
6    Illinois, and a Certified Shorthand Reporter of
7    said state, CSR No. 84-4272, do hereby certify:
8        That previous to the commencement of
9    the examination of the witness, the witness was
10   duly sworn to testify the whole truth concerning
11   the matters herein;
12       That the foregoing deposition was
13   reported stenographically by me, was thereafter
14   reduced to typewriting under my personal
15   direction and constitutes a true record of the
16   testimony given and the proceedings had;
17       That the said deposition was taken
18   before me at the time and place specified;
19       That the said deposition was adjourned
20   as stated herein;
21       That I am not a relative or employee or
22   attorney or counsel, nor a relative or employee
23   of such attorney or counsel for any of the
24   parties hereto, nor interested directly or

14 (Pages 50 to 53)

Page 54

1   indirectly in the outcome of this action.

2      IN WITNESS WHEREOF, I do hereunto set

3   my hand and affix my seal this 12th day of

4   December, 2011.

5

6

7      Notary Public, DuPage County, Illinois.

8      My commission expires 04/20/14.

9

10   CSR Certificate No. 84-4272.

11

12         Athena-Min

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 55

1         I N D E X

2   WITNESS          EXAMINATION

3   BRIAN TORO

4     By Mr. Jungels        3

5

6

7

8       E X H I B I T S

9   NUMBER           REFERRED TO

10  Plaintiff's Deposition Exhibit

11     No. 1        17

12     No. 3        38

13

14

15

16

17

18

19

20

21

22

23

24

Elite Deposition Services
312-445-0005

**A**

aaron 2:11
able 13:7 14:15
  22:18 36:17
  45:1
academy 10:18
  10:24
access 46:4
accommodate
  4:16
action 54:1
actions 36:4
  39:19
active 8:17 9:10
  9:11 13:15
  18:22 20:17
  23:12,14 24:21
  25:1 26:16,19
  27:1 28:5,18
  29:1 30:13 31:2
  32:12 33:3 40:1
  41:2
actively 9:14 27:4
  31:2 50:21
actual 13:4 20:21
adjourned 53:19
affix 54:3
afternoon 31:20
agents 22:15
aggressive 15:16
  15:17 16:7
ago 5:2 17:23,24
allowed 30:21
amount 25:22
  26:6,9 27:14
ankles 13:9
answer 4:2,12
  41:9
anthony 1:3 31:6
anybody 15:12
appeared 2:6,12
approximate
  7:22,23
approximately
  8:10 50:2
area 14:23 30:20
arguing 19:9
arm 24:17 46:16
  46:16,17 49:4
arms 13:6 15:18
  33:16 34:8,8
  36:8 45:1 46:15
  48:5,9,11,16,18
  49:2,9
arrived 5:22 33:5
  33:9,14,20
  34:15 39:2,13
  41:5
asked 20:9,11
asking 4:10
assailant 18:20
  18:22 25:2
assistant 2:11
athena 1:7 2:24
  53:4
attach 13:2
attached 7:8

attack 19:10
attacking 20:1
  50:14
attempting 40:24
attention 37:10
  37:12,14,24
  50:23
attorney 2:8,11
  53:22,23
audibly 4:3
available 8:19
availables 23:17
  23:24 24:7
avoid 25:15
avoiding 27:4

**B**

b 1:6 55:8
back 3:23 4:23
  6:1,7 13:17
  33:16 34:9
  35:12,14 37:3
  38:5,20 41:17
  41:19 42:3,10
  42:17 43:3,10
  44:3 51:9,12
  52:1
background 6:3
  6:4
backwards 45:8
bad 8:14 26:20
banner 2:2
bartended 6:18
basic 5:24 7:10
basically 9:6
  21:21 22:23
basics 29:23
basis 14:5 15:22
  30:6 41:7
baton 21:20
becoming 50:12
begins 31:23
behalf 2:6,12
believe 9:22
  17:23 31:18
  46:6,9
bend 34:7 44:24
  45:20
bent 45:15,21,23
  46:2
best 14:16
bicep 10:5
binal 2:5
bit 25:13 45:19,24
blew 48:20
blow 10:2 23:8
blows 9:20,23,24
blue 12:18,20,23
  13:2,3,4,11,14
  13:19,24 14:9
  14:22 15:5,15
  16:2,5,9,10,11
  21:1,8,9,13 29:2
  32:23 33:22,23
  33:24 34:11
  35:9,11,14,18
  35:22,24 36:5

36:19 38:2,3
  39:6,14 41:16
  42:3,7,10,18
  43:3,9 46:14,19
  46:21 48:11,17
  49:17
blur 48:12
body 23:20,21
bohlsen 1:7
bonakowski 1:7
bond 2:11 18:5
  38:13 41:7
  52:13,21
box 12:18,20,23
  13:2,3,4,14,19
  13:24 14:9,22
  15:5 16:2,5,9,10
  16:11 21:1,9,13
  29:2 32:23
  33:22 34:12
  35:11 36:5,19
  38:3 39:6,14
  41:17 42:3,7,10
  42:18 43:3,9
  46:14,19,21
  48:20
boxed 15:15
  33:23 35:9,15
  35:18,22 36:1
  48:11,17 49:17
boxing 13:11
  21:8 33:24 38:2
break 4:13,15
  38:9
breaks 18:20
brian 1:8,13 3:3
  3:11,13 55:3
bring 13:4,4 32:5
  32:7,10,17
bringing 32:23
broke 43:22
broken 26:2,12
  26:22,24 27:11
  27:13
brought 28:17,18
  28:22

**C**

california 6:7
call 31:23 32:2,3
called 1:13 3:4
  5:14 34:7
calls 13:18
camera 32:6 50:6
  50:16,20 51:3
cant 4:17 7:23
  45:2 48:12,18
  49:2
capture 30:18
carrying 32:21
case 3:21,22 4:24
  5:3,4,5,15 15:13
cast 24:17 25:2
category 21:4
cause 5:12 16:17
  16:22 20:15
  25:6 47:18

causes 16:14
causing 25:15
ccsa0337 17:1
ccsa0345 17:2
  18:10
cell 5:21,22 37:4
  38:6
center 2:9
cermak 30:20
  31:22 32:8,11
  32:14,18,24
  33:6,9 37:7,11
  39:18 50:19,24
  51:6
certificate 54:10
certified 1:19
  53:6
certify 53:7
chain 13:3 38:3
change 24:18
  28:6
characterized
  19:4
charge 5:8 14:23
  15:1
chemical 22:15
chest 13:5
chicago 1:22 2:3
  2:10
chico 1:8
circumstance
  24:19
circumstances
  8:16 9:18 30:23
civil 1:15
clarence 1:10
class 18:3
classes 6:8
classroom 11:1
  12:6
clip 41:17 48:13
  52:1
close 13:5 39:15
closed 23:9 24:4
closer 48:24
clubs 6:18
college 6:5,6,7
combative 19:3,5
  19:11 20:8,10
  34:17,18 50:12
  50:18
come 3:23 6:1
  19:21
command 47:11
commencement
  53:8
commission 54:8
community 6:7
compliance 36:18
concerning 53:10
conlon 1:6
consider 8:18
consideration
  24:10,11,13
  25:11
considered 21:16
constantly 7:2

constitutes 53:15
contact 9:8 19:21
contacted 20:13
continue 43:18
  49:22
contreras 1:8
  32:16,16,17
  39:13
control 11:17
  14:15 15:17
  21:5,7,10,17,17
  25:23 36:8
  40:20 46:3,8,10
  46:14,15,15,16
  47:21,22
controlling 47:9
controls 14:22
cook 1:6 2:8 6:17
  6:20 10:14
  17:14
cooperative
  18:19,23 19:8
  19:13,14,20
  20:12 36:1,20
  49:19,20 50:10
copsulum 22:11
correct 18:14
  20:14 25:24
correctly 22:11
corridor 5:17
corridors 5:16
couldnt 14:1
  48:16
counsel 53:22,23
county 1:6,18 2:8
  6:17,21 10:14
  15:10 17:14
  53:3,5 54:7
couple 26:18
court 1:1 4:1
  14:21
courts 1:16
crossed 35:1
crystal 1:9
csr 1:20 2:24 53:7
  54:10
cuffs 28:21,23
  42:11 48:21
  49:1
cursing 33:12

**D**

d 55:1
daily 5:24 14:2,5
  14:6,12 15:21
  30:6
daley 2:9
daniel 1:9
dart 1:6
date 31:3
day 1:22 14:2,2
  31:17 54:3
deal 11:16 15:8
  25:18
dealing 12:13
  13:15 14:13
  15:13,24 19:1

25:19,19
dealt 9:9 23:14
december 54:4
deemed 14:13
deep 18:8
defendants 1:11
  2:12
degree 6:9
demanded 1:7
department
  14:13
deponent 52:22
deposition 1:13
  3:17,24 4:24
  5:1,9 53:12,17
  53:19 55:10
depositions 1:17
depth 12:10
describe 5:11,18
  5:19 6:4,15
  7:10 8:15,21
  10:2,17 12:22
  18:11,17 19:22
  20:24 23:3,13
  23:23 27:20
  29:11 30:17
  34:5 35:8 36:4
  36:13 39:16,19
  40:17 42:5
  44:13,22
describes 20:23
describing 48:7
  48:10
detainee 5:3,15
  9:8 11:18 14:11
  14:24 16:6,9
  23:16,16 24:12
  24:24 25:1
  27:10 32:12
  33:3,10 39:21
detainees 7:13
  14:15 15:8
deviate 28:3
devices 21:21
dictate 27:5,10
  28:4
dictates 25:20
  26:13
dictating 27:15
didnt 41:2
different 9:19
  26:9 28:12
diffuse 22:24
  23:4,11
direct 23:19,20
direction 53:15
directly 53:24
discomfort 16:14
  16:22,23
discretion 16:5
district 1:1,1,16
division 1:2 5:16
  7:2
doctors 37:17
document 16:24
  17:4,9,12
doesnt 24:13

doing 25:20 40:18
42:19 47:3 49:3
dont 22:16 32:20
43:3,10,13 46:6
46:9 50:22 52:8
drills 11:8
drive 1:22 2:2
dropped 5:21
dropping 5:17
38:2
duly 3:1,5 53:10
dupage 1:19 53:3
53:5 54:7
duties 7:11
duty 51:6,8

**E**

e 55:1,8
easier 15:17
eastern 1:2
educational 6:4
employee 53:21
53:22
enacted 17:22
encountered
31:6,8
encounters 31:14
ended 50:1
enforcement
21:6
english 6:11
enter 30:19
entire 23:18
30:19 48:8
erect 47:5,16
eric 2:4
ert 38:17
escort 11:17 12:8
34:7 35:10
36:16 37:3 44:9
44:15,16,23
45:3,6,12,14,22
46:12 47:10
48:8
escorting 15:11
everybody 23:17
exact 12:9 27:14
43:5
exacting 19:1
exam 17:13
examination
1:14 3:7 53:9
55:2
examined 3:5
example 10:3
exhibit 17:1
38:17 55:10
experience 10:8
experiences 6:16
expires 54:8
expressed 27:17

**F**

facing 13:16
42:16
fact 4:8 9:14 49:3
fall 22:13,14

familiar 5:18
far 5:9 7:8 12:10
21:3 41:4 45:16
45:22 46:2 49:7
49:8
february 6:22
federal 1:14
feel 16:6,8
feels 15:10
feet 41:1,3
fellow 24:1 47:21
fighting 24:1 31:2
33:12 34:22
fights 23:16
filed 10:9
fill 38:13
fine 26:11 38:11
52:20
first 3:4 6:3 7:3
31:5 34:15
fist 23:9 24:4
fit 21:4 24:24
five 8:14
fleeing 15:19
floor 2:9
follow 17:18 20:9
20:11 22:22
24:20
following 20:5
22:21 34:20
follows 3:6
force 3:20 5:3
7:16,18 8:12,23
9:3,5,5,19 10:15
10:19,21,22
11:21 17:6
18:15,18,24
19:4 20:22,23
22:12,20 24:9
24:18,21 25:4,5
25:11,17,22
26:4,7,10 27:15
27:15 30:5,11
33:13 36:10,12
36:13,15,15,24
46:7,9,11 50:7
foregoing 53:12
forgot 22:17
formal 12:16,17
forward 4:8
13:18
forwards 45:8
four 5:2
free 7:9 10:5 36:8
36:9
front 44:11
fully 4:12
further 10:19
52:11,22

**G**

geez 12:2
general 17:8,15
17:17,18
give 4:18 5:9 7:23
14:1 17:2 47:7
given 19:15 20:19

25:21 29:23
53:16
giving 19:16,18
19:19
glasses 22:16
go 4:23 12:10
28:7 31:3 32:14
32:21 37:16,23
38:20 41:19
42:7 44:3 48:20
51:9,12
goes 48:21
going 6:10 7:14
16:22,24 23:18
27:5,5,10,11
28:11,23 32:1
38:8,16 39:6
40:8,9 42:20
good 8:13 26:19
38:10 52:16
gotten 29:6
grab 13:8 45:2
graduate 6:5
grievance 10:9
ground 5:23 9:12
13:16 27:7
28:15 33:11,18
34:16 39:18
group 10:5
groups 9:24 23:5
guys 32:23 43:22

**H**

h 55:8
hamp 2:4
hand 10:4 13:1,1
23:9 54:3
handcuff 12:24
20:20,20 24:23
46:4,21
handcuffed 5:23
9:17 16:23 36:6
39:21 42:6,8
handcuffing 9:1
9:6,6 21:8
27:12,22 28:5,6
33:11 38:1
handcuffs 11:20
13:1 14:10
20:18 21:15,16
24:24 27:24
28:1,7,11 29:1
35:14 36:17
42:8,19,20,21
43:17 44:17
handmade 5:20
hands 9:8 35:11
42:9,12,15,21
handson 11:9,10
happened 5:9
33:8 51:2
harm 47:18
harming 45:10,10
havent 19:15
20:11,12
head 4:3
headbutt 29:3

hear 31:11 39:5,9
41:16 42:2 43:2
43:10,12,21
51:17,20
heard 41:5
held 33:17
hell 42:6
help 4:7 11:17
33:24 37:3
40:20 44:17
helping 34:11
helps 10:5
hereto 53:24
hereunto 54:2
hes 9:14,16 13:15
13:16 14:19
19:9,17 20:10
20:11 24:21,22
26:19,23 27:1,4
27:5,11,13,15
28:17,17,22
31:1,2 39:21
40:1,2,4,6 42:8
47:14,15,16,20
47:20 48:8
49:20,21 50:19
high 6:5 14:14
16:1
highrisk 14:11
15:2,3,5,8,14,22
30:7
hill 1:3 31:6,15
33:14 34:2,3,16
35:2,5,9,24
36:20 37:1,3,6,9
37:23 38:5 39:6
39:17 40:13,15
40:22 41:5
43:21 44:14
46:7,10 47:3
49:18 50:7,9,22
hills 48:5
hold 27:21 28:9
28:15,20 44:15
44:16,23 45:3,6
45:12,14,22
46:12,12,13,18
46:20
holding 27:18
41:2 49:3,9
holds 11:11
holmes 1:8
honestly 5:2 14:1
honorable 1:5
horizontally
42:12
hospital 14:20
30:21,24 37:7
hour 44:5,19
46:23 47:24
48:2 49:14 50:2
51:10,13
hours 4:14
hugh 11:10
hypothetical
28:13

**I**

id 24:20 28:21
ideal 42:13
ill 4:5,8,11,12
17:2
illinois 1:1,19,22
2:3,8,10 53:1,6
54:7
im 4:9,10 16:24
18:7 22:21
25:14 27:5 28:7
28:23 38:11
40:8 46:8 47:9
49:3 52:20
image 49:1
impact 21:19,20
21:23
impacts 21:22
impaired 4:15
incidences 7:17
8:21 10:7 29:7
29:10,13
incident 5:12 6:2
7:14 24:4 29:14
30:3,19 31:4
36:23
indicating 9:2
18:13 42:14,16
44:10
indirectly 54:1
informal 12:14
informally 29:22
initial 14:23
injuries 24:10,14
injury 24:16 26:1
inmate 5:7 7:16
7:18 8:12,19,19
8:20 12:19,21
12:23 13:10,12
15:4,5,6,7,10,14
15:16 16:8,12
16:17 20:4,7,7
20:16 23:17
24:16,18 25:6
25:12,16 26:1,7
26:10,13,14
27:17,21 28:9
28:14 30:5,11
35:13,17,21
45:7,11,15,21
48:10
inmates 14:18
15:2,22,24
24:10 25:11
28:4 30:7 45:4
inside 6:24 7:1,4
7:7
instance 24:23
46:1,6,8
instances 17:11
instructor 11:1
instruments
21:10,18
interested 53:24
involved 13:22
ive 8:1,20 10:11
12:2,20 18:3

20:19 22:4

**J**

j 1:6 2:4,5,9
jail 6:17,21,24 7:1
7:4,7,11,17 8:7
10:14 29:10,13
james 1:8
job 32:7 52:16
john 1:10
joined 10:14
joints 15:18
jungels 2:4 3:8
18:9 38:15,20
38:23 39:1 40:8
40:11 41:12,15
41:19,22 42:1
42:22 43:1,8,18
43:20,24 44:3,7
44:19,21 46:22
47:2,23 48:2,9
49:11,14,16,22
50:1,4 51:9,12
51:16 52:4,11
55:4
jury 1:7

**K**

keep 18:5 24:14
34:8 40:8 42:22
43:24 44:17
45:9 46:22
47:23 49:11
keeping 11:18,19
11:19
keeps 15:19 34:9
45:1 48:22
kept 46:9
kick 26:3 27:7,13
29:2 35:1
kicking 9:16
15:18 27:12
33:11 34:10,21
34:23
kind 9:3,23 11:3
12:4 14:8,23
15:14 29:14,22
knee 35:3
knew 24:16
know 3:24 4:5,15
26:21 41:9
knowing 24:13
knowledge 10:10
41:8,11 50:5,8
50:19
known 16:7

**L**

labeled 17:1,1
lacy 1:10
large 9:24 10:4
23:5
law 21:6
lay 34:21
laying 27:6
lean 4:8
left 49:6

leg 26:2,4,11,12 26:15,19,20,21 26:24 27:11,12 27:13,14 35:3 43:22
legs 28:15 33:15 35:1 36:9
leon 1:9
level 20:16
lewis 1:6
line 21:11,12
lined 42:11
lines 22:22 43:4
links 48:22,22
listening 19:17 20:2
little 6:2 11:21 12:9 25:13,17 45:19,24
lock 8:24 10:6 20:20
locked 45:2
locking 9:1
locks 11:13,14
long 6:11 19:9,14 42:15
look 8:14 17:3
looking 18:10
loose 28:1
loosen 27:24

M
m 1:23
major 6:10
managed 6:18
marked 38:17
marmal 1:9
materials 11:3
matter 27:9
matters 53:11
mean 7:8 43:13
means 21:7 36:14 42:5 52:15
mechanical 23:20
mechanics 23:21
medical 37:9,12 37:14,24 50:23
memory 4:20
metal 5:20
mic 4:6
michael 1:7
mid 45:23
minimal 9:5,5 36:12,13,15,15 46:11
minute 48:3
minutes 38:18,21 38:24 40:9 41:12,20,23 43:6 44:5,20 46:23 47:24 49:15 50:2 51:10,14
mirmingos 1:17 2:24 53:4
model 17:6 18:2 18:15,18 19:4

20:23 21:1 22:13,20 24:9 25:4
module 10:21,22
month 17:23
months 17:23
moreci 1:9
move 20:19 28:24 29:4 45:3,7,8
movement 13:6 14:18 20:3,18 20:21 27:4
movements 15:3 30:7
moving 9:7 13:6 14:21 26:20 28:7 30:6 36:7 40:4 48:22
muscle 9:24 10:5 23:5

N
n 55:1
name 3:9
need 4:13,15 24:22 48:24
never 22:10 30:2 37:23
new 10:21 17:20 18:1
nicholas 1:7
nightclubs 6:19
nods 4:3
nonlethal 21:21
nonmoving 19:24
normally 15:5
northern 1:1
notary 1:18 53:4 54:7
notified 31:24
november 1:23 31:4,15
number 7:22 55:9

O
object 41:7
obviously 13:7
oc 9:20,21 22:3,4 22:6,8,9,23
office 2:8 37:17
officer 6:24 7:11 8:20 12:12 16:4 23:17 30:3 32:16,17 39:13 42:2 43:2,11 44:11 46:4 49:5 49:7 51:17,20 52:2,5,8
officers 15:11 16:1 17:16 24:2 32:15 33:4,12 33:13 34:19 35:9 36:11,24 38:5 40:5 44:18 45:11 47:9,11 47:19,21
oh 49:8

okay 3:14,21,23 4:23 5:7 6:1,15 7:3 8:7 10:7 11:22 18:16 19:2 20:15 21:13 22:12 28:12 29:4,19 30:10 31:3 38:12 39:12 40:8 41:22 43:9 43:18,24 46:22 47:23 48:19 49:22
old 17:19
once 50:5
onthejob 12:7
operation 5:24
opposed 7:6 9:15 26:11
opsium 22:11
order 17:8,15,17 17:18 46:19 47:7
ordered 16:2 38:4
orders 19:16,17 19:18,18,24 20:2,5,9,11,20 34:19,20 39:24 49:21
outcome 54:1
oxion 22:10
oxycloron 9:22

P
p 1:23
page 18:4,12,16
pain 16:17,22 25:6,11,16 27:17,24 35:6 36:17 41:6,11
palm 23:9
part 11:2 15:8 19:14 34:14
particular 46:1 46:16
parties 53:24
pass 16:24
passive 8:17,22 18:21 19:7,23 20:4 22:22 24:21,22 39:22 39:23 40:23
patel 2:5
pause 41:22
pepper 9:22 22:11
perfectly 26:11
person 12:13 19:1 25:19
personal 53:14
personally 5:4 37:13
personnel 7:12
pertaining 1:16
peter 1:8
physical 21:7
physically 40:6

place 8:24 11:20 14:20 30:20 45:2 53:18
plaintiff 1:4 2:6
plaintiffs 17:1 38:16 55:10
play 44:4 52:1
played 38:19,22 40:10 41:14,21 42:24 43:7,19 44:2,6 47:1 48:1 49:13,24 51:11,15 52:3
playing 12:12 42:22 44:1 46:23 47:24 49:12,23
please 4:10 20:6
point 9:7 14:12 19:15,16,20 30:14 39:15 47:3,10 49:17 49:20 50:17 52:9
position 6:23 7:1 12:8 13:10,13 34:7 35:11,18 36:16 42:9 44:14 45:1 48:5 48:6,9,11,17
possible 25:22 35:23
possibly 9:17 11:21 26:5
practically 14:2
practicals 12:7
presence 21:5 37:20
present 2:1
presentations 11:4,5
pressure 23:1,4 23:11
pretty 5:24
previous 3:21,22 4:24 53:8
previously 7:15 22:2 31:9,12 48:10
probably 3:24 4:8 4:14 48:24
procedure 1:15 9:13 44:23
proceedings 53:16
pronounce 22:10
proper 12:22,24
properly 16:19,21
protect 15:10,11 33:3
protecting 24:2 24:11
protects 30:15,15
protocol 50:16
public 1:18 53:4 54:7
punch 29:3

punching 9:17 34:9
purpose 3:19 13:19
pursuant 1:14
put 13:3,8 15:12 16:2,16,19,21 20:18 34:6 35:10 45:11 46:7
puts 44:24
putting 30:14 36:16

Q
question 4:11,13 20:6
questions 52:12
quick 38:9,14
quickly 5:11
quit 34:21,21

R
raise 19:20 20:16
ran 5:15,17,21
read 22:18 52:17
readjust 42:21
real 38:13 51:21 51:22
really 9:16
rear 42:8
reason 4:17,20 47:14 50:20
recall 32:4,10,20 33:2,5,7,8 34:13 34:13 35:2,5 36:22 37:5,6 38:4,7 40:12 43:15 44:8 50:22 51:1,2,5,7 52:2,8
receive 12:5 37:9 37:13,24
received 10:11 11:22
receiving 37:11 50:23
recognize 17:4
record 3:10 53:15
redman 11:8 12:6 12:10,11
reduced 53:14
referred 55:9
refuse 8:24
refusing 9:1 19:18 39:24
relative 53:21,22
release 10:1 28:20
relieve 27:23
relieved 51:5,7
remain 42:6
remember 6:8 36:24
repeat 20:6
rephrase 25:8,13
replay 39:8 43:5

reported 2:24 53:13
reporter 1:20 4:1 53:6
representative 21:6
reserve 52:15,17
resist 20:18 47:4 47:13
resisted 33:23
resister 8:17,18 8:22 9:11 13:15 18:20,21,21,22 19:7,23 20:5,17 22:23 23:15 25:1 26:17,19 27:2 28:18 29:1 30:14 31:2 32:13 33:3 39:22,23 40:1 40:23 47:14
resisters 9:10 23:12
resisting 9:15 26:16,20 28:10 28:16,19 33:10 34:18 36:6,6 40:6 46:3 47:21 49:21 50:21
responding 4:11
responds 19:24
response 39:4,7 51:19
restrain 13:6
restraining 46:12
restrains 13:7
reverse 13:17 42:16
richard 2:9
right 38:8,23 39:19,21 42:22 44:9,14,20 46:18,20 47:14 47:19 48:6 49:6 49:7,8,11
riot 24:7
rise 20:16
risk 14:14 16:1
roaming 7:9
robert 1:6
roll 31:23 32:2,3
rolling 13:16 33:12
room 37:17,23
rules 1:15
run 5:14
running 15:19

S
s 55:8
safe 15:20 24:14 24:15
safer 42:14
safety 7:12 9:12 13:21 14:14 16:8 24:1 40:19
saith 52:22

saw 34:23 37:23
saying 35:2 52:2
  52:6,9
scenario 14:8
scenarios 12:10
  12:11
scene 33:21 39:3
  39:13,15 41:5
school 6:5
screaming 35:5
seal 54:3
sean 2:4
searches 29:18
second 17:2
seconds 38:18,21
  38:24 40:9
  41:13,20,23
  43:6 44:4,5,20
  46:24 47:24
  48:3 49:15 50:3
  51:10,13
secure 44:17
security 7:12
  9:13 13:21
  14:14 16:9
  40:19
see 12:8 37:13,16
  52:1
seen 8:20 15:9
  17:9,11
separate 41:1
sergeant 17:13
  22:8
set 48:21 54:2
shackle 12:18,21
  12:23 13:20,24
  14:9 16:11 38:3
  39:6,14 41:1
shackled 15:15
  35:9,19,22 36:1
  36:7 49:18
shackles 13:8
  15:6 16:2,5,10
  16:10 21:9
  24:23 28:24
  29:2 32:24
  36:19 43:16
shackling 13:11
  21:1,13 40:12
  40:15
shakedown 15:13
shakedowns 5:13
shakes 4:3
shank 5:17,21
shanks 5:18
sharpened 5:20
sheriff 17:14
shes 52:16
shift 31:17,20,22
  31:23
short 4:9
shorthand 1:20
  53:6
show 4:3 18:17
  38:8
showing 38:16
shows 18:19,19

18:23
side 20:22,24
  22:22
sideways 45:9
signature 52:14
simple 5:24
simulations 11:7
single 28:8
sitting 8:24 9:15
  14:19 20:3
  24:22 50:11
situation 13:18
  14:16 15:14
  23:10,13 25:18
  25:21,23 26:13
  27:6,9,10,16,20
  40:21 42:13,15
situations 24:7
  26:18 28:4
six 8:2,14
sleep 14:7
small 52:18
social 21:5
somebody 14:21
  28:5,6 39:9
somebodys 24:14
sorry 18:7 46:8
south 1:21 2:2
speak 4:5 18:7
special 30:23
specific 4:20,22
  11:11,12,14
  26:1
specifically 18:17
specified 53:18
spell 3:12
spivey 1:9
spot 28:22
spray 9:22 22:11
ss 53:2
stabbings 23:16
stand 47:5,6,8,12
  47:15,16,20
standard 24:21
standing 20:2
  35:21 45:16
start 4:11 6:20
started 6:16 7:3
starts 19:19
state 1:19,20 3:9
  51:17 53:1,5,7
stated 23:20
  53:20
states 1:1,15 2:8
  2:11
stenographically
  53:13
stomach 11:19
stood 33:22 34:6
  35:10
stop 47:13
stopped 28:10
  48:2
stops 28:19
straight 47:6,16
street 2:9
strike 10:4 26:5

45:2
strikes 23:5
striking 11:18
  15:19 23:1,4,11
  34:10 36:18
  44:18
structure 23:21
student 11:2
studying 17:13
  17:14
stuff 52:18
stun 9:20
stunning 9:24
  10:2 23:8
stuns 36:18
subject 18:20,23
  18:24 19:2,8,14
  20:12 29:5 36:2
  36:21 49:19,21
  50:10
sued 5:7 10:12
suite 1:21 2:2
supposed 25:6
  26:21
sure 18:5
suzanne 1:6
switched 10:20
sworn 3:2,5 53:10
swung 5:22

T

t 55:8
take 4:14,24 13:3
  17:2 24:9,13
  25:10 26:18
  38:5,9 42:20
  43:3,10,13
taken 1:14,17
  3:17 53:17
takes 24:11
talk 6:1
talking 7:15
  43:15,16
taught 11:11
  12:18,20 25:4,4
  25:10,15,17
team 5:14 7:9
  10:20 11:23
  12:2 14:11,12
  14:22 42:13
teammates 47:10
tell 48:12,13,16
  48:18 49:2
ten 1:21 2:2 7:24
  8:1
testified 3:5,14
testify 53:10
testimony 4:18
  53:16
thats 9:5,7 12:9
  14:1 18:14
  19:19 21:10
  28:5,6,22 30:20
theres 4:20 11:9
  11:10 13:5 15:4
  16:7 45:19
theyre 15:16

theyve 30:13
thigh 10:5
thighs 23:6
thing 12:9
things 6:3
think 8:11
third 21:10,12
  31:21
thomas 1:6
three 8:13
tied 33:15
tier 7:9 23:18
tiers 24:8
time 6:11,12,16
  7:17 14:21
  15:16 28:7,8
  31:5 33:7 37:19
  37:21,22 39:2
  39:12,16 40:22
  40:24 48:8
  50:23 53:18
times 7:20 8:10
  8:13 13:23
  30:10,18
today 4:18
told 26:23 47:13
toro 1:8,13 3:3,11
  3:13 55:3
touch 34:3
train 17:16,18
  18:1 29:19,21
  29:22
trainer 12:12
training 10:15,19
  10:23 11:1,9,10
  11:23 12:4,6,7,7
  12:15,17 25:3
  29:6,24
transcribing 4:1
transcript 4:4
  52:18
trial 1:7 3:15
tried 41:1
true 53:15
trust 52:16
truth 53:10
truthful 4:18
try 4:2,5 20:19
  25:7,15,21
  27:23,24 28:24
trying 9:16 19:9
  22:22 25:14
  27:7,13 30:18
  34:24 36:5,7,8,8
  47:5,15,16,18
  47:20
turn 18:4
turned 50:6,17,20
  51:3
twice 8:13
twisting 48:23
two 4:14 17:23
  45:11
twos 32:22
type 23:3,7,10
  27:21 36:10

types 9:19
typewriting
  53:14
typographicals
  52:18

U

uhhuh 7:5 8:9
  9:11 11:15,24
  15:23 17:6
unable 26:14
uncomfortable
  16:11
understand
  15:21
unfortunately
  22:17
united 1:1,15
upright 35:18
use 3:20 5:3 7:16
  7:16 8:11,11,11
  8:23 9:4,8,19
  10:15,19,20,22
  11:3,7,12 13:23
  14:12,17,19,22
  16:5,10 17:6,16
  18:15,17,23,24
  19:4 20:22
  21:23 22:12,20
  22:24 23:11,19
  24:5,9,18,20,23
  25:3,17,22 26:4
  26:6,9,14 27:5
  27:15 30:3,11
  36:11,24 50:6
uses 20:23 25:5
usual 8:15 35:13
  35:17 44:22
usually 14:17
  16:14 30:12
  35:21 45:11,21

V

verbal 19:5
verbally 19:3,11
  20:1,8,10 34:17
  34:18 50:12,14
  50:18
versus 8:20
vertically 13:2
  42:11 45:17
video 12:8 38:9
  38:19,22 39:9
  40:10 41:4,14
  41:21 42:23,24
  43:7,19 44:2,6
  44:20 47:1 48:1
  49:13,24 50:1,5
  50:9 51:3,11,15
  52:3
videographer
  30:17
videotape 29:20
  29:21 30:2,15
  30:20,21,24
  32:11
videotaped 29:9

29:12,17 30:8
  30:12
videotapes 32:5
  32:7,11,19,21
  38:2
videotaping 29:7
  30:1
visibly 34:23
voice 18:6
vs 1:5

W

wacker 1:21 2:2
wait 4:10 28:21
waiting 51:21
waive 52:14,15
  52:21
walsh 1:10
want 26:6 38:9
  41:2 52:14,17
warrant 15:15
warrants 14:8
  16:9
washington 2:9
watch 31:21
water 38:13
way 12:22,24
  16:16 18:22
  28:8 42:16 45:9
  45:23
weapon 5:20,21
  21:19,20,24
weapons 21:17
west 2:9
whats 9:21 13:19
  18:11 34:6
  44:16
whereof 54:2
whichever 13:18
willie 1:6
witcoff 2:2
witness 3:1,4
  18:7 41:10
  52:20 53:9,9
  54:2 55:2
wont 4:3,14
wording 43:5
words 19:10
  20:12
work 6:15 26:10
working 6:17,20
  6:24 7:4 26:11
wouldnt 16:20
wrists 11:19
  12:24

X

x 55:1,8

Y

yeah 15:3 16:15
  18:3 22:21 25:9
  26:18 27:8 33:1
  45:18 49:2
  51:23
year 6:12 8:10,13
  8:14

**years** 5:2 8:2
**youre** 12:13 13:11
  13:14 15:1,13
  19:1,16,18,19
  23:24 25:14
  27:18 30:6,21
  42:19,20 44:11
  49:5,8
**youve** 8:7 9:9
  10:8 17:9 19:21
  23:4,14,14 30:2
  30:11 52:17

**Z**

**0**

**0** 44:5,20 46:23
  47:24
**00** 31:18,18,19,19
  31:20,20
**04** 54:8
**06** 10:18
**07** 12:3
**08** 12:3
**09328** 38:17

**1**

**1** 1:5 5:16 17:1
  44:5,19 46:23
  47:24 48:2,3
  49:14 50:2
  51:10 55:11
**10** 31:20
**1010** 8:18
**10cv00897** 1:5
**11** 31:18,19
**120** 1:10
**12th** 54:3
**14** 54:8
**17** 49:15 55:11

**2**

**2** 1:23 31:20
  49:15 50:2
  51:10,14
**20** 8:3 54:8
**2006** 6:22 8:8
  10:23
**2009** 31:4,15
**2011** 1:23 54:4
**21** 38:18 44:20
  46:24
**25** 38:24 40:9

**3**

**3** 31:18,19 38:17
  55:4,12
**30** 8:5
**3000** 1:21 2:2
**30th** 1:22
**3124635000** 2:3
**3126035153**
  2:10
**32** 1:23
**34** 41:20
**38** 41:13 55:12

**4**

**4** 44:5
**44** 48:3
**46** 47:24
**48** 41:23

**5**

**50** 2:9
**52** 43:6
**55** 50:3
**59** 38:18,21,24
  40:9 41:12,20
  41:23 43:6
**5th** 2:9 31:4,15

**6**

**60602** 2:10
**60606** 2:3

**7**

**7** 51:10

**8**

**8** 38:21
**844272** 1:21 53:7
  54:10

**9**

**9** 38:21
**96** 6:14
**98** 6:14

| | COOK COUNTY DEPARTMENT OF CORRECTIONS GENERAL ORDER | DISTRIBUTION ALL SWORN PERSONNEL | EFFECTIVE DATE 9/20/02 | GENERAL ORDER NO. 9.16 |
|---|---|---|---|---|
| **CHAPTER** SECURITY AND CONTROL | | **AMENDS** | | **RESCINDS** 9.16 eff. 10/1/91 |
| **SUBJECT** USE OF FORCE | | | | **PAGE(S)** 1 of 7 |

I.   **PURPOSE**

The purpose of this order is to establish:

    A.   The Cook County Sheriff's Office (CCSO) policy, guidelines and procedure for the use of force necessary for a Peace Officer to accomplish a lawful task.

    B.   The Cook County Sheriff's Office members will use the <u>minimum amount of force</u> necessary to accomplish the law enforcement purpose and recognition of the Cook County Sheriff's Office values regarding life.

    C.   The Use of Force Report.

    D.   The Use of Force Model.

II.   **ACTION**

All sworn CCSO members are required to familiarize themselves with the contents of this order and to adhere to the policy established herein.

III.   **ENCLOSURE**

    A.   Use of Force Report

    B.   Use of Force Model

IV.   **ILLINOIS COMPILED STATUTES**

    A.   Chapter 720, Section 5/7-5, Illinois Compiled Statutes provides that;

        "Peace Officer's Use of Force in making arrest.

        (a)   A Peace Officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest. <u>However</u>, he is justified in using force likely to cause death or great bodily harm <u>only</u> when he reasonably believes that such force is

PLAINTIFF'S EXHIBIT 1

Hill v. Cook County et al.

337
CCS AO

necessary to prevent death or great bodily harm to himself or such other person, or when he reasonably believes **both that:**

    (1) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and

    (2) The person to be arrested has committed or attempted a forcible felony that involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

    (b) A Peace Officer making an arrest pursuant to an invalid warrant is justified in the use of any force which he would be justified in using if the warrant were valid, unless he knows that the warrant is invalid."

B.    Chapter 720, Section 5/7-8, Illinois Compiled Statutes provides that;

"Force likely to cause death or great bodily harm.

    (a) Force which is likely to cause death or bodily harm, within the meaning of Section 7-5, includes:

        (1) The firing of a firearm in the direction of the person to be arrested, even though no intent exists to kill or inflict great bodily harm; and

        (2) The firing of a firearm at a vehicle in which the person to be arrested is riding.

    (b) A Peace Officer's discharge of a firearm using ammunition designed to disable or control an individual without creating the likelihood of death or great bodily harm shall not be considered force likely to cause death or great bodily harm within the meaning of Section 7-5."

## V.    DEFINITIONS

A.    USE OF FORCE – Any physical force used to effect, influence or persuade an individual to comply with an order from a Peace Officer. The term includes deadly force and non-deadly force but does not include unresisted handcuffing.

B.    NON-DEADLY FORCE – Any use of force other than that which is considered deadly force.

C.    DEADLY FORCE – Any use of force likely to cause death or serious physical injury, including, but not limited to the use of a firearm or a strike to the head with a large object. Firing at someone is always deadly force.

D.    DEFENSIVE TACTICS – Including skills in verbal commands, handcuffing, uncooperative subject control, self-defensive tactics and the use of intermediate weapons.

338
CCSAO

force. If such are found to be ineffective in accomplishing a legal objective, a member may resort to the use of non-deadly physical force necessary to accomplish their legal objective.

F.     Peace Officers are permitted to use only the force necessary to effect lawful objectives. The determination of what is or is not reasonable force is based on each individual situation and is a judgment decision that the individual officer must make. The decision should be based on factors that include, but are not limited to the age, size or mental state of the individual, or the availability of assistance as well as the circumstances of the particular situation. In every instance where force is to be used, the Peace Officer contemplating the use of force will have:

    1.    An articulable and reasonable belief that the use of force in that situation is required.

    2.    An articulable and reasonable belief that the amount of force contemplated is required.

Officers will not unnecessarily or unreasonably endanger themselves to conform to this policy.

G.     CCSO members using excessive force, unwarranted physical force or verbal abuse will be subject to disciplinary action up to and including termination.

H.     Use of Non-Lethal Weapons/Techniques

    1.    Procedures

        a.    Before CCSO members are allowed to carry any Departmental authorized less than lethal weapon(s) they will be issued a copy of, and receive instruction in the Department's use of force policies and will be trained in the use of said weapon(s).

        b.    A Peace Officer's authority to use any force, as well as the degree of force that he may employ, is governed by the United States Constitution, Illinois Statutes, case law and Departmental policy.

    2.    Oleoresin Capsicum (O.C.) Spray

        a.    Oleoresin Capsicum Spray will be used only when an individual exhibits behavior, which shows intent to actively resist or attack the Peace Officer or to prevent injury to another person. The use of Oleoresin Capsicum Spray is not regarded as use of force that would result in great bodily harm.

           (1)    Decontamination will be rendered to individuals who have been sprayed with O.C. Spray as soon as possible. The appropriate level of assistance includes:

4

E.    IMPACT WEAPON – A weapon designed to establish control by means of impact.

F.    COMBATIVE BEHAVIOR – Mannerisms displayed by a subject that is actively fighting the sworn officer.

G.    AGGRESSIVE BEHAVIOR – Mannerisms displayed by a subject that indicate to the sworn officer that the subject is escalating to a higher level of force.

H.    REASONABLE BELIEF – The person concerned, acting in a reasonable manner believes that the described facts exist.

I.    GREAT BODILY HARM – A bodily injury that creates a substantial risk of death, causes serious, permanent disfigurement, or results in long term loss or impairment of any bodily member or organ.

J.    FORCIBLE FELONY – Treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnapping, kidnapping, aggravated battery resulting in great bodily harm or permanent disability or disfigurement and any other felony which involves the use or threat of physical force or violence against any individual.

K.    USE OF FORCE MODEL – The use of force paradigm adopted by the Sheriff's Office is a guide that suggests a reasonable response to a subject's actions. Officers will not unnecessarily or unreasonably endanger themselves to conform to these suggested guidelines.

## VI.    POLICY AND GUIDELINES

A.    All CCSO members will be trained in the principles that apply to the Use of Force Model.

B.    Deadly force may be used in defense of human life (Officer or another) or to protect a person from immediate danger of serious physical injury. The protection of life is paramount. Peace Officers are not to use deadly force to prevent an arrest from defeat by resistance or escape merely because the offense committed or attempted is categorized as a Forcible Felony, but is permissible if the threat to life is imminent.

C.    Peace Officers must identify themselves and give verbal warnings to any suspect prior to using any force, except under exigent circumstances.

D.    While the use of non-deadly force may be necessary to attain control in certain situations, Peace Officers should not resort to such force unless other reasonable alternatives have been unsuccessfully attempted or would be ineffective under the circumstances involved.

E.    Peace Officers, whenever possible, will exercise advice, persuasion, verbal commands and warnings prior to the consideration of non-deadly physical

3

        (a)     Exposure to fresh air.
        (b)     Flushing exposed areas with cool water.
        (c)     Washing with soap and water.
        (d)     Medical treatment when necessary.
        (e)     Universal precautions will apply when rendering decontamination and personal protection equipment will be utilized when appropriate.

    b.    CCSO Members will only be allowed to carry Department approved Oleoresin Capsicum Spray after satisfactory completion of formal training by a certified instructor.

3.    Baton/Expandable Baton

    A Peace Officer may use their Department authorized impact weapon, baton/expandable baton, only when a lesser degree of force would be insufficient in overcoming resistance by an arrestee.

4.    Defensive Tactics

    It shall be the responsibility of the Sheriff's Training Institute to instruct all recruits and officers in the defensive tactics approved by the Department for use in addressing subjects exhibiting aggressive or combative behavior.

I.    Peace Officer's Use of Deadly Force Guidelines

1.    An Officer is justified in using force likely to cause death or great bodily harm only when the officer reasonably believes that such force is necessary for the protection of life:

    a.    To prevent death or great bodily harm to the Officer or another person; or

    b.    To prevent the defeat of the arrest by resistance or escape and the person to be arrested is using a firearm and indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

    The use of a firearm in any case is a last resort measure. Peace Officers may resort to the lawful use of firearms only after all other reasonable means at their disposal to effect apprehension and control of an individual have been attempted without success.

2.    The following acts are prohibited:

    a.    Firing into crowds.

    b.    Firing warning shots.

341
CCSAO

c.   Firing at an individual against whom the use of deadly force is authorized by law when there is a likelihood of serious injury to persons other than the person to be apprehended.

d.   Firing into buildings, through doors, windows or other openings when the person lawfully fired at is not clearly visible.

e.   Firing at or in the direction of a vehicle or person against whom he/she may legally use such force if there is a likelihood of serious injury to innocent persons or if the use of such force would likely outweigh the law enforcement purpose served.

f.   Firing solely to protect property interests or to stop an individual on mere suspicion of a crime simply because the individual runs away.

## VII.   NOTIFICATION AND REPORTING PROCEDURE

1.   Every use of force by a CCSO member will be reported immediately in compliance with departmental procedures.

2.   Any member using physical force will immediately submit a Use of Force Report, via the chain of command. A Use of Force Report not made within one (1) hour will be considered in breach of the notification procedure and is to be explained in an additional report.

3.   Any member with knowledge of any unreported use of force or allegation thereof will immediately report this information to his/her watch commander.

4.   Any member discharging a weapon while off-duty will immediately notify the Sheriff's Communications Center by telephone at (847) 294-4733 and the local jurisdiction. The Communications Center dispatcher will notify the appropriate Command Duty Officer.

5.   The responding supervisor shall respond to the scene of the incident and conduct a competent inquiry into the circumstance surrounding the use of force and the justification for its use. Responding Supervisors shall make appropriate notifications in compliance with Department procedure.

6.   The responding supervisor will submit a report of his findings before completing his tour of duty in compliance with Departmental procedures.

7.   The responding supervisor will ensure that an Offense/Incident report is completed in compliance with Departmental procedures.

8.   A copy of all reports and attachments prepared and/or collected in conjunction with the investigation be forwarded to the Office of the Inspector General, (I.G.) in addition to any copies forwarded to its Department of Internal Affairs or through the chain of command. This copy should be maintained by the I.G. as the CCSO's permanent record.

9.  The Inspector General shall review all reports forwarded to the Inspector General's Office and will assign any follow-up investigation deemed appropriate to the respective department.

## VIII. MEDICAL AID AFTER USE OF FORCE

If after application of force, personnel observe injury, or the suspect complains of an injury, immediate medical attention must be obtained.

Decontamination of individuals who have been sprayed with Oleoresin Capsicum Spray is explained in H. Section 2 (a.)(1).

## IX. ADMINISTRATIVE RESPONSIBILITY

A.  Unit heads and supervisory members will assure that all sworn members under their command are in possession of this order. This order will be read at roll call and reviewed twice annually during the months of June and December.

B.  The Director of the Training Division will be responsible for:

1.  Issuing this General Order to all recruits prior to graduation from the Academy.

2.  Training all CCSO members in the Use of Force Model.

3.  Insuring that the recruits fully understand the Department's policy regarding their conduct and responsibilities in the performance of their duties.

C.  In the event a civil complaint comes to the attention of the Sheriff's Office, alleging excessive or unwarranted physical force, that has not been the subject of internal investigation, an internal investigation will be initiated immediately.

## X. APPLICABILITY

This order is applicable to all sworn CCSO members and is for strict compliance. Any conflicts with previous Orders, Policies or Procedures will be resolved in favor or this Order.

BY THE ORDER OF THE COOK COUNTY SHERIFF:

_MICHAEL F. SHEAHAN_

MICHAEL F. SHEAHAN

343
CCSAO

7



# Cook County Sheriff's Office
## USE OF FORCE REPORT

DATE_____

TIME_____

REPORTING OFFICER'S NAME_____ STAR #_____

TYPE OF FORCE USED (CHECK)

PHYSICAL FORCE____BATON_____OC SPRAY____OTHER (EXPLAIN)_____

TYPE OF INCIDENT_____

LOCATION OF INCIDENT_____

OFFICER/WITNESS PRESENT_____

PERSON(S) FORCE WAS USED AGAINST

NAME_____CHARGE(S)_____

NAME_____CHARGE(S)_____

DESCRIBE WHY THE USE OF FORCE WAS NECESSARY_____

_____

_____

_____

_____

_____

IF OC SPRAY WAS USED, LIST ACTION TAKEN BY OFFICER TO MITIGATE THE EFFECTS OF THE SPRAY

WHEN_____WHERE_____

WAS FIRST AID REQUIRED? NO_____ YES_____ BY WHOM_____

WAS MEDICAL ATTENTION REQUIRED? NO_____ YES_____ BY WHOM_____

REPORTING OFFICER'S SIGNATURE_____DATE_____

WATCH COMMANDER/SUPERVISOR'S SIGNATURE_____

# Use of Force Model
### The Use of Force Paradigm for Enforcement and Corrections



Copyright 1982, 1986, 1990, 1995 John C. Desmedt, All rights reserved

345
CCSAO

# Exhibit 3 – DVD

# Attached to transcript of Willie Lewis

**Date**: November 14, 2011
**Volume**: I

**Case**: Hill v. Cook County